```
                    UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF NEVADA (RENO)

                                         .
IN RE:                                   .  Case No. 20-50660-gs
                                         .  Chapter 7
METAL RECOVERY SOLUTIONS,                .
INC.,                                    .
                                         .
            Debtor.                      .
. . . . . . . . . . . . . . . .          .
CHRISTOPHER P. BURKE, in his             .  Adv. No. 21-05066-gs
Capacity as Chapter 7 Trustee            .
of METAL RECOVERY SOLUTIONS,             .
INC.,                                    .
                                         .
            Plaintiff,                   .
                                         .
v.                                       .  300 Booth Street
                                         .  Reno, NV 89509
METAL RECOVERY SOLUTIONS,                .
INC., et al.,                            .  Wednesday, April 5, 2023
            Defendants.                  .  9:41 a.m.
. . . . . . . . . . . . . . . .          .
```

        TRANSCRIPT OF MOTION TO SELL CLAIMS AND OTHER
     BANKRUPTCY ESTATE ASSETS FILED BY MICHAEL LEHNERS ON
            BEHALF OF CHRISTOPHER P. BURKE [68];
STATUS HEARING RE: ADVERSARY CASE 21-05066, COMPLAINT FILED BY
 CHRISTOPHER P. BURKE, IN HIS CAPACITY AS CHAPTER 7 TRUSTEE OF
 METAL RECOVERY SOLUTIONS, INC. VS. METAL RECOVERY SOLUTIONS,
INC., THOMAS SEAL, JETTE SEAL, DIFFERENTIAL ENGINEERING, INC.,
            MARK SHONNARD, FEE AMOUNT 350 [1]
              BEFORE THE HONORABLE GARY SPRAKER
              UNITED STATES BANKRUPTCY COURT JUDGE


Audio Operator:          David Lindersmith, ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES:

For Christopher P.        MICHAEL LEHNERS, ESQ.
Burke:                    429 Marsh Avenue
                          Reno, NV 89509
                          (775) 786-1695


For Element Global,       Law Offices of Amy N. Tirre, P.C.
Inc.:                     By:  AMY N. TIRRE, ESQ.
                          3715 Lakeside Drive
                          Reno, NV 89509
                          (775) 828-0909


For Thomas Seal and       Fletcher & Lee
Jette Seal:               By:  ELIZABETH A. FLETCHER, ESQ.
                          448 Ridge Street
                          Reno, NV 89501
                          (775) 324-1011


For Geo-Logic             Kaempfer Crowell
Associates, Inc.:         By:  LOUIS M. BUBALA, III, ESQ.
                          50 West Liberty Street, Suite 700
                          Reno, NV 89501
                          (775) 852-3900


                          Rutan & Tucker LLP
                          By:  RONALD P. OINES, ESQ.
                          18575 Jamboree Road, 9th Floor
                          Irvine, California 92612
                          (714) 641-5100

For Jex Technologies       Foley & Lardner LLP
Corp.:                     By:  ELLEN E. OSTROW, ESQ.
                           95 South State Street, Suite 2500
                           Salt Lake City, UT 84111
                           (801) 401-8952


For Differential           Woodburn and Wedge
Engineering, Inc.:         By:  SETH J. ADAMS, ESQ.
                           6100 Neil Road, Suite 500
                           P.O. Box 2311
                           Reno, NV 89505
                           (775) 688-3000


Also Present:              CHRISTOPHER P. BURKE, ESQ.

                           GEORGE YOUNG, ESQ.
```

1          (Proceedings commence at 9:41 a.m.)

2               THE COURT:  All right.  Good morning.  This is Judge

3     Spraker.  We are on record in person for three related matters,

4     both in the Metal Recovery Solutions main case on a motion to

5     settle claims and compromise, as well as the adversary --

6     related adversary Burke v. Metal Recovery Solutions, et al,

7     also on a motion to settle claims and other relief, and the

8     status hearing in the adversary.  And with that, good morning.

9     It's a pleasure to see everybody in person.  It's been a while.

10    As you saw another person coming in with me is extern.  Glad

11    that things are somewhat getting back to normal.  So with that,

12    welcome, and we'll take appearances.

13               And Mr. Lehners, would you please lead us off.

14               MR. LEHNERS:  Good morning, Your Honor.  Mike Lehners

15    appearing on behalf of Chapter 7 Trustee Christopher Burke, who

16    is seated to my right.

17               THE COURT:  Thank you.  Good morning.

18               MR. OINES:  Good morning, Your Honor.  Ron Oines for

19    Creditor Geo-Logic Associates, Inc., and Mr. Bubala is here

20    with me, and also Gary Lass of GLA.

21               THE COURT:  Thank you.  Good morning.

22               MS. FLETCHER:  Good morning, Your Honor.  Elizabeth

23    Fletcher on behalf of the Seals.

24               THE COURT:  Thank you.

25               MS. OSTROW:  Good morning, Your Honor.  Ellen Ostrow

1  on behalf of Jex Technologies.  Also present in the courtroom

2  is Dave McMullin, CEO and chairman of Jex Technologies; and

3  also George Young, general counsel for Jex Technologies.

4          THE COURT:  Thank you and good morning.

5          MR. ADAMS:  Good morning, Your Honor.  Seth Adams on

6  behalf of Differential Engineering.

7          THE COURT:  Thank you, Mr. Adams.

8          MS. TIRRE:  Good morning, Your Honor.  Amy Tirre on

9  behalf of Element Global Inc. through its agent, Empire Capital

10  Management, LLC.

11          THE COURT:  Thank you, good morning.

12          MS. TIRRE:  And it's a potential bidder.  Thank you.

13          THE COURT:  I understand, and welcome.

14          THE COURT:  All right.  First order of business, I

15  believe, Mr. Lehners, is to bring me up to speed.  I've read

16  what has been filed, but why don't you go ahead and let me

17  know, obviously with Ms. Tirre's participation, in the case

18  that some things are going on that I might not be aware of.

19          MR. LEHNERS:  Your Honor, I'm happy to.  Thank you,

20  and good morning.  Your Honor, this motion is -- was originally

21  to approve the sale of claims and assets to GLA for $1,150,000

22  in cash.  The motion was filed on February 23rd, Docket Number

23  255.

24          On March 17th, Jex submitted an over-bid by email for

25  $1.2 million cash on the same terms.  That's acknowledged in

1   Jex's opposition at Docket 294.  The assets which are being

2   purchased are attached or described in Exhibit 2 for my motion

3   for sale.  And largely they, the tangible assets are the

4   trailers, related equipment, and the intangible assets are the

5   property rights of the debtor, the appeal pending before the

6   Ninth Circuit Court of Appeals of the GLA judgment, as well as

7   the Trustee's adversaries claims, which are filed by me.

8          Depending on who purchases these assets, it will

9   involve a compromise of one or more claims, as well as a 363(b)

10  sale analysis.  My motion in reply set forth the applicable

11  standards regarding 363(b) and 9019, and I also refer to

12  evidence in the record to support the relevant standards.  And

13  again, depending upon who the highest bidder is, that's going

14  to be a function of what, if any, claims are compromised.  So,

15  while I would like to suggest to you that maybe it would be

16  better to allow the bidding to go forward first, since the

17  highest bidder may eliminate several or all of the objections

18  before you since it involves 9019, but I defer to you, Your

19  Honor, on that.

20         THE COURT:  I -- and I defer to you.  I'm fine with

21  that, I think that makes a lot of sense.  The problem is going

22  to make -- is going to be making sure that we understand the

23  apples and the oranges.

24         MR. LEHNERS:  Of course.

25         THE COURT:  Obviously between the bidders that have

```
1   kind of circled who gets what.  You know, if it is a sale to
2   GLA, there really is no compromise, right, because it is a
3   purchase of the causes of action.  It is not settling those
4   causes of action, as I understand it.
5             MR. LEHNERS:  It's settling one.  And that would be
6   the appeal of --
7             THE COURT:  And that's part of the problem, right?
8             MR. LEHNERS:  Exactly.
9             THE COURT:  Yes, keeping the grid --
10            MR. LEHNERS:  Yes.
11            THE COURT:  -- so that we know how to do that.
12  There's been instances where, you know, it's very easy in the
13  auction process to lose that grid, and that can complicate
14  things if there's further review required.  So I am trying to
15  make sure that we keep that clear so that, you know, I can
16  understand what is the best --
17            MR. LEHNERS:  Of course.
18            THE COURT:  -- and most appropriate offer.  And if
19  there is any further review, then that will be clear as well,
20  on a cold record.
21            MR. LEHNERS:  All right.  Your Honor, may I proceed
22  then with a brief analysis?
23            THE COURT:  Sure.
24            MR. LEHNERS:  Okay.
25            THE COURT:  I would appreciate it.
```

1          MR. LEHNERS:  I'd like to turn to 363(b) first.  The

2     analysis is well set forth in the Alaska Fishing Adventure,

3     LLC, and the Court there recognized the ultimate objective of

4     liquidating the estate in a manner that is most advantageous to

5     creditors.  Thus, the matter will ultimately rest in the

6     judgment and discretion of the Trustee.  And a bankruptcy

7     court, according to that opinion, should determine only whether

8     the Trustee's judgment was reasonable, and whether a sound

9     business justification exists supporting the sale and its

10    terms.  We have set forth the reasons why Mr. Burke's trustee

11    judgment was reasonable.  Mr. Burke has spent hours and hours,

12    as have I, negotiating sales with Jex, the Seals, and GLA.

13    While these negotiations were kept confidential under Federal

14    Rule of Evidence 408, it did promote three offers.  Each one

15    was better than the last, and that leaves us here today with a

16    $1.2 million cash offer.  This came about because of

17    Mr. Burke's hard work.

18          Now, one of the things that I felt was important in

19    this analysis is called constrained competition.  This is

20    explained in the Lahijani case.  A sale to competitor is

21    permitted, which is constrained competition, but it warrants

22    more scrutiny.  And in Lahijani, the only bidders were one

23    defendant acting on behalf of fellow defendants and plaintiffs

24    who held about 70 percent of the claims.

25          In reversing, the Bankruptcy Appellate Panel noticed

1    that the trustee had rejected additional percentage revenues.

2    In other words, if it sells for this, there is a certain

3    percentage added on to the estate.  That had a value greater

4    than zero, and it was error for the trustee to reject that

5    because the trustee wanted certainty.  In other words, the

6    guiding principle is that the Court's obligation in a Section

7    363 sale is to assure that optimal value is realized by the

8    estate under the circumstances.

9           And here, we're dealing with patented technology that

10   is subject to a protective order, and Mr. Burke has done the

11   best that he can to negotiate and get the bidding up.  He has

12   maximized the value.

13          That takes us to the compromise of claims.  I'm going

14   to go through briefly all of them, because I think they're

15   relevant depending upon who the bidder is going to be.  The

16   first one I'd like to talk about is the appeal pending before

17   the Ninth Circuit, which is the appeal of GLA's $2.3 million

18   arbitration award given by Judge Pro.  When I went over the ANC

19   Properties factors, I looked to the probability of success of

20   that litigation.  Mr. Burke and I, and Mr. Burke is also a

21   licensed attorney who has done a lot of appeals, I've done a

22   lot of appeals, and we concurred that the probability of

23   success for Dr. Seals is low, unfortunately.  Judge Pro made

24   express findings that the handwritten notes support an

25   agreement for a 70/30 split.

1    I did the research for the standard of review on

2 findings of fact in an arbitration award.  The standard is

3 clearly erroneous.  A finding is clearly erroneous where

4 although there is evidence to support it, a reviewing court, on

5 the entire evidence, is left with a definite and firm

6 conviction that a mistake has been committed.  Judge Pro made

7 an express finding that there was, or were handwritten notes

8 evidencing a contract for a 70/30 split.  I believe that

9 finding alone precludes a clearly erroneous finding.

10    I also read Mr. Oines's brief, and I also believe

11 that a judgment had been entered, or could have been entered

12 for quantum meruit, meaning that if there were not a contract,

13 GLA would still be entitled to recoup the fair value conferred

14 upon the Seals and the debtor.

15    The difficulties in collection is the next prong.  If

16 this appeal were successful by the Seals, or MRS rather, it

17 would probably only prolong litigation if the Ninth Circuit

18 were to order the District Court to make additional findings.

19 That would most likely be appealed by the non-prevailing party,

20 so delay becomes the difficulty in collection.

21    The third is the complexity of litigation.  The

22 complexion -- the litigation is complex.  This involves a

23 complaint filed by GLA in September of 2017.  There's a very

24 large record regarding this appeal, it is complex, and it would

25 take time.

1      Last, and perhaps most important of the ANC Properties

2   factors is the interest of the creditors, and proper deference

3   to their reasonable views in the premises.  That is considered

4   paramount.  The appeal adds no money to the estate.  It would

5   only cost more time.  For that reason, it is the trustee's

6   business judgment, and mine, that a sale of the appeal and

7   related assets for what we have now, and may have more, 1.2

8   million, it pays creditors now, and that is the paramount thing

9   that we look at, it's bringing in --

10          THE COURT:  But let me interrupt on that, because

11   this is raising a point that another recent case of mine has

12   also raised.  I think you've laid it out wonderfully and

13   correctly, and primary, you know, factor is the best interest

14   of the creditors.  But the creditors here are limited

15   non-insider to Brownstein Hyatt for 61,000, Gill Gallagher

16   (phonetic) for 1,500.  Differential has been the subject of the

17   claim objections.

18          MR. LEHNERS:  Yes.

19          THE COURT:  We know what's happened so they are out,

20   leaving Geo-Logic.

21          MR. LEHNERS:  Yes, Your Honor.

22          THE COURT:  And it's the only other creditor.  Does

23   that calculus get factored into the primary interest of the

24   creditors?  Because, you know it's an odd mix.

25          MR. LEHNERS:  It does, Your Honor.  Lahijani tells us

1    it does.  In Lahijani, we had a plaintiff that had 70 percent

2    of the claims.  Here, GLA has a greater percentage, but they

3    had the majority percentage.  And what the BAP told us is that

4    it warrants more strict scrutiny.  In other words, we're not

5    going to give it passing deference.  We're going to get under

6    the hood and see what's going on under this.  That's why I did

7    the detailed analysis that I did.  So with respect to GLA being

8    the biggest creditor on the block, that is true; however, the

9    size of the claim doesn't necessarily defeat the analysis.  It

10   means we go deeper into it, and that's what I've tried to do.

11   Does that answer your question?

12            THE COURT:  It does.  It may spur some additional

13   questions as we go along that line, but it does.  Thank you.

14            MR. LEHNERS:  Thank you, Your Honor.  Next is the

15   adversary complaint that I filed on behalf of Chapter 7

16   Trustee.  There are 11 claims in that.  Two of them are moot

17   because it had to do with the perfection of Differential

18   Engineering's proofs of claim, and that's now been rendered

19   moot.  But all boiled down, it comes down to really three.  The

20   claim for alter ego, which would be Dr. Seal and Differential

21   Engineering and the debtor, claims for fraudulent transfers,

22   and Dr. Seal's and his wife's breach of fiduciary duty as

23   officers of the debtor.

24            So when I go again through the ANC factors, the

25   probability of success, Your Honor, I have extensively cited

1  the record in two respects.  The first are your March 31st,

2  2022 findings of fact.  That's Docket Number 202.  And I've

3  also read carefully the opinion, which is unpublished, from the

4  Bankruptcy Appellate Panel that affirmed your decision.  And

5  that is what I have in the record, and this is what these facts

6  are referenced from.  You will find most of that analysis in

7  the reply that I filed with the relevant citations.

8        But what was found is that the Seals are the

9  directors and the shareholders of the debtor, Metal Recovery

10  Solutions.  The Seals own 100 percent of the debtor's stock.

11  Dr. Seal is also the sole owner and president of Differential

12  Engineering, making it an affiliate.  It is undisputed that

13  there were transfers and distributions from the debtor to the

14  Seals totaling $1.2 million in 2019.  This was in two

15  transfers, one on May 24th of 2019; the second on June 3rd,

16  2019.  This was while the GLA suit was pending, and was also

17  prior to Judge Pro's September 21st, 2019 award.

18        Also in 2019, in particular January and July, the

19  debtor executed separate secured promissory notes in favor of

20  differential engineering.  Together, they total $1,735,565.

21  Most notably, this was for antecedent debt.  Also most notably

22  is that the notes were collateralized by significantly all of

23  the debtor's assets:  the trailers, the equipment, the bank

24  accounts.  Most interesting, the debtor's statement of

25  financial affairs when the debtor filed showed gross revenue

1  for the 2019 year of only $110,000.  The $60,000 bonuses called

2  for under the note to Differential Engineering were

3  inconsistent with the contract.  Why?  Because the bonuses were

4  to be paid a percentage.

5       What I recall from our evidentiary hearing is that

6  the percentage was to be one half of the pre-tax profits.  And

7  we had two years where the pre-tax profits were close to 4

8  million, and another one I think it was near 1 million, yet

9  that was not split.  But we did have several years where there

10 were no pre-tax profits, yet $60,000 in bonuses were paid.

11      At the evidentiary hearing, Dr. Seal was unable to

12 answer the question of how and on what basis it was to be

13 decided when Metal Recovery Solutions had enough money in

14 operating capital to warrant making payments to Differential

15 with respect to the notes.  And in 2016 and 2017, Metal

16 Recovery Solutions did have sufficient cash reserves, but it

17 did not pay Differential Engineering on the notes, only the

18 monthly fee.

19      In Nevada, our legislature has codified the alter ego

20 doctrine.  It basically says that no person other than a

21 corporation is individually liable for a debt of that

22 corporation, with one exception, unless that person acts as

23 alter ego of the corporation.  The legislature then codified

24 the three elements of alter ego as recognized by Nevada Supreme

25 Court precedent.  The corporation is influenced and governed by

1  the person.  There is such an unity of interest and ownership

2  that the corporation and the person are inseparable from each

3  other, and adherents to the notion of the corporation being an

4  entity separate from that person would sanction fraud or

5  promote manifest injustice.

6          The evidence that I have set forth in the record

7  meets those, or at least I think there's a substantial

8  likelihood that the trustee could prevail.  And if the Seals

9  and Differential Engineering are the alter egos of the debtor,

10  then each is liable for the debtor's claims.  If each is liable

11  for the debtor's claims, that means the assets of those two

12  entities become estate property.  That would include both the

13  patent, and the rights to license it.  The following are set

14  forth --

15          THE COURT:  Is there a Nevada state decision that

16  applies that result as alter ego?

17          MR. LEHNERS:  Your Honor, there's LFC goes back and

18  talks about -- oh, I think it's McCleary Land and Cattle [sic],

19  which may have been overruled on other grounds.  But LFC

20  recognized not only piercing, but reverse piercing.  It applies

21  both.  Another --

22          THE COURT:  But did they do that?

23          MR. LEHNERS:  I'm sorry?

24          THE COURT:  Did they do that as a matter of

25  transferring title versus imposing liability.  Or if you wanted

1   to consider it a different way, alter ego as extension of

2   liability versus substantive consolidation in bankruptcy to

3   fuse the two entities, thereby transferring title of one into

4   the dominant?

5           MR. LEHNERS:  I would agree that that's the result.

6   But the way LFC explained is it, is that in a standard

7   piercing, you are basically taking an individual who owes a

8   debt and attacking the corporation seeking to pierce the

9   corporate veil to get the corporation's assets to satisfy the

10  individual's debt.

11          THE COURT:  To -- or alternatively, to make that --

12  or to recognize that alter ego's liability for the other's

13  debts.

14          MR. LEHNERS:  I agree.

15          THE COURT:  But there is a difference between

16  extension of liability and the ownership of assets.

17          MR. LEHNERS:  Well, Your Honor, it is a distinction.

18  But in the event that it doesn't become owned by the debtor,

19  the debtor has a right to take it.  And it would become

20  property of the estate.  For example, in the classic alter ego

21  doctrine, I control a corporation as if it were my own, but it

22  has a rental property.  I am liable for a $100,000 judgment.

23  My creditor would be able to make an alter ego claim against my

24  corporation, and if successful, my corporation is liable with

25  me on that claim.  And since corporations can't claim

1  exemptions, that creditor could take the rental house in that

2  corporation.  That is classic veil piercing.

3          THE COURT:  How do they take it though?

4          MR. LEHNERS:  Writ of execution.

5          THE COURT:  Writ of execution leading to foreclosure.

6  They do not own it.  Whereas, again, overlaying the state law

7  versus subsequent consolidation.  Upon consolidation, that

8  debtor owns that condominium.

9          MR. LEHNERS:  The in this case the Supreme Court has

10  held you cannot add somebody by motion to a judgment.  You have

11  to bring an independent action for alter ego.  If you are

12  successful under our statute, that entity is liable for the

13  debt.  And what that means is that that entity can collect as

14  if it were jointly liable with the debtor, and be able to claim

15  whatever exemptions are applicable.  Your Honor, it's much akin

16  to a 542 turnover action.  Somebody owes the estate money.  I

17  have a right to collect it, but in order to do so, I have to

18  file a lawsuit.  If successful, I get the money.  It's the same

19  principle here.

20          So is it property of the estate?  To be honest with

21  you, it's a right to get property into the estate.  Does the

22  estate own it at that time?  No.  Alter ego has to be

23  established, and then once established, the asset has to be

24  attached.  Once attached, then it becomes property of the

25  estate, just like a turnover action.  At least, that's my best

1    guess, sir.

2            THE COURT:  All right.

3            MR. LEHNERS:  Reverse piercing is the opposite.

4    Reverse piercing takes place where the corporation is found to

5    be the alter ego of a director or some other entity.  And

6    instead of piercing a human's corporate interest to attach the

7    corporate assets, the corporation is now -- the creditors of

8    the corporation are now going after the individual that caused

9    that.  That's what reverse piercing is.  And the important

10   cases on that are McCleary Cattle, LFC, and Judge Markell's

11   comments in In re Giampietro, which involved is an LLC subject

12   to alter ego like a corporation.  He concluded that it was.

13   But I enjoyed the decision.  I thought it did a good job of

14   setting it out.

15           The  LFC case does talk about five factors that

16   should be examined for a finding of alter ego.  Those are

17   comingling of funds, undercapitalization, unauthorized

18   diversion of funds, treatment of corporate assets as the

19   individual's own, the failure to observe corporate formalities.

20   Without repeating myself, I believe I set forth this Court's

21   findings as well as the BAP, and I believe that they hold sway

22   on these five factors.

23           THE COURT:  You know, I appreciate the detail that

24   you're giving us, but I also think that your initial point as

25   to who gets -- who may prevail will greatly affect whether we

1   go down this in further detail versus if it is a sale, then it

2   is just a sale of that asset and that cause of action.

3          MR. LEHNERS:  Right.

4          THE COURT:  And I appreciate the level of detail.  I

5   don't mean to cut you off, but I think depending on the

6   outcome, we may need to continue this depending on the status

7   of any objections afterwards.  But I don't know if we need to

8   go completely through this at this time, if that makes sense.

9          MR. LEHNERS:  Sure.  Your Honor, if I could offer an

10  observation?  We're selling a bundle of rights, a pocket full

11  of lottery tickets, but the rights haven't been quantified yet.

12  What we are required to do, we can't just say we've got a claim

13  for alter ego and leave it at that.  We have to handicap it.

14  Now, we can't predict what the outcome is going to be, and I

15  did not mean for my in-depth analysis to try to do so.  I was

16  only trying to handicap it and predict what is likely to

17  happen.  Even in ANC, they say we don't need a mini trial of

18  this.

19          THE COURT:  Sure.

20          MR. LEHNERS:  We need to predict the probability, and

21  that's all I'm doing.

22          THE COURT:  Let me ask -- zoom out just a little bit.

23          MR. LEHNERS:  Please.

24          THE COURT:  Because as you indicated and mentioned at

25  the beginning, the sticks that are both tangible and

```
 1  intangible.

 2              MR. LEHNERS:  Yes.

 3              THE COURT:  And depending upon who the buyer may be,

 4  that calculus kind of shifts.  But has there been any, I don't

 5  want to say allocation, but in coming up with the purchase

 6  price, and now trying to measure competing bids, how does the

 7  trustee look a purchase now at the 1.2, as between the

 8  tangible, the trailers and the associated, and the intangible,

 9  the causes of action and the different lawsuits that we are now

10  going through?  Is there anything that you can give me as to

11  the weight, the valuation now as to Jex?  Because when Jex --

12              MR. LEHNERS:  Sure.

13              THE COURT:  -- is the bidder, it moves the pieces.

14  It helps on certain things, and maybe not so much on others.

15  So when we get to any competing bids --

16              MR. LEHNERS:  Yes.

17              THE COURT:  -- from Differential or Ms. Tirre's

18  client, how do I mark that as a valuation of the whole?

19              MR. LEHNERS:  Well, Your Honor, a bundle of rights

20  means that bought a dispute, and we have not won judgment yet.

21  There are going to be defenses to it.  I've tried to outline

22  what those are, and clearly the trailers are linked to license,

23  and they're linked to the technology.

24              THE COURT:  To be clear, and you know, I apologize

25  for interrupting --
```

1          MR. LEHNERS:  No.

2          THE COURT:  -- but this sale is as is, where is --

3          MR. LEHNERS:  Yes.

4          THE COURT:  -- as to the trailer.  You are simply, I

5  want to put this on the record, just so my understanding is

6  clear, is you are selling the physical trailers, and then

7  whatever may come as of it?

8          MR. LEHNERS:  We are selling the existing trailers,

9  subject to the rights that the lessee would have under state

10  law.  In other words, I cannot stand here, nor will I stand

11  here today and say that the purchaser of those trailers, if not

12  Jex, gets the trailers free and clear of the lease.  I cannot

13  say that because that has not been found.  That claim has not

14  been made.  The only thing that I brought up was the

15  exclusivity of the license.  And I referred to the minutes on

16  that, and the minutes show that the debtor also had the right

17  to use the license as well as Jex, and the only other way that

18  the license could be deemed non-exclusive is if somebody were

19  to prevail on the alter ego theory against Differential and

20  Dr. Seal.  Then that person would have the right to attach the

21  patent from Dr. Seal, it's not exempt, and the lessor rights of

22  Differential Engineering, if it is the --

23          THE COURT:  And that is the Trustee's view.

24  Obviously, we haven't heard from anybody else, there may be

25  differences as to that.

1          MR. LEHNERS:  Your Honor, I don't want to presume and

2   speak for Mr. Burke.  I'd like him to give his opinion on that.

3          THE COURT:  You can stay seated, Mr. Burke.  That's

4   fine.

5          MR. BURKE:  Thank you, Your Honor.  Christopher

6   Burke, Chapter 7 Trustee.  I'm not sure exactly the question

7   that was being posed, except in terms of the trailers, there's

8   money owed on the trailers.  There's about 750,000 still owed.

9   And in the normal course, if that was paid, that's it, the

10  trustee is out, and the trailers become Jex.  So at this point,

11  we're selling the right to receive that money.

12         MR. LEHNERS:  Thank you, Mr. --

13         THE COURT:  And that is without assumption of the

14  lease?

15         MR. LEHNERS:  Well --

16         THE COURT:  Right?

17         MR. LEHNERS:  -- Your Honor, we are selling -- as Jex

18  pointed out, the lease basically says pay us this, and they're

19  yours.  I think it qualifies -- I think it -- each side has the

20  right to cancel the lease, but most leases have a residual at

21  the end, this does not.  Once you've made all the payments,

22  they're yours.  So if Jex continues to make the payments on

23  that, it's theirs.  I don't know what performance is remaining

24  on the estate side --

25         THE COURT:  Well --

1          MR. LEHNERS:  -- so I don't even know if it is an

2    executory contract.

3          THE COURT:  That's what I -- that's kind -- part of

4    what I'm saying.  There are arguments here, and they intersect

5    and crisscross.  So until we figure out who the actual buyer

6    is, I don't know which arguments will be represented and what

7    format.  One of them is there's a stated lease.

8          MR. LEHNERS:  Right.

9          THE COURT:  The lease was not assumed.  We know what

10   happens to leases that are not assumed in Chapter 7.  They're

11   rejected.  This has indicia of -- it has a purchase option; 1

12   million total is paid.  It is owned by Jex.  We also know that

13   there are disguised leases that are truly sales.  That's a

14   different.

15         MR. LEHNERS:  Right.

16         THE COURT:  But all this kind of goes, I mean we're

17   now into the same unknow as to the tangible property, and

18   that's before we even get to the issues regarding the

19   technology itself --

20         MR. LEHNERS:  Right.

21         THE COURT:  -- which Differential says is tied to

22   those trailers --

23         MR. LEHNERS:  Right.

24         THE COURT:  -- and therefore raises issues.  Issues

25   can often mean disputes, which can often mean lawsuits.  The

1   point I'm trying to make is that all this is being sold as it.

2   Whatever the trustee has, without knowing exactly what it has

3   is up for auction and has drawn three bids so far.

4           MR. LEHNERS:  Yes.

5           THE COURT:  So if Differential is correct and they

6   somehow convince that those trailers are so tied to the

7   technology that nobody else can functionally use them, so be it

8   under state law or however you litigate it.  That is -- that's

9   the main point that I want to emphasize for this.  There is a

10  number of disputes, not only in the causes of action, but

11  actually with the physical property being sold out, too.

12          MR. LEHNERS:  Your Honor, that's absolutely correct.

13          THE COURT:  Okay.

14          MR. LEHNERS:  And I'm glad I asked Mr. Burke the

15  question, because taking the trailers with the lease is the

16  right to receive another $700,000.

17          THE COURT:  If it is a disguised sale.

18          MR. LEHNERS:  Well, again, is it in an executory

19  contract?  What's the performance remaining due on both sides?

20  You see, once Jex pays, or whoever pays on the lease, they make

21  that last payment, signing over the title is nothing.  In other

22  words, there's really nothing remaining performance-wise on the

23  estate except to cash the checks that Jex has been sending it.

24  And then when it sends the last check in, then the trailers

25  would be signed over.  But even if you were to find --

```
 1              THE COURT:  Is that how -- well, I mean, if Jex is
 2   currently the bid on the board?
 3              MR. LEHNERS:  Yes.
 4              THE COURT:  So classic example, if Jex prevails, this
 5   is not an issue, right?
 6              MR. LEHNERS:  Agreed.
 7              THE COURT:  They buy it; there's no more payments; it
 8   is owned free and clear --
 9              MR. LEHNERS:  Right.
10              THE COURT:  -- and nobody else is going to dispute
11   that.  If GLA were to purchase it, then they can --
12   oversimplifying this in my mind, there's two options.  They can
13   either assert ownership of the trailer, or they can assert the
14   validity of the lease, maybe, and the income stream.  But those
15   are two different possibilities that are not being resolved
16   today.
17              MR. LEHNERS:  They can't be resolved today --
18              THE COURT:  Okay.
19              MR. LEHNERS:  -- Your Honor.  And I believe that's
20   even clarified in the terms sheet, that these are claims
21   subject to defenses, and we make no guarantee as to the
22   outcome.  And I will state for the record again, we are not
23   making any guarantee as to the outcome.  I'm only pointing out,
24   again, in an analysis to handicap it, that is it an executory
25   contract?  I think not, because of the performance, but maybe
```

1    it is.

2            THE COURT:  Well, let's be clear, too, because some

3    of the original motion indicated this was sale free and clear

4    of liens.

5            MR. LEHNERS:  Yes.

6            THE COURT:  And, you know, the 363(m) suggests that

7    is.  Usually when you sell a physical piece of property, you

8    get it, and the free and clear of liens generally means no

9    debt, secured debt against it.  That isn't necessarily the

10   issue here --

11           MR. LEHNERS:  No.

12           THE COURT:  -- but free and clear of interest may

13   come into play if, say, GLA were to purchase it, and Jex

14   continues to have a right to purchase that under the lease,

15   which may or not be -- may or may not be a lease, right?

16           MR. LEHNERS:  Right.

17           THE COURT:  So --

18           MR. LEHNERS:  And --

19           THE COURT:  Is it -- but what is the free and clear

20   aspect of that as to the trailer?  Or again, we're now down

21   another rabbit hole I've taken you on, which may be we need to

22   have the auction and see what that means.

23           MR. LEHNERS:  Your Honor, that's a very good point.

24   But when I say free and clear of claims, it means I'm not

25   altering claims under state law.  That usually means that if

1  there's a security interest, we have to satisfy the provisions

2  of 363(f).  We don't have a secured claim here.  The estate is

3  not a secured creditor.  It has leased the trailers to Jex.

4  The lease was not assumed.  That constitutes technically a

5  breach, but breaches can be waived by subsequent performance

6  and ratification, as has happened here.  These are defenses

7  that may come up with respect to the nature and quality of the

8  asset being purchased, as opposed to an absolute claim, say for

9  a lien for an amount specific that is being sold free and

10  clear.  You see, Your Honor, it has more to do with describing

11  the nature of the asset being sold, which in turn is a function

12  of state law regarding the property rights of these assets

13  instead of a third-party creditor saying I have a claim to that

14  asset because I have a perfected Article 9 security interest.

15          It's a very, very close distinction on this.  It's

16  very hard to parse.  And maybe I did go too deep into the

17  rabbit hole with this analysis, but this is what we get when we

18  look at trees instead of forests, or so I've been told.

19          But, Your Honor, again, you are correct, and I can

20  see that it is important to make for the record.  What the

21  trustee has is what the trustee is selling.  He is a neutral

22  party.  He is a fiduciary to all of the creditors.  He has

23  something that is worth money.  If all these questions that

24  you've raised regarding the lease rights, the technology

25  rights, the patent technology rights, if all of those had been

1    firmly and hardly resolved, we'd probably be getting a lot more

2    money right now.  But because --

3              THE COURT:  Or not.

4              MR. LEHNERS:  Or not.  Depending upon how it's

5    resolved.  But again, we are selling them subject to state law

6    claims.  All right.

7              Your Honor, with respect to walking away, because

8    what I think we're really getting into, what's the function of

9    the trailers, what's the function of the technology.  That's

10   the lion's share.  But now I'd like to shift if I could, and

11   talk about the 1.2 million.  How do we get that?  Well, Nevada

12   has also codified breach of fiduciary duty.

13             I've cited the statute, NRS 78.138, and it says the

14   fiduciary duties of directors and officers are to exercise

15   their powers in good faith and with a view towards the

16   interests of the corporation.  And there's a follow up statute

17   that Nevada has regarding shareholder distributions.  And that

18   is the basis of the breach of fiduciary claim.  It prohibits

19   the directors of a corporation from making a distribution to

20   its shareholders if the corporation would not be able to pay

21   its debts as they became due in the usual course of business.

22             This case was filed, I believe in July of 2020.  In

23   the statement of financial affairs, the income, the gross

24   income of the debtor in 2019 was $110,000.  Yet in 2019, $1.7

25   million of antecedent debt was collateralized and 1.2 million

1   in shareholder distributions was taken.  That is the factual

2   basis for the breach of fiduciary duty and the recovery of the

3   1.2 million. Thank goodness it's a lot less complex than the

4   technology and the license.

5           As far as the difficulties to be encountered in

6   collection of this, we do not have enough information, although

7   I will concede Ms. Fletcher has provided some, but we don't

8   have enough to make an informed decision about how much would

9   be recovered from Dr. Seal if the adversary were to proceed, or

10  how much he'd have when the adversary concluded.  So we don't

11  know.  We perceive these as significant difficulties in the

12  matter of collection.  The complexity of the litigation is

13  ultimately, Your Honor, an issue of fact.  But the trustee

14  believes that there would be expense and delay in determining

15  these facts.

16          While we have findings on the record, I don't know if

17  it's enough to support a summary judgment or not.  There may

18  have to be a trial, and this bankruptcy has been pending since

19  2020, and the adversary since 2021.  It's time to move it

20  along.  It's time to move it to a close, not to go ahead and

21  delay matters by trying a case where we do not what we would

22  recover if we prevail in the end.

23          And we want to talk about the last interest, Judge

24  which is the interest of the creditors.  Again, this case was

25  filed in July of 2020.  July of 2021 is when the adversary was

1   filed.  It's been a long and expensive process.  It is the

2   trustee's business judgment that the amounts bid today will

3   maximize the returns for the creditors when the cost of ongoing

4   litigation is weighed against an unknown recovery.

5          Your Honor, with respect to Jex, and the findings,

6   and the exclusivity of the technology licensing agreement, if

7   it's all the same to you, I do have it in my outline, but it's

8   exactly what I have in my reply brief.  May I just defer you to

9   that rather than taking any more of the parties' time?

10          THE COURT:  Certainly.  And that doesn't preclude us

11   from getting back into it if the need arises.

12          MR. LEHNERS:  Thank you, Your Honor.

13          THE COURT:  But --

14          MR. LEHNERS:  Again, in conclusion, the trustee is a

15   neutral fiduciary.  He and I have spent many, many hours

16   dealing with the differential claim litigation and designing

17   the basis for claims in the adversary as a result.  We were

18   guests in that claim litigation because trustees are required

19   under 704(a)(5) to examine claims and, if a purpose would be

20   served, to object to them.  We watched the depositions, we

21   watched the evidentiary hearing, and we made our decision, and

22   that is of record.  The trustee -- I know that this is somewhat

23   contentious litigation, but the trustee does not seek to favor

24   one side over another.  We are a neutral fiduciary duty -- we

25   are a neutral fiduciary.  Obtaining maximum value is the goal

1  before my trustee and myself.

2         What the highest bidder does with the assets that are

3  purchased, that's the business of the highest bidder.  If the

4  highest bidder wants to take certain positions with it or

5  litigate certain things, it is free to do so.  We lose control

6  over the asset once it's been sold.  And any harm that befalls

7  the Seals is rooted in the prepetition activities, which are

8  part of the record.  And the Seals have the right to avoid this

9  if they wish to submit an overbid.  Your Honor, I want to thank

10  you for listening to me, and can I answer any other questions

11  before I sit down?

12         THE COURT:  Not at this time, thank you.

13         MR. LEHNERS:  Thank you, Your Honor.

14         THE COURT:  I -- let me retract that.  How does the

15  trustee proceed -- propose to proceed now?

16         MR. LEHNERS:  Well, Your Honor, may I confer with

17  him?

18         THE COURT:  Sure.  Why -- I need to go off record for

19  just a moment.  My law clerk hasn't been able to join

20  telephonically, so I would like to get law clerk on the line.

21  So go ahead and confer while we do that.

22       (Recess taken at 10:24 a.m.)

23       (Proceedings resumed at 10:29 a.m.)

24         THE COURT:  All right.  Thank you.  We are back on

25  record in Metal Recovery.

1          Mr. Lehners?

2          MR. LEHNERS:  Yes.  Thank you.  Good morning, again,

3    Your Honor.  Mike Lehners, appearing on behalf of the Chapter 7

4    Trustee, who's also present.  I have discussed the trustee's

5    thoughts with him.  I hope I've done an adequate job of

6    explaining the apples and the oranges.  It is the trustee's

7    desire to proceed, if the Court is willing, with the auction

8    now, in $50,000 increments.  The terms of the sale would be

9    that defined in the asset term sheet.  Again, that is Exhibit 2

10   to 255.  And if anybody needs to confer with their clients or

11   counsel, we should take a five-minute break before the

12   beginning -- the bidding begins.  That is our wish.

13         THE COURT:  Thank you.  Let me survey the other

14   participants.  We've had, kind of, an opening statement as to

15   the trustee's desire to sell the assets and essentially cover

16   the compromise of the claims to the extent that various

17   interested parties may ultimately be the purchaser.  Who

18   purchases what may effectively compromise one or more claims in

19   one or more litigations.  So I appreciate that.

20         I have read the materials, as I indicated, and I

21   understand that much of this is discussed in the trustee's

22   reply, and I am relying upon that.  I need to open it up to the

23   other participants, including Differential, as the objecting

24   party, to see if there are objections to be raised or arguments

25   to moving forward with the auction at all versus approving the

1    ultimate winning bidder at the auction.

2         So any argument as to the trustee's ability to

3    conduct the impending auction I'm interested in hearing now,

4    please?  Mr. Adams?

5         MR. ADAMS:  Your Honor, Seth Adams, on behalf of

6    Differential Engineering.  Not to muck up the process,

7    especially given the amount of time that it has taken for all

8    of us to get here, but that having been said, I think as the

9    discussion regarding the trailers just evidenced, when we are

10   discussing the sale of assets, I think it's a fairly important

11   thing to identify what we're actually selling.

12        THE COURT:  It is, and it isn't.  I mean, this is a

13   Chapter 7.  And depending on your vantage, fortunately or

14   unfortunately, we don't have to be specific in the

15   determination of the existence of the asset.  Especially, when,

16   you know, I think, Mr. Lehners and myself have tried to make it

17   abundantly clear, this is whatever it may be out there.  Your

18   point, as I understood it from your brief in your opposition,

19   is depending on how this breaks, if GLA were to obtain it,

20   really you are concerned that it's going to result in

21   additional litigation.  If Jex is the prevailing bidder,

22   though, is that the same concern?

23        MR. ADAMS:  Perhaps not, although I wouldn't presume

24   for a minute that GLA wouldn't identify whether it had any

25   right to associate it, so --

1           THE COURT:  Right.

2           MR. ADAMS:  -- you know, whether that stops

3    litigation globally, I certainly could make that

4    representation.  But as far as my clients are concerned, there

5    are certain preclusive effects of selling the Ninth Circuit

6    appeal.  My client is not a litigant in that Ninth Circuit

7    appeal, but it's drastically affected -- if you're selling an

8    alter ego cause of action that's predicated off an order that's

9    subject to an active appeal.

10          You know, and likewise, as we've seen with the

11   trailer, I think the other elephant in the room is the

12   intellectual property.  The most recent term sheet that was

13   supplied by the trustee included all intellectual property

14   rights.  There is little to no identification, outside of the

15   recently filed reply briefs, as to what the basis for the

16   debtor would be to even have intellectual property to sell.

17          The trustee identified some things that were taken,

18   arguably, out of context from this Court's ruling on the

19   objections to claim.  GLA, likewise, took findings from an

20   arbitration proceeding, produced a couple of pleadings from

21   that, and from this they are drawing that either MRS has a

22   license, MRS has trade secrets, or potentially, Differential

23   has patents -- I'm sorry, I said Differential; I meant Metal

24   Recovery Services.

25          THE COURT:  Metal Recovery.

1              MR. ADAMS:  That there is something here to sell.

2    What I worry, right here and now, is just like all of the lead

3    up with the noticing regarding the sale.  Initial offer to Jex

4    done on the morning of an adversary proceeding status hearing,

5    to morph and use the same hearing, do a separate sale to GLA,

6    with a separate and distinct term sheet identifying leases,

7    identifying intellectual property.  If we're rushing forward

8    right now, not all bidders are going to understand what it is

9    that their bidding, and we are chilling bidding.

10             THE COURT:  Who else is out there to be -- Ms. Tirre,

11   I see you stand up there -- I'll take that as part of the

12   answer to my question.  I'm aware that -- I appreciate the

13   appearance to signal that.  That was helpful.

14             But you also have to be cognizant of the situation

15   here.  Under your opposition, there can only be a sale once the

16   trustee exhausted all avenues of recourse, including all

17   appeals of all eventual adversaries, to determine and ascertain

18   the exact rights of all parties.  And that's not how the world

19   works.

20             My concern, and I guess phrasing different ways, the

21   fact that the trustee has agreed, and has stated on record,

22   that this is as-is, with no representations as to any existence

23   or rights, you are buying the right to step into the shoes of

24   Metal Recovery through the bankruptcy as a potential purchaser,

25   whatever they may be.  From what the trustee's telling me,

1    that's the highest and best use of the estate at this time.  To

2    get where you need to be, you want to be, requires time,

3    potentially a lot of time, and expense for a bankruptcy estate

4    that you're not funding.

5              MR. ADAMS:  Um-hum.

6              THE COURT:  Right?  So I understand your point.

7    Clarity is always preferable, but bankruptcy is comfortable

8    with a lack of clarity.  And that is what Mr. Lehners was

9    talking about as to the trustee's business judgment.  So at

10   least, that is how I'm seeing the matter.  I'm willing to hear

11   any additional argument.

12             And it's not that you don't raise good points, but

13   they all go to the lack of clarity.  And as long as everybody

14   understands that, as the baseline here, that's where we are.

15   And if we are at a $1.2 million bid, that seems to have the

16   potential to greatly resolve a number of the outstanding issues

17   that seems to support the trustee's business judgment as to

18   officially administering this estate, which is really the

19   trustee's sole concern.

20             The fact that it may launch additional litigation is

21   beyond my understanding of the trustee's control of the estate,

22   because he's liquidated that asset for the benefit of the

23   estate's creditors.  It doesn't solve your client's problems,

24   but that's how -- I've listened to Mr. Lehners' discussion and

25   reading -- keeping in context your opposition.  So I don't mean

1   to preclude you from any argument; I just want to let you know

2   what the Court was thinking.

3          MR. ADAMS:  No, Your Honor.  And certainly, I only

4   want to raise my arguments right now as to going forward with

5   the sale or not.  We certainly have other points to address if

6   the need arises.  I think my concern, though, is, as I listen

7   to the trustee describe his position and justification for the

8   business judgment on the trailers, the business judgment and

9   justification with respect to the litigation rights on the

10  appeal, I heard a lot of discussion regarding efficiency and

11  regarding moving things along, and yet, if we are just,

12  frankly, kicking the can down, whether that's within this court

13  or another court, I guess I'm not seeing the gains in

14  efficiency.  And whether the trustee directly is involved in

15  all of that, I can't necessarily say.  But it certainly seems

16  like it's inevitable and we're just shifting the forum.

17         THE COURT:  Again, it's who's can unfortunately,

18  because you're tied to several cans.  You know, the Seals may

19  be tied to some GLA, depending on who would prevail, it alters

20  that dynamic greatly, but it liquidates the assets of the

21  estate, which is the trustee's job.  His can probably comes off

22  the board, so to speak, mixing metaphors and analogies.  The

23  trustee will then have the assets that the estate will have to

24  make a distribution, which is the function of the estate.

25         So I see that, you know, despite the likelihood that

1    some litigation or new disputes may arise, depending upon the

2    sale of the trailers to whom, and the use of those trailers.

3    Those -- that purchaser is coming into the sale with eyes open

4    and clear that these are not clarified, defined rights.  There

5    are disputes attended to all of this.

6              MR. ADAMS:  I understand that, Your Honor.  And

7    that's -- I think that underpins one of my biggest concerns is

8    that uncertainty naturally is going to drive down bidding.  You

9    know, if I know for certain that I'm acquiring that chair, I'm

10   going to bid accordingly, as opposed to the opportunity to

11   receive that chair.  So --

12             THE COURT:  Well, you know, again, in classic

13   bankruptcy forum, Differential has the ability to bid and solve

14   all of those problems, or the Seals may bid and solve all of

15   those problems.  And I don't know what the relationship between

16   Differential, the Seals, and Jex may be.  You know, and there's

17   a potential path within this auction that that becomes an

18   issue, you know, especially on a 363(m).

19             So there's a lot in play and a classic bankruptcy

20   forum, the more lack of clarity seems to have an inverse

21   relationship with the discretion to the trustee seeking to find

22   a way out in an expeditious manner that that provides a not

23   insubstantial amount of money for the estate so --

24             MR. ADAMS:  I understand, Your Honor.  I'm going to

25   defer.  I know that there are other parties, but thank you.

1            THE COURT:  Ms. Tirre looks -- oh.  A race to the

2   podium who --

3            MS. TIRRE:  I'm going to defer to Ms. Ostrow.

4            THE COURT:  Okay.

5            MS. TIRRE:  Thank you.

6            MS. OSTROW:  Thank you, Your Honor.  And we're the

7   successful bidders who up -- or not successful bidder, but the

8   highest offer, so I'll keep it brief.  But I wanted to -- one

9   important factor for Jex, as you're aware, is that we are the

10  not -- the first -- or the exclusive licensee to the patents

11  with Differential.  That's our position.  There's some

12  difference with the trustee.

13           But one thing I wanted to raise that was in our

14  response to this Court is the trustee, in his reply, emphasized

15  that there is a license that MRS holds to the patents.  Your

16  Honor --

17           THE COURT:  And again, I've cautioned, or subtly

18  tried to caution, Mr. Lehners because words, I think, matter,

19  and it is Mr. Lehners' position, on behalf of the trustee, that

20  there is a license.  I understand where he gets that from the

21  adversary, but I don't think anything is as clear as Jex has

22  the exclusive, exclusive, exclusive, versus Mr. Lehners, that

23  MRS and the estate has a license.  I understand those are the

24  stakes that both parties are setting.

25           MS. OSTROW:  Yeah.  And one of the issues I wanted to

1    raise, Your Honor, is that under 365(c)(1), and the Ninth

2    Circuit law, a license, without the consent of the -- either

3    exclusive licensee or the licensor, cannot be assigned.  So

4    that's --

5          THE COURT:  And my understanding -- we can clarify

6    with Mr. Lehners -- but I don't think he's trying to assign

7    without the consent of the licensee.  I understand Mr. Lehners'

8    point of view is that the estate disagrees that there is truly

9    an exclusive license to Jex exclusive of Metal Recoveries pre-

10   existing the use of Jex Technology that has some existence.  I

11   understand that it may be limited by, you know, by geography,

12   by what Mr. Lehners believes are certain limitations, such that

13   the trustee is the licensee and is willing to consent to that

14   assignment.

15         MS. OSTROW:  Thank you, Your Honor.  I think that's

16   the point I'm trying to clarify as well.  Under the CFLC, Inc.

17   case which is at -- not citing a brief, Your Honor -- but 89

18   F.3d 673 from the Ninth Circuit, this is a quote from that

19   case, Your Honor.  "It is well settled that a non-exclusive

20   license of a patent has only a personal, and not a property,

21   interest in patent and that their personal right of debtors

22   cannot be assigned unless the patent owner authorizes the

23   assignment or the license itself permits assignment."

24         So our position would simply be that's not part of

25   the -- the license is not part of the bundle of rights that's

1  before this Court, and that the debtor may sell it all, because

2  there's no consent.

3         THE COURT:  I appreciate that and I'm glad you made

4  that statement.  That goes into the quantum of whatever the

5  estate is selling and further adds definition as to the dispute

6  that surrounds the technology.

7         MS. OSTROW:  Thank you.  And the other is just that

8  we do — —our position is that we would like a 363(f) as it

9  comes to Jex, but we reserve all rights to any other bidders.

10  And we do have responses to GLA's reply, but I believe that is

11  not the time that you need to hear that.  But I just wanted to

12  bring up the license issue before --

13         THE COURT:  Well, it kind of is, and it isn't.  It's

14  a delicate balancing act at the moment.  As to your 363(f),

15  what is the lien of interest that is being sold free and clear

16  of?

17         MS. OSTROW:  So the trailers would be -- we think

18  that the trailers will be subject to the lease.  But as the

19  lessee under that lease, we would -- Jex would step into the

20  sides of both, so that wouldn't be an issue if we are the

21  successful bidder.

22         THE COURT:  That's as to Jex, correct?

23         MS. OSTROW:  Correct.

24         THE COURT:  So as to a non-Jex entity though, you

25  believe that, not withstanding the breach of the rejection,

1   that that is still a interest in the trailers?

2          MS. OSTROW:  Yes, Your Honor.  And my basis for that,

3   Your Honor, is that at the beginning of this case, when the

4   trustee reached out, the trustee said we'd like you to continue

5   to perform under the terms of this lease.  We have provided

6   that payment.  We have provided over $268,000 to the estate for

7   operation of those trailers.  Both trailers have not been

8   operating at the same time.  But since July of 2020, when this

9   case was filed, we've continued in good faith with the trustee.

10  We've kept the trailers in good operating condition.  We've

11  also made improvements to the trailers.

12          We understand, as well, that those trailers are

13  currently in Chile, and it would be substantial fees to move

14  them.  And they are currently contracted at entity -- at mine

15  sites to perform services, and we've been relying on them.

16          THE COURT:  Thank you.  You raise an interesting

17  point that I had thought with Mr. Lehners but haven't raised.

18  There are numerous representations of facts being presented

19  here, such as Jex continued performance under the lease, the

20  location of the trailers, which seem to be fairly important

21  points.  Mr. Lehners also detailed some matters primarily taken

22  from the adversary decision of the court as entered in the BAP

23  which is a little different.

24          But let's be clear for any record on further review.

25  What am I to take of these?  Is there any objection to

1    Ms. Ostrow's statements being accepted as a proffer for this

2    purpose, or do I need to take testimony, Counsel?

3              Mr. Lehners, as to the statements regarding the

4    trailers, the performance under the lease, and the location of

5    the trailers.

6              MR. LEHNERS:  Thank you, Your Honor.  It's my

7    understanding -- first of all, I did want to clear something up

8    for the record, which is very important, as my trustee pointed

9    out.  When I said we're selling all the assets of the debtor --

10              THE COURT:  Exclusive cash.  Yes.

11              MR. LEHNERS:  Well, Your Honor, the trustee has

12   collected quite a bit of money.  We did recover a preference.

13   Jex has been making the payments.  The assets the trustee has

14   already collected will not be offered for sale.  It is only the

15   rights that are in the purchase --

16              THE COURT:  And I consider that to be exclusive of

17   any cash that the estate holds wherever it may come from.

18              MR. LEHNERS:  And I also have the deepest respect for

19   Ms. Ostrow's argument.  Again, perhaps things were misread into

20   my attempt to handicap what my prediction of the probability

21   rights are.  We are neutral.  We are not trying to argue that

22   the lease was, or was not, assumed.  We acknowledge, and

23   Mr. Burke can confirm, the payments have been made.  And we ask

24   Jex to make the payments to the estate, correct?

25              MR. BURKE:  Your Honor, Christopher Burke.  The

1  payments have been made up until a couple of months ago when we

2  started negotiating the full sale, so I've been lenient on that

3  pending the outcome of this.

4         THE COURT:  Makes sense.

5         MR. BURKE:  But before that, the payments were made.

6  Thank you.

7         THE COURT:  Understand.

8         MR. LEHNERS:  And anything that I've said that

9  implies that the trailers can be sold free and clear of Jex's

10 rights or the lease is not my intention.  Again, it is to point

11 out, as required by the medicine cabinet case, what the

12 possibilities are.  So everybody comes into this eyes wide

13 open.  And anything I said to take one position or another is

14 simply nothing more than my attempt at an objective analysis.

15        THE COURT:  I appreciate that.  As to the specifics,

16 though, Mr. Lehners doesn't -- take it doesn't object to the

17 consideration of Ms. Ostrow's statements as a proffer.  Any

18 objection from any other counsel?

19        MR. OINES:  Just --

20        THE COURT:  And Counsel, you can remain seated and at

21 the mics.  We're losing stuff in the flux in between, so thank

22 you.

23        Ms. Tirre, you'll eventually have to get to a mic,

24 but -- go ahead.

25        MR. OINES:  Thank you.  Ron Oines for creditor, Geo-

1  Logic Associates, Inc.  Just a point of clarification, what

2  exactly is the proffer, and are we being asked to stipulate to

3  certain facts?

4            THE COURT:  Well, specifically, the two matters that

5  the Court is most interested in is that Jex has continued to

6  make the monthly payments as required under the lease --

7  prepetition lease agreement to the trustee, at the trustee's

8  request, including apparently, some payments to the state.  The

9  state being -- which state?  There was --

10            MS. OSTROW:  I apologize.  I don't understand.

11            MR. LEHNERS:  I think the word was estate.

12            THE COURT:  Estate.  Okay.  Thank you, sir.

13            MS. OSTROW:  Yeah.  It was the estate, sir.

14            THE COURT:  That makes me it much clearer.  So to the

15  estate and the trustee's request, subject to the negotiations

16  effectively trailing that off.  And the second is that the

17  trailers, the two trailers, are currently located in Chile.

18            MR. BUBALA:  Your Honor, Mr. Bubala, on behalf of

19  GLA.  It is not clear to us that Jex is in compliance with the

20  terms of the lease, in terms of payments.  There's a

21  differential in payments when the trailers are in use.

22            THE COURT:  I don't need to be that specific for

23  this.  Just that there is some payments being --

24            MR. BUBALA:  Yes --

25            THE COURT:  -- made at the trustee's request.

1          MR. BUBALA:  We will not require evidence that they

2     have been making payments, but our acceptance of that proffer

3     is limited to we're not in agreement that we don't know that

4     it's the correct amount to be paid.

5          THE COURT:  All right.  All right, then.  I think I

6     sidetracked you, Ms. Ostrow, your statement.  But that was an

7     important point I wanted to clarify for the record.  I'll let

8     you continue and noted that, you know, you were indicating

9     under the view of the law and the Ninth Circuit case that you

10    cited that based upon even the trustee's parameters as stated

11    that there is at least an argument to the contrary that the

12    trustee, the estate, may not have any license to sell.

13         MS. OSTROW:  Correct.  Thank you, Your Honor.

14         THE COURT:  All right.

15         MS. OSTROW:  And I'm happy to address some of the

16    issues that were raised in GLA's reply regarding some of the

17    additional intellectual property if this is now the time that

18    the Court would like to hear that, specifically as to the

19    trademark and the trade secrets.  Or we can hold off on that

20    depending on how you'd like.

21         THE COURT:  And again, the Court's overriding premise

22    is that all of this remains in dispute, and some of it hotly

23    disputed.  As to that, as between Jex and GLA, and even the

24    estate and Differential.  All of that establishes that at a

25    bare minimum there are arguments and I believe that they are

1    nonfrivolous arguments.  I'm trying to be careful of the

2    quantification of those arguments because, as Mr. Lehners says,

3    I do not have to conduct a mini trial to sell this.  I just

4    know, and I know from the history of Metal Recoveries

5    bankruptcy, there are numerous disputes and continuing

6    arguments between all of the parties in interest which are

7    largely present in the court here today.  But as I indicated, I

8    think ultimately that inures to the trustee's benefit in

9    selling this and being absolutely clear that there are no

10   representations as what being sold.

11           So while there may be an argument that there is a

12   license as to Jex Technology from the estate, it is well within

13   the possibility that there is not.  And that arena gets shifted

14   out of the bankruptcy estate to whoever buys it to the extent

15   that they may or may not want to pursue the validity of that

16   license.

17           So as to the other aspects of your technology, I

18   think it falls within the same parameters unless there is

19   something specific that we think that we need to address or if

20   you believe that something is such a showstopper that this

21   auction of whatever the estate may have cannot proceed.

22           MS. OSTROW:  I think that the trademarks -- thank

23   you, Your Honor -- and I think that the trademarks and these

24   trade secrets that are alleged, as we know we dispute, but that

25   would also fall under that Ninth Circuit precedent that I

1  mentioned to you before.  So to the extent there's a license

2  that is just cut off and it is not authorized.  And then any

3  sale order, if it's not us -- I mean, if it's not Jex that's

4  the successful bidder as to the patent exhaustion, that does

5  not apply.

6         And we can -- there can be an evidentiary hearing

7  about that.  I understand the Court's parameters about

8  potential disputes.  But I wanted to note on the record that

9  this body of patents, the trailers are one, specifically, one

10  segment of how this entire heat bleaching process works.  And

11  so a patent exhaustion argument does not fit within this.

12         THE COURT:  However, again, I appreciate that, and my

13  knowledge of patent application law is exceedingly limited, and

14  I default to the bankruptcy aspect.  There's two pieces of

15  personal property independent of anything else, stripped down,

16  they have some value.  They may not have the value with the

17  attendant technology patents licenses that Jex currently has,

18  but there has to be some value for them as trailers.  And

19  that's where all this gets complicated, obviously.

20         So again, I understand what you are saying, but I am

21  not hearing that that is preclusive of the sale of the trailers

22  as trailers.

23         MS. OSTROW:  Correct.

24         THE COURT:  Or the pickup.  You know?  Or whatever

25  supplies may exist or whatever.  They have a greater right,

1    obviously, and I assume that's why Jex has made an offer to

2    purchase.  But is there any reason that the auction cannot go

3    forward having placed on record all the concerns about the

4    legalities of the technology, the patents, and the licenses?

5        MS. OSTROW:  And our lease, Your Honor.  I think that

6    those are our main concerns, and we reserve, depending on who

7    the successful bidder is, we reserve all objections to the sale

8    and our participation doesn't waive those, Your Honor.

9        THE COURT:  I understand that, and I get that.  But

10    as lawyers, we always reserve.

11        MS. OSTROW:  Thank you, Your Honor.

12        THE COURT:  Right?  But life goes on and having

13    certain things happen will affect the playing field.  I have no

14    idea how this auction may proceed, or play out, so I can't tell

15    you, but you do -- if GLA is the winning bidder, there cannot

16    be an objection that GLA can't bid.  It's what they have

17    purchased, right?  So to the extent that your reservation is to

18    strike GLA, I mean, that's why I keep asking about the

19    showstopper.

20        MS. OSTROW:  Right.  No.  And just for clarification,

21    Your Honor, as you've gone through that.  You said if GLA is

22    the successful bidder, depending on what are in the terms, we

23    still will have the opportunity to -- I'm not -- we're not

24    tying to say GLA cannot participate in the bid, but we'd like

25    to say that we have certain objections to what the terms are in

1  selling the assets to GLA.  Is that -- we're reserved on doing

2  so.

3         THE COURT:  And that's the cart/horse situation,

4  right?  Because we may not know what was sold to GLA in that

5  situation.  It remains -- the one thing that is clear is that

6  whatever the estate has, except the cash that it has and has

7  received from some administration to the date, will be sold.

8  They get the bag, and we don't know what is in that bag.  So to

9  the extent that Jex then wants to say well, but GLA did not

10 purchase the patent or the exhaustion argument or any of the

11 technology, that's for another day, probably in a different

12 court.

13        MS. OSTROW:  Okay.  And that would be something that

14 we would ask, Your Honor, in the order as well, is an express

15 preservation of those kicking it down the road in another --

16 either before this court or another court, where we can still

17 raise those issues, and a 363 sale order isn't going to prevent

18 us from showing up in another court that interprets your order,

19 and says I know how bankruptcy sales work, you no longer have a

20 right to this.

21        THE COURT:  Well, and that's why we've gone an hour

22 and a half on these preliminaries is I am trying to make it

23 abundantly clear that we are selling the bag, to continue that

24 analogy, and without defining what may and may well not be, in

25 that being sold.  That all it is, whatever they have --

1   whatever they have to be determined later.

2           MS. OSTROW:  All right.

3           THE COURT:  So.  Ms. Tirre?

4           MS. OSTROW:  I think that's all we have.  I'll just

5   briefly make -- yeah.  Please.

6           THE COURT:  Okay.  Sure.  Go ahead.

7           MS. OSTROW:  I think the only other clarification,

8   and I might potentially seek this from Mr. Burke, Your Honor,

9   as well, that what's being sold is everything with the estate.

10  So whatever the sale goes through here, the creditors that

11  have -- you know, the trustee hasn't objected to, will receive

12  the trickle down from admin claims and then unsecured debt, but

13  this is everything the estate owns.

14          MR. LEHNERS:  Except for what's been collected so

15  far.

16          MS. OSTROW:  Yeah.  Aside from the cash.

17          THE COURT:  But what I believe what they're asking is

18  that there are no other assets that the trustee is aware of

19  administrating -- administering and whatever assets there may

20  be, even if they are unknown presently and arise, they are

21  being sold within the bag.

22          MR. BURKE:  Correct.

23          THE COURT:  All right.

24          MS. OSTROW:  Okay.  And then we would just reserve

25  rights as far as if the contracts are somehow found to have

1  been deemed waived and their argument regarding the 365(g) and

2  the waiver there, Your Honor, to assert any claims against the

3  estate for having provided the $268,000.  Thank you.

4          THE COURT:  Thank you.

5          MS. OSTROW:  $268,000, Your Honor.  And we have been

6  negotiating with other parties and entered into contracts down

7  in Chile, so there might be additional reliance that we've

8  relied upon in --

9          THE COURT:  I understand the reservation.

10          MS. OSTROW:  Thank you.

11          THE COURT:  Thank you.  All right.  One more time,

12  Ms. Tirre.

13          MS. TIRRE:  Thank you, Your Honor.  Amy Tirre, on

14  behalf of Element Global Inc. through its agent, Empire Capital

15  Management, LLC.  Your Honor, my client retained me to appear

16  today to bid on these assets.  And it is -- a cash bidder

17  understands that those are the terms.

18          In reviewing the motion and the term sheet, we walk

19  away with a different understanding than what has been

20  discussed on the record here today.  And the four issues I'll

21  raise, I'll call them the four L's.  I've got a license issue.

22  I've got a lease issue.  I've got a liabilities issue.  And

23  I've got a legal standard issue.  So I'll take them --

24          THE COURT:  Well done.

25          MS. TIRRE:  -- in turn.  Thank you.

1              THE COURT:  The four L's.

2              MS. TIRRE:  Four L's.

3              THE COURT:  Okay.

4              MS. TIRRE:  So the first issue is this license and

5    whether or not it exists.  And I understand from the Court's

6    comments, the Court wants to sell the bundle of sticks without

7    examining exactly what's in the bundle.  However, from a third-

8    party bidder's perspective, that is a problem when it comes to

9    the legal standard.  Because I've heard the terms "as-is"

10   "where-is" bantered about, but we also have 363(f) free and

11   clear.  So let's think this through.

12             If my client were to purchase what -- one of the

13   sticks is a license, if it exists, and then seeks to enforce

14   that license, it is no longer getting that free and clear,

15   which is my understanding was a term on the term sheet.  There

16   would be a finding under 363(f) that the assets are being sold

17   free and clear.  And now, it's acquiring a license subject to

18   claims by Differential and/or the Seals.  So that is

19   problematic.

20             THE COURT:  Well, let's just explore that a little

21   bit.  What license does Elements Global think it's getting?

22             MS. TIRRE:  Your Honor, it's waiting for the legal

23   ruling here today at this hearing because that is -- it's

24   asking me for that legal ruling.  Is there a license; is there

25   not a license.  And then --

1          THE COURT:  There has been no legal ruling.

2          MS. TIRRE:  Exactly.  And I understand, and I was

3     anticipating there would be.

4          THE COURT:  There has been reference within the --

5     Right.  There has been testimony within the adversary claim

6     objection referencing the debtors' use of Jex Technology.  What

7     that means is not going to be clarified today.

8          MS. TIRRE:  And I think my client is anticipating

9     that it would be clarified today primarily because of

10    Ms. Ostrow's argument under 365(c)(1).

11         THE COURT:  But that's not a 365 -- that's not a

12    363(f) issue.  It either exists or it doesn't.  It is not

13    subject to any interest, you know, or liens.  It may or may not

14    exist under applicable law.

15         MS. TIRRE:  Well, rights, claims, interests, liens.

16    Liens are bigger.  You know, 363(f) is bigger than just liens,

17    Your Honor.

18         THE COURT:  Certainly.  I get that.  That's why I

19    raised the issue of, you know, of the lease of the trailer as

20    well, right?  I mean, your next L.

21         MS. TIRRE:  I was going to get to that L.

22         THE COURT:  Right?  But I mean, it's the same issue.

23    There is -- there are issues attendant to that which parties,

24    depending upon which ones bid, which one buys, who's left out,

25    may dispute, may cause problems.

1          MS. TIRRE:  And Your Honor, fundamentally, that

2   chills the bid.

3          THE COURT:  Life chills bids.  Right?  I mean,

4   uncertainty.

5          MS. TIRRE:  But it's the trustee's duty to maximize

6   the value of the assets.  That's why we're here.

7          THE COURT:  But how does he maximize it?  He

8   maximizes it by going and filing a declaratory judgment to

9   establish that.  If your client's willing to fund that, maybe

10  Mr. Burke will talk.  But that is quintessentially the exercise

11  of a Chapter 7's trustee's business judgment.  It is cheaper

12  and more efficient, and the estate will recover more, by

13  selling what we have now without full knowledge than to file a

14  declaratory action, retain Mr. Lehners on a hourly fee to

15  litigate for two years plus with appeals to get your clarity.

16  So here we are.  I --

17         MS. TIRRE:  Fair enough.  But that's -- my client's

18  anticipating that we would walk away from the first part of

19  this hearing with an understanding of is there a license, is

20  there not a license, and we're not getting that ruling.

21         THE COURT:  I get that.  That is not the function of

22  the sale and compromise motion, unfortunately.

23         MS. TIRRE:  All right.  Next point, with respect to

24  the lease.  The way the term sheet is structured, under I

25  believe it's 1-D or purchased assets, Roman at 1-D, it refers

1  to a sale of the leases regardless of whether --

2            MR. BUBALA:  Your Honor, could you provide a page

3  number?

4            THE COURT:  Or ECF?

5            MS. TIRRE:  Oh.  I can.

6            MR. BUBALA:  Or ask for a page number since I can't

7  ask Ms. Tirre myself?

8            MS. TIRRE:  Oh certainly.  No problem.  It's page

9  26 -- I'm sorry, page 27 of 30.  It's the Exhibit 2 to the

10 trustee's sale motion --

11           THE COURT:  To the motion.

12           MS. TIRRE:  -- which is docket 255-3, filed on

13 February 23rd.

14           THE COURT:  All right.  Before we get there, because

15 I'm going to have to song and dance a little bit.

16           I want to ask Mr. Lehners.  I am looking at the term

17 sheet attached to your omnibus reply.  Is that modified from

18 the sale motion?

19           MR. LEHNERS:  Your Honor, what I've attached as the

20 exhibit to 255 at page 26, it references the buyer is Geo-

21 Logics.  And I will show this to Mr. Oines to make sure it is,

22 in fact, the term sheet that he gave me.

23           MR. OINES:  Yes.

24           MR. LEHNERS:  Thank you, Mr. Oines.  This is the term

25 sheet submitted by GLA.  It is attached as the second exhibit

1    to 255 starting at page 26.  I believe that's what Ms. Tirre is

2    referencing?

3              MS. TIRRE:  It is.

4              MR. LEHNERS:  Thank you.

5              THE COURT:  All right.

6              MR. LEHNERS:  Any other questions, Your Honor?

7              THE COURT:  I want to clarify, that term sheet is the

8    same term sheet that is attached as Exhibit 1 to the omnibus

9    reply?

10              MR. LEHNERS:  I believe it is, Your Honor.

11              THE COURT:  Okay.

12              MS. TIRRE:  So with respect to my second L, the

13   lease --

14              MR. LEHNERS:  Exhibit 2 to the omnibus reply, Your

15   Honor.

16              THE COURT:  Exhibit 2?

17              MR. LEHNERS:  Yes.  Jex's bid of February 2nd is

18   Exhibit 1 to my omnibus reply.

19              THE COURT:  Okay.

20              MR. LEHNERS:  Exhibit 2 is the GLA bid.

21              THE COURT:  Just a moment.

22         (Counsel confer)

23              MS. TIRRE:  But I think if I may just proceed on this

24   one point --

25              THE COURT:  I'm sorry.

1           MS. TIRRE:  -- and maybe we can --

2           THE COURT:  We're not -- everybody's not at the same

3  page yet, Ms. Tirre.  I'm sorry.  We're in a bad deposition

4  situation here.

5           MS. TIRRE:  Okay.

6           MR. BUBALA:  I apologize, Your Honor.  Lou Bubala on

7  behalf of GLA.  255 is a sale motion.  There's reference to

8  page 26.  I don't know what that is.  The purchase term sheet

9  is Exhibit 3 which starts on PDF page 35 and then 36 is the

10 first page.  So when somebody says page 26, I don't know what

11 they're referring to.  That is not our term sheet.

12          THE COURT:  Can I ask, to the extent possible, if you

13 have an ECF designated document, refer to the page number in

14 the blue ribbon up top?

15          MR. LEHNERS:  Your Honor, perhaps I can be of some

16 assistance.

17          THE COURT:  Yeah.  Mr. --

18          MR. LEHNERS:  The sale motion originally did contain

19 three exhibits, then it was redacted.  The redacted version,

20 255-3, which is now 255 on the docket, contains only two

21 exhibits.  That's what I showed Mr. Oines.  So if Mr. Bubala is

22 looking at the sale motion with three exhibits, it is the

23 unredacted motion.  It should be the redacted motion.

24          Does that help, Mr. Bubala?

25          MR. BUBALA:  Yes, it does.  We're -- you just removed

1  an exhibit number and moved 3 up to 2 in your redacted version?
2  Yes.  Okay.  We're in agreement.

3           THE COURT:  That gets Mr. Bubala to the right page.

4           MR. BUBALA:  Yes.

5           THE COURT:  It does not get the Court to the right
6  page since all I have is the unredacted.  So what am I supposed
7  to be looking at?

8           MR. BUBALA:  Your Honor, I believe that starts on
9  page 36 of the unredacted original motion.

10           THE COURT:  Thank you.

11           MR. BUBALA:  Is the correct --

12           THE COURT:  Sorry about that.

13           MR. BUBALA:  -- asset and term sheet.

14           THE COURT:  I'm sure this will make for a much better
15  transcript than it does for live.  I am at the asset purchase
16  agreement term sheet at page 36 of the unredacted.  Thank you.

17           MR. LEHNERS:  It is also found on page 26 of the
18  redacted one.

19           THE COURT:  26 of the redacted.  Of -- yes -- okay --
20  thank you.

21           Ms. Tirre, finally we are back to you.  You may
22  proceed.

23           MS. TIRRE:  Thank you, Your Honor.  I only have in my
24  possession the redacted version.

25           THE COURT:  Understand.  That's the problem.  Again,

```
 1   apples and oranges seems to be the --
 2              MS. TIRRE:  The theme.
 3              THE COURT:  -- phrase of the day.
 4              MS. TIRRE:  The theme for today.  So in reviewing
 5   docket number 255-3, beginning on page 6, it's the asset
 6   purchase agreement term sheet.  And if we turn to the next
 7   page, we're looking at the list of what the assets are that are
 8   being sold, and we get to D.  And it describes contracts,
 9   leases, agreements, et cetera.  And then -- and it designates
10   them as agreements -- and then it says, "regardless of whether
11   such agreements are executory, have been rejected or deemed
12   rejected within the meaning of Bankruptcy Code Section 365".
13   So my -- and I'll wait.
14              THE COURT:  Yeah, I'm not --
15              MS. TIRRE:  Are you ready?
16              THE COURT:  No.  It's not translating well.
17              MS. TIRRE:  I'm so sorry.
18              THE COURT:  Hold on, please.
19              Mr. Bubala, did you find the number for the
20   unredacted?
21              MR. BUBALA:  Yeah.  So it's -- in the unredacted it's
22   page -- PDF page 37.  We have a large table at the top that's
23   C, D, E.  And she was talking about subsection D.
24              THE COURT:  Page 37 at 255?
25              MR. BUBALA:  Yes, page 37 of 40.
```

1           THE COURT:  37 of 40, D.  All right.  I am with you.

2   Thank you.

3           MS. TIRRE:  So Your Honor, in reviewing that term, my

4   understanding is that if my client were the prevailing bidder,

5   that it would, as the new owner of the trailers, it would be

6   receiving an assignment of the lease with Jex as the lessee

7   which includes this ongoing payment stream for the duration of

8   the lease.  So the lease in this instance becomes an asset

9   regardless of whether or not it's rejected, and the prevailing

10  bidder becomes the owner of the trailers subject to that lease.

11  Based upon what I heard Mr. Lehners and Ms. Ostrow state on the

12  record, it's my understanding that that's their intention as

13  well.  And maybe -- my point is to clarify that if my client is

14  to bid.

15          THE COURT:  Mr. Lehners, I think this is a point for

16  you.  You can either stay at the table, so Ms. Tirre doesn't

17  have to keep going back and forth, or you can approach.

18          MR. LEHNERS:  No problems, Your Honor.  It is true

19  there is a lease.  It is true that it may or may not be

20  executory.  It is true the trustee has asked for, and Jex has

21  made payments, on that lease.  Again, this has all been

22  disclosed.  And D does mention executory agreements, contracts,

23  and whether or not the executory agreements have been rejected.

24          All I can tell Ms. Tirre, there's a lease, or it's a

25  contract, and it has been paid on.  Its validity under state

1  law, its severability from the trailers, again, that would be

2  the subject of a mini trial, and I cannot go that deep in my

3  analysis.  I can only explain the issues regarding what may

4  affect this lease.  I think the analogy of what you're buying

5  is in the bag, and that's what we're selling.  Does that help?

6         MS. TIRRE:  My question is, is there an assignment of

7  the lease as part of the bundle of rights?

8         MR. LEHNERS:  To the extent that there is, we are

9  assigning what we have.  There is a document called a "lease".

10  We would be including that in the sale.  Yes.

11         THE COURT:  Subject to the bankruptcy and what has

12  and has not happened.  That's -- you know, you're picking up

13  Mr. Adams' point that there is a lack of clarity.

14         MS. TIRRE:  There's a lack of clarity that results in

15  chilling of the bid.  And I do think it's substantial, Your

16  Honor, because my client's prepared to bid.  But I'm not

17  certain I will be returning to bid after I have a chance to

18  confer with him about what's occurred this morning.  But

19  anyway, we'll proceed.

20         THE COURT:  Yep.

21         MS. TIRRE:  With respect to the two remaining L's,

22  we've covered one, which is this question of the legal

23  standard.  And that is are we dealing with as-is/where-is or

24  are we dealing with free and clear?  To me, they are distinct

25  with respect to, depending on the type of asset, let's say,

1  that's being sold.

2         THE COURT:  It goes as to what is against versus the

3  existence of the asset.  We are not selling free of clear of

4  disputes.  That is not an interest that is being -- you cannot

5  say I have a contract, no I don't.  You sell it through the

6  bankruptcy and there -- it does away with questions of

7  consideration and consent.  That isn't how that works.

8         To the extent that there is a lien, I have not heard

9  anything to suggest that there is.  To the extent that, you

10  know, there is some -- there's no real property changing hands

11  so there's no, you know, other interest against that.

12         But there is a fair question as to, you know, as

13  you've said, the nature of the lease.  As to one group of

14  parties, they may well want to continue it and recognize it as

15  a lease.  As to another, they may want to recognize that it was

16  rejected and that has some, you know, meaning for them.

17         MS. TIRRE:  Welp, Your Honor, I can just say, it

18  matters, depending on what we're looking at, in terms of a

19  tangible versus an intangible asset.  So the lease, personally,

20  I can understand where my client stands, and that's clear

21  enough for me.  The license, very unclear because if there is a

22  license, whether it exists, that answer -- that question is not

23  being answered this morning.

24         And then if the buyer intends to assert and enforce a

25  license, then, what you're essentially telling me is, that

1  license is not free and clear because it's as-is/where-is,

2  subject to all other claims and disputes.

3          THE COURT:  Well, then yeah, I think we might be just

4  circling the track here, but it is not free and clear of

5  disputes that it's an unenforceable license.

6          MS. TIRRE:  Understood.

7          THE COURT:  Yeah.

8          MS. TIRRE:  I'm just --

9          THE COURT:  I understand.

10         MS. TIRRE:  -- I'm making the record clear, Your

11  Honor, for myself --

12         THE COURT:  And same.

13         MS. TIRRE:  -- and for my client.  So when my client

14  gets the opportunity to review the transcript, if there's any

15  question.

16         THE COURT:  I understand.

17         MS. TIRRE:  And then, my fourth L relates to

18  liabilities.  So we have spent a lot of time analyzing -- or,

19  not we -- I'll just say Mr. Lehners, for the record, the Court,

20  we've been discussing the various claims that the trustee has

21  asserted in the various litigations and that those are claims

22  that would then be sold to a third party.  Or they may be

23  compromised if they're transferred to GLA.  That's clear

24  enough.

25              What I want to make a record about is with respect to

1  liabilities that the estate may have because this term sheet

2  that I have been looking at and relying upon states that the

3  sale is free and clear -- or the buyer is not assuming any

4  liabilities.  And so given the status of the various pending

5  litigations, I want to make very clear that, for example, if

6  the buyer, my client, is the successful bidder and takes on the

7  claims that the estate holds as assets, including the claims

8  asserted in the adversary proceeding, which include alter ego,

9  fraudulent transfer, and I understand, brief of fiduciary duty.

10 And those claims that are asserted in the adversary, I believe,

11 are also sort of assume -- subsume the claims that GLA brought

12 in its pending federal case against the debtor itself as well

13 as the Seals and I believe Diversified [sic].

14       Because once a bankruptcy case is filed, if a

15 creditor has brought alter ego and fraudulent transfer claims,

16 I believe the trustee steps into the shoes and has -- is the

17 only party that can assert those claims for the benefit of all

18 creditors versus that sole loan creditor being able to continue

19 with that ongoing, you know, court -- state court or federal

20 court litigation outside of the bankruptcy court.

21       So I just want to make a record that, to the extent

22 that my client is the prevailing bidder, my client is getting

23 an assignment of claims.  But to the extent that the estate,

24 the debtor, the trustee, is defending any litigation, the

25 prevailing bidder is not stepping into the shoes and assuming

1  any liabilities with respect to any pending litigation.

2          THE COURT:  And my sense is you probably need to talk

3  to Mr. Lehners about that.  And I don't want to speak for him

4  or the trustee.

5          So we're at about 11:20.  My sense is we should go

6  ahead and continue these discussions -- the preliminaries --

7  and then break, let people talk, and then come in, you know,

8  after lunch and see where we proceed to auction.  All right?

9  That'll give you an opportunity to discuss with Mr. Lehners and

10  Mr. Burke and if there's anything that we need to address on

11  the record, then -- preliminary to the actual auction itself --

12  we can do that then.

13          MS. TIRRE:  Okay, Your Honor.  I just point out just

14  to make final point on this is on the very same page you were

15  just on, which I believe is now 37 of 40, with your unredacted

16  version of the motion --

17          THE COURT:  It is.

18          MS. TIRRE:  -- the statement that I'm referring to is

19  there toward the bottom of that page in the table.  It says

20  explicitly, "buyer will not assume any liabilities of the

21  sellers or the estate."

22          THE COURT:  What subsection is that?

23          MS. TIRRE:  Your Honor, the table is broken up where

24  it has the subparts C, D, and E.  And then just below E --

25          THE COURT:  Right.

1            MS. TIRRE:  -- is the sentence I'm referring to.

2            THE COURT:  Thank you.  Thank you very much,

3    Ms. Tirre.

4            MS. TIRRE:  Thank you.

5            THE COURT:  Might as well go ahead, Mr. Lehners.

6            MR. LEHNERS:  Your Honor, I'm sorry.  I will be as

7    fast -- very fast.  I have four comments.  Number one, you

8    mentioned this is not a sale free and clear of disputes.

9    Ms. Tirre did talk about liens, claims, and so on.  And I wish

10   to make the following clarifications.

11           A lien is a claim against property that is security

12   for a debt.  We know of none since Differential's security, or

13   claim, has been extinguished.  A lease is the right to use

14   property that may include a purchase option.  That does exist

15   and it's been discussed.  The claims against the debtor are by

16   GLA, the law firm, and Mr. Fuller's office.  There is no

17   security interest claim by any of those creditors in the assets

18   being sold.  Not under Article 9, not under any statutory lien

19   that I am aware of or the trustee is aware of.

20           So the claims against the debtor, to the best of my

21   knowledge, are not secured by estate property because the only

22   secured claims we saw were asserted by Differential

23   Engineering.  And even if there were some secret lien out

24   there, a security interest, it would not be perfected as

25   there's no UCC-1.  And as the trustee is selling his strong arm

1  powers under Section 544 and Section 545, they would be able to

2  avoid such secret liens.

3         And last, I can appreciate the luxury of certainty,

4  but this is a Chapter 7 trustee; that is something he cannot

5  give.  What he can give is his best description and analysis,

6  which we have done.  So I thought it important to make the lien

7  liability angle crystal clear, because I'm not aware of any

8  liens attaching to the specific assets or claims being sold.

9         THE COURT:  All right.  There is a potential

10 distinction between selling free and clear of liens and selling

11 free and clear of liens and interests.  Is this sale free and

12 clear of just liens or free and clear of liens and interests?

13        MR. LEHNERS:  Your Honor, the sale is free and clear

14 of liens, but it is not free and clear of disputes.  Where an

15 interest falls between the lien and dispute, I don't think I

16 can answer that right now.

17        THE COURT:  All right.        Mr. Bubala?

18        MR. BUBALA:  Whenever Mr. Lehners is done, I'd like

19 to --

20        MR. LEHNERS:  I'm done.

21        MR. BUBALA:  Okay.

22        MR. LEHNERS:  I said I'd be quick.

23        MR. BUBALA:  Your Honor, I'll try to provide -- Louis

24 Bubala on behalf of GLA.  I'll try to provide a little clarity.

25 Look, subsection 1-D that we've been discussing about all

1  contracts, leases, agreements, it is as specific as it can be.

2  And to the extent that the conflicts with 365(f), we're

3  essentially waiving any protection under 365(f).  We are taking

4  subject to leases.  That is what that provision says.

5       I don't know what other parties want to do in terms

6  of their bids, but our bid includes taking it subject to the

7  lease.  Maybe I should have stood up and said that at 9:30, but

8  here we are.

9       A second point of clarification, you kick it down the

10  road later or not, I don't know what Elements or Empire is

11  other than mysteriously filed a request for special notice and

12  a notice of appearance.  They're a complete foreign unknown

13  entity.  To the best we can tell, they are traded on pink

14  sheets at below a penny a share.  We don't believe they have

15  any financial viability, and we will not accept a proffer from

16  Ms. Tirre about their viability.  We don't believe that they

17  should be entitled to participate in any bidding today.

18            THE COURT:  Okay.

19            MR. BUBALA:  We don't believe this is a factor in

20  chilling of this action at all.  We have, as Mr. Lehners has

21  said, at least three parties already that have put bids

22  forward.  We are nearing -- we're prepared to take an auction

23  here.  The concept of chilling does not arise in this case with

24  bids at this value.

25            THE COURT:  Understand.  I take the point.

1          Mr. Lehners, I think I'm coming back to you.

2          So does anyone else wish to weigh in any as we are

3   approaching the close of the preliminaries at least it feels?

4          MR. LEHNERS:  Your Honor, I believe I've stated

5   everything that's relevant on the record, but may I talk to my

6   client very briefly?

7          THE COURT:  Well, let me -- again, I have a sense,

8   and subject to discussing with you and other counsel, my sense

9   is we should kind of conclude this preliminary part, let people

10  go get lunch.  I have a sense that there may be some

11  discussions that should happen or will happen or need to

12  happen.  I don't know.  But come back at 1.

13         MR. LEHNERS:  Sure.

14         THE COURT:  And then we can see what, you know, we

15  need to do.  But the anticipation is that we would move to the

16  auction.  I see Ms. Ostrow has some --

17         MS. OSTROW:  Thank you, Your Honor.  And we will talk

18  to Mr. Burke.  So one -- two items.  First, our offer is free

19  and clear of claims and liens and interests based on the

20  current offer, but we'll discuss that offline, Your Honor.

21         THE COURT:  Right.  And that's kind of purchase we're

22  discussing because --

23         MS. OSTROW:  Right.

24         THE COURT:  -- you are the interest.

25         MS. OSTROW:  Yes.

```
 1              THE COURT:  So it's kind of easy.
 2              MS. OSTROW:  Yeah.  Just to make sure.  We don't know
 3    if there's additional claims that someone could bring for
 4    prepetition conduct.
 5              THE COURT:  Right.
 6              MS. OSTROW:  And then, I have an emergency hearing at
 7    one o'clock, Your Honor.
 8              THE COURT:  Okay.
 9              MS. OSTROW:  So I was just hoping if I could have --
10    maybe if we could come back at 1:20 or so that would be --
11              THE COURT:  Sure.  Not a problem for me.  I'll let
12    you -- I've got plenty of stuff I can deal with so -- but I
13    think it's important that everyone talk, probably get some
14    food.  And then -
15              Ms. Tirre?  We need to get you a mic.
16              MS. TIRRE:  Yeah.  In light of Mr. Bubala's
17    objection, Your Honor, at this moment I don't know if my client
18    will be bidding or not when we return.  However, if my client
19    wishes to bid, then I need some instruction or guidance as to
20    what will be required to overcome Mr. Bubala's objection.  I
21    have requested from my client a document to show its financial
22    wherewithal to bid.  I have requested that.  I'm hoping I will
23    have that in my possession.  If I do, I will come to court with
24    it.  I'm hoping that will be sufficient.
25              THE COURT:  You also should be prepared to --
```

1          Mr. Lehners, what is the term for closing?

2          MR. LEHNERS:  Your Honor, it is payable all cash five

3   days after entry of a non-appealable order.

4          THE COURT:  And you've sought waiver of -- well,

5   okay, so it won't affect the --

6          MS. TIRRE:  The 14 day --

7          THE COURT:  14 days.

8          MR. LEHNERS:  (Indiscernible -- 11:30:08) waiver of

9   6,000.

10          THE COURT:  Okay.  So yeah, you'll have to figure out

11   and present something as to being able to close within 14 days.

12          MR. BUBALA:  Your Honor, for clarification with

13   everyone else, we are willing to pay tomorrow, notwithstanding

14   any order.

15          THE COURT:  And that's what I think you have to talk

16   to Mr. Burke about in the next two hours.

17          MR. BUBALA:  Right.  I just wanted to make sure

18   Ms. Tirre's client understood that we're not going to delay for

19   five days.

20          THE COURT:  Yeah.

21          MR. BUBALA:  Our offer will be payment immediately.

22          THE COURT:  And Mr. Lehners, I'll expect you to

23   translate all of these discussions in the next two hours as to

24   any modification of the terms.

25          MR. LEHNERS:  Yes, Your Honor.

1          THE COURT:  Because if the terms -- we have the

2     terms.  If there's a modification, we'll take it in the

3     standard of what is the best and highest offer.  All right?

4     So --

5          MS. TIRRE:  Thank you.

6          THE COURT:  All right.         Mr. Adams, I see you

7     patiently standing in the back so --

8          MR. ADAMS:  Thank you, Your Honor.  I hope that my

9     question is very simple.  Seth Adams on behalf of Differential.

10    Ms. Tirre highlighted that aforementioned sentence, I guess,

11    buyer will not assume any liabilities to the seller to the

12    estate, and there was some discussion as to whether we were

13    referring solely to liabilities and/or claims.  In the context

14    of potential disputes regarding the purchaser's ability to

15    utilize a license, intellectual property, I want to make sure

16    that that is something that is not being compromised.

17          In other words, if I am to read claims into this

18    sentence, if a purchaser buys and that purchaser is utilizing

19    something that my client believes to be violative of their

20    intellectual property, I do not want this phrase being

21    transposed into something that would preclude my client from

22    pursuing those rights that you talked about were being

23    preserved this morning.

24          THE COURT:  I get it.  I appreciate you putting it on

25    the record.  And at 1:30 we'll see what happens.

1          MR. ADAMS:  Thank you, Your Honor.

2          THE COURT:  All right.  Okay.  So I'm going to let

3   you talk because I think that there's some things to talk

4   about.  Yeah.  Again, first of all, I'm glad we set this on for

5   an in-person.  I think this is one of the better uses of in-

6   person I've seen over the past recent term.

7          As I told -- or had a conversation with Ms. Ostrow, I

8   do not hear anything, other than potentially Mr. Adams'

9   comments that the sale should not go forward.  And as indicated

10  by my running commentary, I believe the trustee has

11  demonstrated a sound business judgment for the auction going

12  forward.  I think the discussion that we've had demonstrates

13  that all of the, you know, problems or warts on the assets

14  demonstrates that this sale is an expedient, efficient, and

15  from the bids on the record to date and a advantageous

16  administration of the estate.

17         So subject to anything that may come up contra at

18  1:30, when we convene.  It is the Court's intention to proceed

19  with the sale, and we'll discuss the exact terms when we

20  reconvene.  But we'll let the parties go.  We'll be adjourned

21  until 1:30.  Off record, please.  Thank you.

22         MR. BUBALA:  Your Honor, will you keep the courtroom

23  open for us so we can use this as a meeting space?

24         THE COURT:  That depends on Mr. Lehner's graces.  So

25  yes, sir.

1          MR. BUBALA:  Thank you.

2          THE CLERK:  Please rise.

3      (Recess taken at 11:33 a.m.)

4      (Proceedings resumed at 1:38 p.m.)

5          THE COURT:  We are back on the record in the Metal

6   Recovery main case and Burke v. Metal Recovery Solutions

7   adversaries.

8          Mr. Lehners, why don't you go ahead and just advise

9   me where we believe we're at.

10          MR. LEHNERS:  Your Honor, we -- I spoke to the

11   parties and I think it's come time to basically set up bidding

12   procedures.  Of concern is the application of 363(f).  That was

13   discussed a lot.  And I think it would be better if the parties

14   gave you their thoughts on how it's going to apply here, given

15   the items that we are selling.

16          And you can also discuss the bidding increments.

17   Ms. Tirre will be acting on behalf of her bidder, and I just

18   think we need to set those parameters up before we go ahead

19   with the auction, and I think it's best you hear it from the

20   individual parties.

21          THE COURT:  All right.  Certainly.  Let me go ahead

22   and state my baseline.  My understanding is that the current

23   offer being proposed is from JEX at 1.2 million, subject to the

24   term sheet that is either Page 26 or 37, depending upon what

25   you're looking at, on the ECF, and all the terms stated there.

1   Let me see if I can get to that.

2           Anyway, while I'm bringing that up, we'll use that as

3   the baseline -- as the baseline for our discussion.  I was

4   hoping things reset when we left, so bear with me for a minute.

5   We're going to talk -- allow you to talk through it while I'm

6   pulling up the documents actually -- be able to talk

7   intelligently --

8           MS. OSTROW:  Thank you, Your Honor.  And thank you

9   for the time, too, earlier.  One thing that we talked about

10  with Mr. Lehners and Mr. Burke is that this is -- our offer is

11  conditioned on a 363(f) finding, and we reserve all rights

12  to -- if we are not the successful bidder, to object to the

13  successful bidder the trustee selects otherwise.  But our offer

14  is expressly conditioned on that finding from the Court,

15  Your Honor, and that can be found in the term sheet both as to

16  the Court approval, a requirement that the Court find that

17  there's -- 363(f) finding, an also that the sale order include

18  that finding.

19          THE COURT:  I am almost to the point where I can pull

20  up documents.  So, before we really get into the weeds on this

21  too much, let me take that time to get them.  Can you give me

22  the ECF number?

23          MS. OSTROW:  Yes.  And I think it might be easier for

24  the record if we refer to the -- what the Court initially did

25  was the omnibus reply, which is at Docket 305 --

1            THE COURT:  Okay.

2            MS. OSTROW:  -- because I think everyone has the same

3    page numbers that way.

4            THE COURT:  If everybody else is, I can get to that.

5    So I am at ECF 305.

6            MS. OSTROW:  Yes.  And I am at Page 33 of --

7            THE COURT:  48, hopefully?

8            MS. OSTROW:  Yes.  48.  Thank you.

9            THE COURT:  All right.  And a chart with a bunch of

10   bullet points.

11           MS. OSTROW:  Yes.  And that bullet point says, "All

12   purchased assets shall be purchased free and clear of all

13   claims, including, without limitation, successor liability

14   claims, liens, and encumbrances, pursuant to Section 363(b) and

15   Subsection 5 of the bankruptcy code."

16           And the next section, Your Honor, at the very bottom

17   of the page, it says, "The trustee will motion to approve the

18   sale pursuant to Section 363(f) of the bankruptcy code, and

19   seek such similar relief."

20           THE COURT:  All right.  There's a nuance there.  I

21   don't dispute anything that you say, but lawyers are lawyers,

22   right?  And to the extent that some -- the buyer steps in, does

23   something, that is not successor liability or anything free and

24   clear of, that's incident of the ownership of the asset, that

25   is not what we're talking about under 363(b) and (f), correct?

1          MS. OSTROW:  I think that's my understanding.  So if

2    I could give just an example.  So, for example, the -- if we

3    step in as the owner of the trailers, we're technically each

4    side of the lease.  We're not going to be assuming we can

5    assume --

6          THE COURT:  Right.

7          MS. OSTROW:  -- the lease and it would be fine, but

8    there would be no -- any sort of prepetition claims that were

9    against, you know, some sort of breach of a contract or

10   something.  That's stuck with the estate.  No one could pursue

11   us for use of the trailers.

12         To the extent that -- because -- it's more

13   complicated if there are other buyers with us with JEX, because

14   we contend we have the exclusive license, a lot of those

15   disputes go away.

16         THE COURT:  Right.

17         MS. OSTROW:  But we understand that if -- let's say

18   GLA is the successful bidder, that if they buy the assets,

19   there would still be an issue of a license dispute down the

20   road.

21         THE COURT:  And that's when we will have a much more

22   detailed --

23         MS. OSTROW:  Robust --

24         THE COURT:  -- discussion of what that is.  And quite

25   honestly, it may not be after the bid.  It may be trying to

1  figure out which is the best and highest offer.  But again,

2  things get complicated even as the nominal lessee right now,

3  anything prepetition or anything presale that JEX did with the

4  trailer as the lessee -- again, I can imagine a situation where

5  there's a claim against both JEX and Metal Recovery, even

6  post-petition, because of the ownership of it, that that's not

7  really being released here, certainly not as to JEX, right?

8         Anything that JEX does -- just because it has an

9  incident to the trailer, just to be clear, I never know how far

10 to go out on a tree of "what ifs," but I think your point is,

11 to the extent that it is a prepetition claim against Metal

12 Recovery, that's against the estate.  Nothing is being

13 transferred, as I understand it.

14        I'll ask Mr. Lehners to confirm that in a moment, but

15 I think that's all well and cooked into this right now.  So I

16 think that's not a problem.  Why don't we go ahead and have

17 Mr. Lehners knock that out before we get too far afield.

18        MS. OSTROW:  Thank you.

19        MR. LEHNERS:  Thank you, Your Honor.

20        Thank you, Ms. Ostrow.

21        Your Honor, as I had mentioned before, what we are

22 selling is the claims that we have.  With respect to claims

23 against the estate and with respect to 363(f), there are some

24 issues.  We have reviewed the schedules and statements filed by

25 Metal Recovery Solutions signed under penalty of perjury.  They

1    did disclose to and only to Article 9 security interests, and

2    those were in favor of Differential Engineering, and those have

3    been dealt with.

4            Given the concerns of the bidders here today, I would

5    request, if the Court is willing, and Dr. Seal is willing, to

6    simply have him make a brief statement under oath that there

7    are no other security interests executed in favor of any other

8    party or liens against assets of the estate, secured claims,

9    liens.

10           THE COURT:  I'm not sure what that accomplishes.

11   Right?  Because all we're concerned about, quite honestly, is

12   perfected liens.

13           MR. LEHNERS:  Right.

14           THE COURT:  Right?  So, to the extent that there's a

15   secret lien out there, presumably, the bankruptcy code washes

16   that out.  The time has come for, you know, unsecured claims,

17   so that really should probably not be an issue.  But if there's

18   a perfected lien out there, there's a perfected lien, and it

19   rides through the bankruptcy -- has there been a UCC search?

20   If it's in Chile, does it matter?  I mean, I'm not sure how you

21   would perfect security interests against trailers that are now

22   in Chile.

23           MR. LEHNERS:  Your Honor, we did rely upon the

24   schedules and clearly we can perform a UCC-1 search and have --

25           THE COURT:  But there's no reason to believe that

1    that -- what you're telling me is there's no reason to believe,

2    as you stand here today, that that's going to indicate

3    anything.

4            MR. LEHNERS:  No.  I think Dr. Seal was 100 percent

5    honest when he filled out his schedules.  I haven't found any

6    misrepresentations --

7            THE COURT:  Well, and nobody's come in the two years

8    and said, hey, those are our trailers either.

9            MR. LEHNERS:  Exactly.  However, given the concern

10   that Ms. Ostrow voiced, it's a thought that went through my

11   mind that at least something should be put on the record for

12   assurances that there are no perfected liens or security

13   interests out there.  Unperfected liens, unperfected security

14   interests can be dealt with under the trustee's powers that are

15   being assigned.  That's not an issue.  But it's the ones that

16   are of record.  And I do think that that should probably be

17   addressed with respect to the --

18           THE COURT:  I'm not opposed to that, but I'm not sure

19   what it's going to give you in addition to the statement of --

20   the statements, the --

21           MR. LEHNERS:  The schedules.

22           THE COURT:  Right.  So you've got one sworn statement

23   against another then, and adding two sworn statements doesn't

24   make it any more true or false.

25           MR. LEHNERS:  Understood.

1          THE COURT:  So, you know, the only other thing that

2   would be done would be a UCC, and you're telling me that in

3   reasoned business judgment not necessary because the debtor has

4   sworn to it under penalty of perjury --

5          MR. LEHNERS:  Uh-huh.

6          THE COURT:  -- and there's been no indicia in the

7   past two years that anybody's got -- other than Differential,

8   of course.

9          MR. LEHNERS:  That's what we are relying on.

10  However, given the concern shown by the parties, it was an

11  issue I thought I should tell the Court.

12         THE COURT:  If the bidders believe that that is

13  material to it, then, you know, I'm happy to hear them and we

14  can undertake this.  But if not, then I think we've got what

15  we've got, and putting Mr. Seal -- Dr. Seal under testimony

16  isn't really going to change that.

17         MR. LEHNERS:  Understood, Your Honor.  Thank you for

18  hearing --

19         THE COURT:  Ms. Ostrow, you can nod yes or no.  You

20  don't need it?  No.  And Mr. Bubala is saying he doesn't.

21         Ms. Tirre, are you concerned?  All right.

22         All right.  So that issue is what it is.

23         MR. LEHNERS:  Right.  Can I answer anything else for

24  you, sir?

25         THE COURT:  I'm not sure if Ms. Ostrow was done or

1   not.

2          Did you have any other -- we interrupted you, so I

3   want to make sure that you have a full chance to --

4          MS. OSTROW:  Oh, no, no, no.  Thank you.  I

5   appreciate it.  I just -- and I think that -- I appreciate

6   Mr. Lehners addressing the concern, and I think that the Court

7   understands that the parties have not always gotten along, and

8   so it's more of an issue about claims and other -- less about

9   liens, more about general claims, hopefully, and also

10  protecting the fact that we don't believe the debtor owns

11  certain things --

12         THE COURT:  Right.

13         MS. OSTROW:  -- and patent exhaustion argument

14  preserved --

15         THE COURT:  I think we're -- you know, we're getting

16  to that point where we just need to see who the bidder is to

17  see what that means towards the sale.

18         MS. OSTROW:  Thank you, Your Honor.

19         THE COURT:  All right.  Certainly.

20         UNIDENTIFIED:  (Indiscernible).

21         UNIDENTIFIED:  My question will probably refer to Ms.

22  Ostrow, so that's why I'm doing a little hand motion.  There

23  was a reference to a 3 -- was it a 363(f) finding or a 365(f)?

24         MS. OSTROW:  Oh, I apologize.  I may have said 365.

25  I meant 363, Your Honor.  363(f).

```
 1          THE COURT:  You want the free and clear.

 2          MS. OSTROW:  Yes, Your Honor.

 3          THE COURT:  Yes.

 4          UNIDENTIFIED:  Okay.  All right.  I just needed to

 5  clarify that because I was reading 365 and --

 6          THE COURT:  Okay.

 7          UNIDENTIFIED:  -- I was thinking what?  All right.

 8  Thank you.

 9          THE COURT:  All right.  Mr. Bubala, anything before

10  we go into the terms specifically?

11          MR. BUBALA:  No, Your Honor.

12          THE COURT:  Ms. Tirre.

13          MS. TIRRE:  Your Honor, I spoke with the trustee and

14  his counsel, and I had the chance to get my client

15  representative on the phone.  I believe my client has satisfied

16  the trustee's concerns or if there -- there weren't any.  It

17  was raised by GLA's counsel.  But my client is prepared to go

18  forward and bid today.

19          THE COURT:  Okay.  Good.

20          MS. TIRRE:  And I'd just make a record.  There were

21  no bidding procedures in the order.  There's no

22  prequalification requirements.  There's no proof of fund

23  requirement.  No other bidder here has had to satisfy that, so

24  I would ask, to the extent the GLA still raises its objection,

25  it be overruled with respect to my client.  Thank you.
```

 1          THE COURT:  All right.  So I think that's a natural

 2   segue as to who are the bidders in the room.  We obviously have

 3   JEX.  I'm assuming from GLA's participation that GLA is

 4   participating.  And based upon Ms. Tirre's comments, I'm

 5   assuming that her client is participating, as well.

 6          MS. TIRRE:  Your Honor, may I speak further to that?

 7   Ms. Ostrow just made a record with respect to the terms and

 8   conditions for her client, and including a 363(f) finding --

 9          THE COURT:  363(f), yes.

10          MS. TIRRE:  Yeah, finding.  And my client is going to

11   require the same finding in the Court's order with respect to

12   its -- if it is the prevailing bidder.  Because this is, again,

13   back to the term sheet my client was relying upon, it's in the

14   term sheet.

15          THE COURT:  That's fine --

16          MS. TIRRE:  Thank you.

17          THE COURT:  -- except --

18          MS. TIRRE:  Yes.

19          THE COURT:  -- the meaning of "free and clear."  One

20   is going to be much different from JEX versus your client, as I

21   understand, right?

22          MS. TIRRE:  Understood.  With respect to JEX, that's

23   not an issue for my client, because I understand that it

24   asserts certain rights and has certain objections with respect

25   to both the license and/or the lease --

```
 1                THE COURT:  Okay.
 2                MS. TIRRE:  -- depending on who the bidder is.  And
 3   I'm not concerned about that for my client.
 4                THE COURT:  All right.  And that's an important
 5   statement to --
 6                MS. TIRRE:  Understood.
 7                THE COURT:  -- get on the record, I think.  I think
 8   that largely clears that path.
 9                So, Mr. Lehners, any comments?  I mean -- or concerns
10   from the trustee as to that?
11                MR. LEHNERS:  Not at this time, Your Honor.
12                THE COURT:  All right.  So, to the extent sale is
13   free and clear, free and clear of liens with any interest to
14   attach in the order and priority that they existed pre, there
15   are no known existing liens to attach, that is really an
16   abundance of caution as to free and clear of interest.  It
17   sounds like there's an agreement that the motion which provided
18   that the sale be free and clear is free and clear of interest,
19   although the parties are all aware of JEX's -- JEX
20   Technologies' position regarding its technology, patents,
21   licenses, which is not being sold free and clear of.  That is
22   determined by federal laws, the patents and the trademarks, and
23   the other applicable state law as to its interest pursuant to
24   its preexisting agreements for the use of the trailers, the
25   technology, and such.  All right.  That is one term.  That is
```

1    taken care of.  Agreed?

2              MR. LEHNERS:  Yes, Your Honor.

3              THE COURT:  All right.  Mr. Bubala?

4              MR. BUBALA:  Yes, Your Honor.

5              THE COURT:  Mr. Oines?

6              MR. OINES:  Yes.

7              THE COURT:  Okay.  Ms. Tirre?

8              MS. TIRRE:  Yes, Your Honor.

9              THE COURT:  All right.  Ms. Ostrow, I should also

10   just come back to you.  Is that acceptable as to the Court's

11   representation of that term?

12             MS. OSTROW:  Could you repeat that, please,

13   Your Honor?

14             THE COURT:  No, I don't think I can.  I can summarize

15   it, though.  It's just that free and clear of liens, that's the

16   easy one.  No one believes there's any liens.  It will be free

17   and clear with liens to attach in order and priority that they

18   may exist.  None are believed to exist, pursuant to the Court's

19   ruling on Differential claim objections.

20             Free and clear is also as to interest except your

21   client's interest in the technology, the lease, the patents,

22   all we've been talking about, it's not being sold free and

23   clear of.  That is to be determined under the applicable law.

24             MS. OSTROW:  I appreciate that, Your Honor.

25             THE COURT:  All right.  So free and clear, as we have

1    discussed, what other terms and conditions are -- do we need --

2    Mr. Adams, go ahead.

3            MR. ADAMS:  Thank you, Your Honor.  I think mine

4    might be --

5            THE COURT:  I think you need to come up.  I'm sorry.

6    That's the problem.

7            MR. ADAMS:  Not a problem.  Sorry.

8            THE COURT:  Get your steps in.

9            MR. ADAMS:  Seth Adams on behalf of Differential

10   Engineering.  I would hope that Differential could dovetail,

11   although the interests are completely distinct from those

12   asserted, that we simply don't have -- we haven't lost by

13   virtue of a sale free and clear the right to have

14   determinations of the ownership of intellectual property.

15           Again, today there's no -- not going to be any

16   definitive ruling as to what is being sold.  JEX is obviously

17   wanting to maintain all of its rights.  I would certainly ask

18   that Differential be able to do the same.

19           THE COURT:  I don't think that is a problem, but I'm

20   not sure what lien or interest -- I mean, the lien we

21   understand.  That's claim objection.  That's through the

22   adversary and the BAP appeal.  That would be free and clear

23   of --

24           MR. ADAMS:  Uh-huh.

25           THE COURT:  Right.  I mean, subject to distribution,

```
 1    which is really the ultimate end goal there for Differential.
 2    As to any interest, I'm trying to make it fairly clear-cut
 3    between ownership.  That is not an interest to be sold free and
 4    clear of, right?  And that's what Mr. Lehners has repeatedly
 5    said.  All that's being sold is all that they own.
 6              MR. ADAMS:  Okay.
 7              THE COURT:  So, if there is not an ownership, they
 8    cannot own it.  They cannot sell it.  I think that answers the
 9    question.
10              MR. ADAMS:  And I think we've put that on the record.
11    I can't imagine incorporating it into an order would
12    necessarily --
13              THE COURT:  Right.
14              MR. ADAMS:  -- be possible, but I appreciate that,
15    Your Honor.
16              THE COURT:  All right.
17              MR. ADAMS:  Thank you.
18              THE COURT:  I have a sense, Mr. Bubala, I should come
19    back to you as to additional terms or -- or do I need to go to
20    either Ms. Ostrow or Mr. --
21              MR. BUBALA:  Your Honor, we put the terms forward
22    that were filed with Mr. Lehners' motion.  We --
23              THE COURT:  I'll keep inching this along then.
24    50,000 increments is --
25              MR. BUBALA:  Fair enough.
```

1          THE COURT:  -- acceptable?  All right.

2          Ms. Tirre, 50,000 increments?

3          MS. TIRRE:  Yes, Your Honor.

4          THE COURT:  And Ms. Ostrow.  All right.  50,000

5   increments.

6          All right.  Closing?  It was said to be 14 -- well,

7   effectively 14 days after the Court's order.  Is there any

8   change in the term of closing?

9          MR. LEHNERS:  Your Honor, just a term of

10  clarification.  And it basically says that payment is due

11  within five business days of the bankruptcy court entering a

12  final non-appealable order approving the agreement.  I would

13  like some clarification of what "non-appealable" means in this

14  context.

15         THE COURT:  I know what it means legally, but I'm not

16  sure that that's what the parties mean.

17         MR. LEHNERS:  In other words, what I'm getting at is

18  we have 14 days to appeal an order after entry on the docket.

19  In the event Day 15 comes and there is no appeal, then it's a

20  non-appealable order.  If it is, however, appealed, we have

21  asked for a 363(m) finding, and there would be a stay required.

22  At that point in time, the stay, I would presume, would require

23  a bond, probably equal to or greater than the amount of the

24  bid, so the estate and the creditors would be protected.

25  That's all I was getting at.

```
 1                THE COURT:  Okay.

 2                MR. LEHNERS:  As opposed to the order's entered,

 3   automatically is paid, and then there's an appeal later on.  So

 4   I believe under the term sheet -- and parties are free to pay

 5   early if they wish.  We would love that.  But I just wanted to

 6   clarify, the way I read it, non-appealable means no appeal

 7   filed within the 14 days.  And if one is filed, we default to

 8   363(m).

 9                THE COURT:  All right.  So let me -- where is -- is

10   the closing requirement -- do you happen to have --

11                MR. LEHNERS:  Yes, Your Honor.  I am looking at 255.

12   It is Page 26, purchase price, 1,150,000 in cash.  And then in

13   the bullet point below that, you will find that language.

14   Page 26.

15                THE COURT:  So I'm looking, unfortunately, at one

16   that's been typed over.

17                MR. LEHNERS:  Is it ECF 255?

18                THE COURT:  I'm on the reply.

19                MR. LEHNERS:  Oh, I can get that --

20                THE COURT:  No, no, no.  I'll find it.

21                UNIDENTIFIED:  I have it.

22                MR. LEHNERS:  Your Honor, Page -- also 26 of the

23   reply, would be Exhibit 2.

24                THE COURT:  I've got "Sale Order" as the header on

25   the far left of the columns.  "Court approval."  "Court
```

1   approval" is the last --

2         MR. BURKE:  Your Honor, may Mr. Lehners approach --

3         MR. LEHNERS:  May I approach?

4         MR. BURKE:  -- and give you his copy?

5         THE COURT:  Thank you, Mr. Burke.  All right.  255-3

6   at Page 26.  Within five days of the business -- business days

7   of the bankruptcy court entering a final non-appeal -- so

8   really we're talking about 19 days then?

9         MR. LEHNERS:  Yes.  Yes, Your Honor.  If there's no

10  appeal.  And if there is an appeal --

11        THE COURT:  If there's no appeal.

12        MR. LEHNERS:  -- we deal with 363(m).  That's --

13        THE COURT:  Okay.  So the Court interprets this five

14  days after becomes non-appealable.  And if there is an appeal,

15  then there's issues -- that will play out.

16        MR. LEHNERS:  Yes, Your Honor.  We'll play those out

17  then.

18        THE COURT:  All right.  Does everyone agree with the

19  term for closing?  Mr. Bubala, it sounds like it's taken from

20  your document, so --

21        MR. BUBALA:  Which was taken from JEX's document

22  originally.

23        THE COURT:  Okay.

24        MR. BUBALA:  Your Honor, we would modify our bid so

25  we would close within two days.

```
1              THE COURT:  All right.  That's when we get into --
2              MR. BUBALA:  Two days --
3              THE COURT:  That will be your counter-offer.
4              MR. BUBALA:  Yes.
5              THE COURT:  All right.  Ms. Ostrow, you're the
6    current -- current bidder on the board, so I assume there's no
7    problem with the closing date.
8              MS. OSTROW:  That's correct, Your Honor.
9              THE COURT:  All right.  And Ms. Tirre.
10             MS. TIRRE:  I'm just clarifying.  Right now --
11             THE COURT:  Mic.  We should have just had a handheld
12   so you'd get --
13             MS. TIRRE:  Thank you.  So, just clarifying, it's 19
14   days, correct?
15             THE COURT:  Hopefully, knock on wood.  Right?  I
16   mean, the earliest it would be was the 14-day period, five days
17   after, it's 19.  If something happens, then blah blah blah, and
18   it's whenever the Court enters the order, of course, so --
19             MS. TIRRE:  And we're all pragmatists, but --
20             THE COURT:  Yes.
21             MS. TIRRE:  -- my client's understanding is that it
22   could possibly be shorter than that, and that's fine, too, but
23   I just --
24             THE COURT:  Okay.
25             MS. TIRRE:  -- wanted to understand what the timing
```

1   is that's currently before the Court.

2              THE COURT:  And I think that from -- Mr. Bubala is

3   indicating that that will be a term --

4              MS. TIRRE:  Thank you.

5              THE COURT:  Thank you, Ms. Tirre.

6              All right.  What other terms are there that we need

7   to clarify before we go into auction?

8              MR. LEHNERS:  Your Honor, I guess, could I ask for a

9   clarification?  The term sheet has a waiver of the 14-day stay

10  under 6004(h) --

11             THE COURT:  Uh-huh.

12             MR. LEHNERS:  -- as to the effectiveness.  We're

13  applying a different rule under 8000 or something for the

14  appealable time period.

15             THE COURT:  Yeah.  You're not waiving -- I don't

16  think you can get everybody here to waive the time for the

17  appeal.  And since it's triggered on the appeal, the

18  effectiveness is immaterial to the performance of the purchase

19  price.

20             MR. LEHNERS:  Okay.

21             THE COURT:  But I mean you're right.  I did see that

22  there -- were waiving the -- I mean the 6004(h), but that

23  becomes meaningless because it's tied to the appellate period.

24             MR. LEHNERS:  Unless we close.

25             THE COURT:  Unless you make an offer that has to be

1  accepted or met.

2          MR. LEHNERS:  Okay.

3          THE COURT:  Anything else that we need to discuss?

4          All right then.  We're agreed that we are now into

5  the auction, correct?  Hearing no objection, the offer

6  currently before the Court on the terms that we have just

7  discussed is by JEX Technology at 1.2 million cash.  Are there

8  any bids in excess -- and we're starting from the beginning at

9  50,000.  Correct, Mr. Lehners?

10          MR. LEHNERS:  We have 1.2 million outstanding, and

11  the bidding increments -- the bidding increments are 50,000.

12          THE COURT:  All right.  So any bids at 1,250,000?

13          MR. BUBALA:  Yes.

14          THE COURT:  All right.  GLA bids 1.25.  And that's

15  the counter-bid then, Mr. Bubala?

16          MR. BUBALA:  Yes, Your Honor.

17          THE COURT:  All right.  Then, on the terms and

18  conditions we have previously stated, any bid at 1,300,000?

19          JEX bids 1,300,000.  Feel free to jump -- we don't

20  have to go 50,000 if that was improvident.  It may take us an

21  hour to get through.

22          So 1.3 million is the bid from JEX.  Any bid at a

23  higher -- higher offer?

24          MR. BUBALA:  GLA, 1.35.

25          THE COURT:  1.35.  1.4?  All right.  And Elements

1    Global bids 1.4.

2              1.45?

3              MR. BUBALA:  1.45, GLA.

4              THE COURT:  1.45, GLA.

5              1.5?  1.5 from JEX.

6              1.55?

7              MR. BUBALA:  GLA.

8              THE COURT:  1.55 from GLA.

9              1.6?  1,600,000?  From GL -- from JEX.  Sorry.

10             1.65 million?

11             MR. BUBALA:  GLA.

12             THE COURT:  GLA is at 1.65.

13             1.7 million?  1.7 million from JEX.

14             1.75?

15             MR. BUBALA:  GLA.

16             THE COURT:  GLA.  1.8 million?  Elements Global?

17             1.85 million?

18             MR. BUBALA:  GLA.

19             THE COURT:  GLA at 1.85.

20             1.9 million?  1.9 million from JEX.

21             1.95?

22             MR. BUBALA:  GLA.

23             THE COURT:  1.95 from GLA.

24             2 million?  2 million from JEX.

25             2,050,000?

```
 1              MR. BUBALA:  GLA.

 2              THE COURT:  GLA.

 3              2,100,000?

 4              UNIDENTIFIED:  Sorry.  Where -- what is the increment

 5  right now?

 6              THE COURT:  We're moving to 2.1 million.  Elements?

 7              Move to 2,150,000.

 8              MR. BUBALA:  GLA.

 9              THE COURT:  GLA at 2,150,000.

10              2.2 million?  JEX.

11              2,250,000?

12              MR. BUBALA:  GLA.

13              THE COURT:  GLA at 2.25.

14              2.3 million?  2.3 from JEX.

15              2.35?

16              MR. BUBALA:  GLA.

17              THE COURT:  GLA at 2.35 brings us to 2.4 million.

18              UNIDENTIFIED:  2.4?

19              THE COURT:  2.4.  Yes.  Sorry.  Elements?

20              2.45?  The current bid is 2.4 million.  The needed

21  bid to continue is at 2.45.

22              MS. OSTROW:  Your Honor, can we take a recess?

23              THE COURT:  Pardon me?

24              MS. OSTROW:  Can we take a recess, just for five

25  minutes (indiscernible) recess?
```

1          THE COURT:  Recess?  We'll be in recess for about

2   five minutes.

3          MS. OSTROW:  Thank you.

4          THE COURT:  Let the in-court know that we are off

5   record.

6          THE CLERK:  Please rise.

7      (Recess taken at 2:12 p.m.)

8      (Proceedings resumed at 2:33 p.m.)

9          THE COURT:  We are back on record in the Metal

10  Recovery Solutions main case and the associated adversary Burke

11  v. Metal Recovery Solutions, et al.

12          All right.  When we took our break, the present bid

13  was 2.4 million by Ms. Tirre's client, Elements Global.  And

14  the next bid would be 2.45.  Is there a bid at 2.45 million?

15          MS. OSTROW:  Yes, Your Honor.  There is a bid at

16  2.45.  I want to clarify for the record this is a joint bid

17  between JEX and Dr. Seal.  That would be 2.3 million from JEX

18  Technology and -- I'm not very good at math -- .15 --

19          THE COURT:  150,000.

20          MS. OSTROW:  Thank you.  From Dr. Seal.  That's

21  embarrassing.  But -- and we've discussed this with the

22  trustee, and I think the trustee is amenable to the acceptance

23  of the joint bid.

24          MR. BURKE:  Yes, Your Honor.  That's correct.

25          THE COURT:  All right.  Thank you.  So we'll

1  accept -- the Court accepts the bid of 2.45 million combined

2  from JEX and Dr. Seal.

3          MS. OSTROW:  Thank you, Your Honor.

4          THE COURT:  That brings us to 2.5 million.  A bid at

5  2.5 from Elements.

6          2.55?  Any bid at 2.55 million?

7          There is no bid from JEX.  I'm seeing no bid from

8  GLA.  I'm not going to do "going once, twice."  All right.

9  That concludes the bidding.  The winning bid is 2.5 million

10  from Elements Global.

11          Mr. Lehners, are you requesting a backup bid?

12          MR. LEHNERS:  I am, Your Honor.  I would like the

13  backup bid of 2,450,000, the joint bid by JEX and Dr. Seal, to

14  be the backup bid.

15          THE COURT:  Unless there's any objection, the Court

16  will find that the backup bid submitted by JEX with Dr. Seal at

17  2.45 million -- $2,450,000 is the backup bid.

18          All right.  Now we know who the winning bidder is.

19  What additional matters do we need to discuss, if any?

20          MR. LEHNERS:  Your Honor, the one issue that I have

21  is that since Elements -- we have no claims against Elements at

22  all, none.  They're a stranger to the case.  I don't believe --

23          THE COURT:  I don't know that.

24          MR. LEHNERS:  Okay.  That's fine then.  Then I'll

25  just stand on the 9019 analysis that I have done.

1          THE COURT:  But the trustee is requesting a 363(m)

2    designation, correct?

3          MR. LEHNERS:  Correct.

4          THE COURT:  All right.  I will need some testimony,

5    Ms. Tirre, to establish the good faith, because I have no idea

6    who Elements Global is.  So is your client available by remote?

7    Client representative?

8          MS. TIRRE:  He is in an airport right now.

9          THE COURT:  All right.

10         MS. TIRRE:  So it's -- just for the record, it's

11   Element Global, Inc.

12         THE COURT:  Okay.  And there's a long string after

13   that, as well?  I --

14         MS. TIRRE:  No.  It's -- there's an authorized agent.

15   It's called Empire Capital Management, LLC.  With respect to a

16   good faith finding for the prevailing bidder, Your Honor, if we

17   could just have a break, I'll contact him.  I understood he was

18   walking through airport security as I was last speaking with

19   him.

20         THE COURT:  The other alternative, if he's going to

21   be someplace tomorrow morning, I have a 9:30 and an 11.  And

22   I'm here.  So if you want to actually have a set time where he

23   won't be public, I just need -- need you to put him on there

24   and go through whether there's any association to the -- you

25   know, the bankruptcy debtor, the principals or -- and allow any

```
 1   for cross-examination is there is a concern.

 2             MS. TIRRE:  Okay.  Yes, Your Honor.  For the record,

 3   I did forward the definition of "insider" to Mr. David

 4   Richards, who is the principal of Empire Capital Management,

 5   LLC.  I asked him to verify that neither Empire Capital

 6   Management, LLC nor Element Global, Inc. has any party

 7   affiliated with it that could be deemed an insider under

 8   Section 101 -- I think subpart 31 of the code, and I have an

 9   email to that effect in my possession.

10             But with respect to putting on evidence, if I could

11   have a break, I'll contact Mr. -- the person who I have been

12   conferring with is Steve Gagnon, G-A-G-N-O-N, and he is the CEO

13   of Element Global, Inc.  I have to confer with him to see if he

14   has availability tomorrow.

15             And may I ask just for the Court's indulgence.  I

16   happen to have a doctor's appointment at 10 a.m. tomorrow.  It

17   happens to be in the neighborhood here.  So if it could be

18   11:30, I think I could be here.

19             THE COURT:  I can accommodate that.

20             MS. TIRRE:  Okay.  Thank you.

21             THE COURT:  Certainly.  So let's go off record one

22   more time, let Ms. Tirre coordinate with her client, and then

23   we will see what else we need to address by way of closing this

24   matter up.  All right.  Off record.

25         (Recess taken at 2:40 p.m.)
```

1      (Proceedings resumed at 2:51 p.m.)

2           THE COURT:  All right.  We're back on record in Metal

3  Recovery Solutions and the associated adversary v. Metal

4  Recovery Solutions et al.  Ms. Tirre?

5           MS. TIRRE:  Thank you, Your Honor.  Amy Tirre on

6  behalf of Element Global, Inc.  I conferred with Mr. Steve

7  Gagnon.  He will be available tomorrow at 11:30 a.m. Pacific

8  time for a telephonic appearance --

9           THE COURT:  Sure.

10          MS. TIRRE:  -- to testify regarding the good faith of

11 the buyer.  And I just want to make clear, he is the CEO of a

12 publicly traded entity, and therefore, the sole subject matter

13 of tomorrow's hearing is the good faith finding and lack of

14 insider status.

15          THE COURT:  It -- it's the good faith finding.  Yes.

16          MS. TIRRE:  Okay.

17          THE COURT:  That's all.  But given everything that's

18 happened in this case, I think it's best to cross the T and dot

19 the I.

20          MS. TIRRE:  Right, Your Honor.  I just -- my only

21 concern is we're not opening the door to a big evidentiary

22 hearing about the financial status of Element Global, Inc.

23          THE COURT:  We will see where it takes us.  I

24 understand the concern.  I -- I'll be here and listening.  So

25 as a logistical matter, I'll be here, "here here."  So --

1          MS. TIRRE:  I will be "here here" too.

2          THE COURT:  Okay.  I was going to say, if you want to

3    come, any other parties that that want to come are welcome to

4    participate.  Since it'll be telephonic, it can be

5    telephonically or in person.  And then --

6          MS. TIRRE:  Your Honor, as I stated, I'll be --

7          THE COURT:  Okay.

8          MS. TIRRE:  -- in the area of -- physically of the

9    courthouse.

10         THE COURT:  Right.

11         MS. TIRRE:  I will come to the courtroom tomorrow.

12   Thank you.

13         THE COURT:  Okay.

14         MS. TIRRE:  My client will -- representative will be

15   on the phone.

16         THE COURT:  Of course.  All right.  Mr. Lehners, any

17   other matters that we need to clarify or address before we

18   conclude the auction?

19         MR. LEHNERS:  Your Honor, no, not that I can think

20   of.  Everything was set forth very well.  I did take notes

21   regarding what 363(f)(5) means, that Jex's rights are

22   preserved; that the other claims would attach to the proceeds

23   in order of priority; and we're selling exactly what we own.

24         I have also offered to circulate the proposed order

25   of course, to Ms. Tirre as well as Ms. Ostrow and Mr. Bubala

1  and Mr. Oines if they wish to see it, so everybody can chime

2  in, and we can make it as thoroughly -- as thorough as

3  possible.

4          And I want to thank you for listening to us today.  I

5  know it was long.

6          THE COURT:  It's my job.

7          MR. LEHNERS:  And it was going down a lot of rabbit

8  holes, but I think we got a good result today for the

9  creditors.  Thank you, Your Honor.

10          THE COURT:  All right.  I still need to make my

11  findings, but I want to allow the people who are getting up in

12  the gallery to make their statements before I conclude with my

13  findings.

14          MS. OSTROW:  Thank you, Your Honor.  Just one

15  question on scheduling for tomorrow.  Is there availability for

16  a Zoom appearance as well, or will it only be telephonic?  And

17  I don't want to throw it too many wrenches in.

18          THE COURT:  We can accommodate a Zoom video.

19          THE CLERK:  I could create a Zoom meeting --

20          THE COURT:  Yeah, if you would, go ahead.

21          THE CLERK:  -- by video.

22          THE COURT:  I assume you want to participate by

23  video?

24          MS. OSTROW:  Yes, Your Honor.  I have a flight this

25  evening and an infant at home, so she's technically a toddler

1   now.  Then one other thing that Mr. Lehners did say, we would

2   like to look at the final order and be able to comment before

3   the Court enters that, so thank you.

4           THE COURT:  Certainly.  Ms. Fletcher?

5           MS. FLETCHER:  Hi.  Elizabeth Fletcher on behalf of

6   Dr. Seal.  I'd like to ask if we could also look at the order

7   since we participated in the bidding, and we had an opposition

8   in.

9           THE COURT:  I do not have a problem with you looking

10  at it.

11          MS. FLETCHER:  Great.  Thank you.

12          MR. LEHNERS:  No objection for the record.

13          THE COURT:  Thank you, Mr. Lehners.

14          All right.  We have spent a considerable amount of

15  time going through the predicate for the sale, the terms of the

16  sale, and then ultimately concluding the sale.  There was some

17  question at the beginning of this morning as to what

18  transaction would actually ultimately be presented.  As I

19  understand it and reading between the lines from Ms. Tirre's

20  comments about her client being, as advised to the Court, a

21  third party, this is not a compromise.  This is a sale.

22          The transfer of the assets is not in conclusion of

23  litigation.  This comment may be subject, quite honestly

24  until -- with tomorrow's testimony to confirm that, but as of

25  this moment, the Court is interpreting this to be a sale under

1   363, rather than compromise under 9019.  Recognizing given the

2   other parties in interest that if either GLA or really Jex had

3   been the prevailing bidder, then they -- that would cast a

4   different light as to the aspects of the pending lawsuits and

5   claims asserted by the trustee as how they would proceed.

6          With that said, until the sale actually closes, there

7   is some necessity to at least recognize the compromise

8   component of it, given that Jex is a backup bidder at

9   $2,450,000.  Regardless of which vehicle is used and the

10  standards to be applied, again, I am struck by over --

11  overriding sense that the discussion today demonstrates the

12  best interests and -- of either a sale or the compromise of

13  this bundle of assets, which is obviously subject to

14  considerable dispute amongst the parties as to what the estate

15  actually holds, be it the tangible property inherent in the two

16  trailers.  While the estate owns the two trailers, their use

17  and the value of those entities depends upon the ability either

18  to maintain the lease between the estate and Jex, or use the

19  trailers for individual purposes presumably with Jex

20  technology.  The question of any entities other than Jex's

21  ability to use the Hydro-Jex technology is a very disputed,

22  contentious point.

23         However and again, mysterious, I'm walking through

24  this; I may be interested in developing this tomorrow as to the

25  intent of the purchaser, but the representation was made by

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  Ms. Tirre going through the terms and conditions, and I

2  understood it, that Elements was intending to enforce the lease

3  as the lease, and therefore, it obviates some of the concerns

4  about the use of the technology as -- if that is the case, .

5  Jex will continue to possess the trailers with a option to

6  purchase and has all the rights under its license with

7  Differential as to the use of the Jex technology.

8          That is a good result for the estate.  It helps

9  alleviate burdens on the estate as to the determination of the

10  exact rights as to the usage of the trailers.  And quite

11  honestly, the concerns regarding the technology, and I am

12  speaking fairly informally there, as to the patents,

13  trademarks, IT, and all of those concerns that were referenced

14  during the course of this hearing.  That comes at a big

15  benefit, not the least of which is the significant increase in

16  the purchase price as well.

17          The auction served its function to maximize the

18  purchase price.  There was a considerable amount of discussion

19  about chilling with the lack of clarity as to what the estate

20  actually owned and its ability to convey items.  But again, the

21  actions speak louder than the words and a robust auction was

22  held.  The fact that a -- it appears a third party was able to

23  participate and ultimately prevail, suggests that this was far

24  from chilled.  Does seem that there is a very limited market.

25  The parties that have essentially necessitated the bankruptcy

1  filing were obviously the primary parties in interest and

2  participated vigorously.  But the fact that the third party was

3  able to take advantage of a continuance, appear, bid,

4  participate meaningfully, I think reflects that there was

5  sufficient time, deference to the concerns to allow the estate

6  to ascertain the realities of the sale and keep it moving

7  forward.  And this case, with its history of which I am well

8  acquainted and well aware and take into full account, needs to

9  continue to move forward.  The trustee has done so.

10       The sale/compromise is a wholly appropriate

11  mechanism.  To the extent that it's a sale is clearly supported

12  by the sound business judgment.  It was submitted to an auction

13  for which three entities participated through several rounds.

14  I have agreed on the terms.  I think it has been a, you know, a

15  excellent example of the use of an auction to maximize the

16  estate with unknown -- with assets that are unknown in their

17  ownership and the extent of rights, faced with a difficult and

18  costly, timely path to ascertaining those rights, while

19  maximizing a return for the estate.

20       As to the claims, we have what appears to be a third

21  party purchasing those claims.  The claims are subject to

22  continuing dispute.  There have been some ancillary

23  developments within the claim objection for which certain facts

24  were adduced, relied upon in a claim objection that may well be

25  used in any further claims litigation within particularly the

1    trustee's adversary.  That's all well and good, but the point

2    is, is that there is some knowledge and development of those

3    facts by the trustee or through GLA in the claim objection.

4           So there is some establishment of the universe of the

5    factual predicate supporting the claims brought by the trustee.

6    They have not been litigated to conclusion.  There are no

7    pending motions that I'm aware of in that adversary, but they

8    are -- they constitute claims of the estate, and they are

9    capable of being sold.  No party has objected to the sale of

10   those claims.  The discussion regarding those claims for

11   purposes of compromise also serves to support the sale of those

12   claims as part of this aggregated bundle that the estate owns.

13          At the commencement of this morning, I did ask

14   Mr. Lehners if there was some valuation of the separate

15   components being transacted today.  We never really got to

16   that.  But there was a reference to the Open Medicine case from

17   the BAP and I think, related to that, what's clear in this

18   situation is that oftentimes in bankruptcies that the sum is

19   worth way more than the individual parts, and is the Court's

20   considered understanding and finding, that that is exactly the

21   case here today.  I don't know if it's possible to break down

22   the components to assign specific valuations, but altogether

23   the components of the tangible property in relationship to the

24   lease, in relationship to the causes of action, and the claims,

25   had significant value as demonstrated through the auction.

1          So I do not believe that it's necessary to really

2    develop any more discussion than the trustee has submitted

3    within the reply, in particular, and Mr. Lehners' presentation

4    at the commencement of this proceeding.  But while I do not

5    opine or offer any decision as to what was said there, I think

6    those points in that discussion are all valid as a preliminary

7    statement of the trustee's claims and quite honestly, the

8    concerns.  I think it also establishes while you know, it's

9    easy enough to say that litigation is costly and time consuming

10   and uncertain, all that's true.  The Court's involvement in

11   this case for an extended period of time, including the

12   totality of the claim objections and the filing of the

13   trustee's lawsuit, leaves the Court with a firm and definite

14   conviction that the sale of these claims, while substantial

15   claims, is supported by the economic benefit that the estate

16   has received by bundling it with the sale of whatever assets it

17   has as to the hard assets in the trailer, the lease with Jex,

18   and any other personal property that goes along with it.

19          So short answer, saying I do not believe that the

20   estate could recover the same total amount by segregating the

21   hard assets and the causes of action to the point that the sum

22   is greater than the individual components here.  So the Court

23   does find that the sale is in the best interest of the estate,

24   that there is a reasoned, articulated, and supported decision

25   by the trustee to proceed with the sale and/or compromise.

1   Turns out that the Court believes that as constituted to

2   Elements Global, Inc., that it is a sale and not a compromise,

3   but even if something were to happen to the winning bid of the

4   $2.5 million such that the backup bid to Jex and Dr. Seal at

5   $2.5 -- -45 million would be the winning bid, the Court would

6   find alternately that the elements of (a) and (c) have been

7   met.

8         There are questions regarding the probability of

9   success.  It hasn't been developed into the specifics enough to

10  really have a firm and definite conviction, but there is a

11  substantial amount there underlying it to warrant those claims,

12  both as to the fraud, the preference, the breach of fiduciary

13  duty.  There is some natural overlay between those claims and

14  the claim objections, and indeed, I believe it was discussed

15  and part of the concern of going with the claim objection was

16  that there was that natural overlay.  The Court is not stating

17  or opining on any issue, preclusive effect to be given, but

18  there is enough there to support that there's something there.

19        Again, the Court finds that the time and cost of that

20  would be significant.  I think that the time and cost of the

21  claim objection can be used as a proxy in that regard, and that

22  has taken a couple of years.  So that also supports the

23  settlement of the claims.

24        The collection is uncertain.  I have heard no real --

25  no discussion from -- about Dr. Seal's or -- and his wife's

1   financial condition to recover any amounts from them, the time

2   and effort it would take to recover that.  So that's a fairly

3   neutral.

4        As for the best interest of the creditors I'll say

5   that GLA is overwhelmingly the significant creditor.  They have

6   not -- they were, unfortunately for them, not the successful

7   bidder, but their participation in the sale and the lack of any

8   objection to the sale strongly supports the sale and compromise

9   of these assets as they will reap the most significant benefit

10  out of this transaction.  So for all these reasons, the Court

11  finds that the sale is in the best interest and under (a) and

12  (c), any need to analyze this transaction as a settlement under

13  9019 would meet those factors, and quite honestly, there's

14  really nothing to detract from the finding of the compromise

15  being in the best interest of the estate, and the auction

16  largely bears that out.

17       That will constitute the Court's findings of facts

18  and conclusions of law as to the standards to be applied and

19  findings necessary to support the Court's ruling, approving the

20  motion to sell and compromise as needed.  So Mr. Lehners, we'll

21  go ahead and charge you with preparing the appropriate order,

22  getting the necessary sign offs, and I look forward to

23  receiving that in due course.

24       MR. LEHNERS:  Your Honor, I will get right on that.

25  I also believe we did have an adversary scheduling

1    conference --

2           THE COURT:  Status.

3           MR. LEHNERS:  -- today, and there's probably some

4    matters to take up with that.  But we could push it to tomorrow

5    if you wish.  Since Ms. Tirre is the high bidder, we can deal

6    with it now.  Whatever your pleasure.

7           THE COURT:  Why don't you have a chat on the way out

8    with Ms. Tirre?  But I assume that she's going to want to get

9    some, you know, some time underneath it before we actually make

10   any decisions on how it's going to proceed.  So what I would

11   suggest is that you talk about the next opportunity that the

12   parties want to set the status and scheduling.

13          MR. LEHNERS:  Of course, Your Honor.

14          THE COURT:  So Ms. Tirre, Mr. Lindersmith is

15   concerned that I have the Chapter 7 Vegas duty calendar at 11.

16   I can't imagine that it's going to run -- they're -- it's

17   short.  So I am comfortable setting it on for 11:30 because I

18   don't think it's going to -- go ahead.  I don't think it's

19   going to impact that, but if I'm talking when you come in, that

20   is why, and it should be done prior to 11:30, I believe.

21          MS. TIRRE:  Thank you.  I just double checked my

22   doctor's appointment.  It's actually 10:30.

23          THE COURT:  Okay.

24          MS. TIRRE:  It's about a ten-minute drive from here.

25   It's fine with me if it's noon.  I didn't hear anything from my

1   client.  I don't know if the Court will work over the noon hour

2   or not.

3           THE COURT:  Well, no, no.  I -- I'll have to start

4   heading to the airport, but --

5           MS. TIRRE:  Oh.

6           THE COURT:  -- 11:30, I imagine the eleven o'clock

7   calendar should be done by 11:20.

8           MS. TIRRE:  Got it.

9           THE COURT:  I'm expecting a half hour for this, quite

10  honestly, and then will be --

11          MS. TIRRE:  Okay.  I will be here at 11:30.

12          THE COURT:  All right.

13          MS. TIRRE:  Thank you.

14          THE COURT:  Thank you.

15          THE CLERK:  The only impact may be that I may have to

16  just start the Zoom meeting a few minutes late.

17          THE COURT:  Yeah, if it runs, it'll take a moment.

18          THE CLERK:  If the duty judge calendar runs long,

19  just so that everyone knows.

20          MS. TIRRE:  Thank you.

21          THE COURT:  Yeah.  All right.  For the good of order,

22  anyone else need to raise any points before we adjourn?

23          All right.  Thank you very much.  I know it was a

24  lengthy process, but I think it was effective.  I appreciate

25  the professionalism, and I -- I'm glad to have seen everyone.

1    So we're adjourned.

2              MR. OINES:  Thank you, Your Honor.

3              MR. LEHNERS:  Thank you, Your Honor.

4              THE CLERK:  Please rise.

5        (Proceedings concluded at 3:13 p.m.)

6                         * * * * *

7

8

9

10

11

12

13

14                  **C E R T I F I C A T I O N**

15

16              I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428      DATE: May 17, 2023

25   ACCESS TRANSCRIPTS, LLC