UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

|  |  |
|---|---|
| IN RE: | . Case No. 20-50660-gs |
|  | . Chapter 7 |
| METAL RECOVERY SOLUTIONS, | . |
| INC., | . |
|  | . |
| Debtor. | . |
| . . . . . . . . . . . . . . | . |
| CHRISTOPHER P. BURKE, in his | . Adv. No. 21-05066-gs |
| Capacity as Chapter 7 Trustee | . |
| of METAL RECOVERY SOLUTIONS, | . |
| INC., | . |
|  | . |
| Plaintiff, | . |
|  | . |
| v. | . 300 Booth Street |
|  | . Reno, NV 89509 |
| METAL RECOVERY SOLUTIONS, | . |
| INC., et al., | . Monday, April 17, 2023 |
| Defendants. | . 11:02 a.m. |
| . . . . . . . . . . . . . . | . |

TRANSCRIPT OF EVIDENTIARY HEARING RE: MOTION TO SELL CLAIMS AND
OTHER BANKRUPTCY ESTATE ASSETS FILED BY MICHAEL LEHNERS ON
BEHALF OF CHRISTOPHER P. BURKE [68];
STATUS HEARING RE: ADVERSARY CASE 21-05066, COMPLAINT FILED BY
CHRISTOPHER P. BURKE, IN HIS CAPACITY AS CHAPTER 7 TRUSTEE OF
METAL RECOVERY SOLUTIONS, INC. VS. METAL RECOVERY SOLUTIONS,
INC., THOMAS SEAL, JETTE SEAL, DIFFERENTIAL ENGINEERING, INC.,
MARK SHONNARD, FEE AMOUNT 350 [1]
BEFORE THE HONORABLE GARY SPRAKER
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:        Illuminada Hamill, ECR

Transcription Company:  Access Transcripts, LLC
                        10110 Youngwood Lane
                        Fishers, IN 46048
                        (855) 873-2223
                        www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1

```
ZOOM APPEARANCES:

For Christopher P.           MICHAEL LEHNERS, ESQ.
Burke:                       429 Marsh Avenue
                             Reno, NV 89509
                             (775) 786-1695


For Element Global,          Law Offices of Amy N. Tirre, P.C.
Inc.:                        By:  AMY N. TIRRE, ESQ.
                             3715 Lakeside Drive
                             Reno, NV 89509
                             (775) 828-0909


For Geo-Logic                Kaempfer Crowell
Associates, Inc.:            By:  LOUIS M. BUBALA, III, ESQ.
                             50 West Liberty Street, Suite 700
                             Reno, NV 89501
                             (775) 852-3900


                             Rutan & Tucker LLP
                             By:  RONALD P. OINES, ESQ.
                             18575 Jamboree Road, 9th Floor
                             Irvine, California 92612
                             (714) 641-5100

For Jex Technologies         Foley & Lardner LLP
Corp.:                       By:  ELLEN E. OSTROW, ESQ.
                             95 South State Street, Suite 2500
                             Salt Lake City, UT 84111
                             (801) 401-8952

For Differential             Woodburn and Wedge
Engineering, Inc.:           By:  SETH J. ADAMS, ESQ.
                             6100 Neil Road, Suite 500
                             P.O. Box 2311
                             Reno, NV 89505
                             (775) 688-3000

Also Present:
                             STEVEN GAGNON

                             DAVE MCMULLEN

                             GEORGE YOUNG, ESQ.

                             GARY LASS
```

1

<u>I N D E X</u>
<u>4/17/23</u>

| <u>WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>FOR ELEMENT GLOBAL INC.:</u> | | | | |
| Steven Gagnon | 12 | 14/19 | -- | -- |
| | | 27/31 | | |
| <u>FOR THOMAS SEAL</u>: | | | | |
| Thomas Seal | -- | 40/43 | -- | -- |

| <u>EXHIBITS</u> | <u>ADMITTED</u> |
|---|---|
| None | |

1          (Proceedings commence at 11:02 a.m.)

2          THE CLERK:  Good morning.  This is Illuminada

3   speaking from the courtroom.  We are now on record with the

4   Honorable Gary Spraker presiding.

5          THE COURT:  Thank you and good morning.  This is

6   Judge Spraker.  This is Judge (indiscernible).  We are on

7   record for the eleven o'clock calendar.  Only matter before the

8   court are in Metal Recovery Solutions, Inc. and the associated

9   adversary of Burke v. Metal Recovery Solutions, Inc.  Time set

10  for evidentiary hearing -- continued evidentiary hearing

11  regarding motion to sell, claims, and other bankruptcy estate

12  assets.

13         Note for the record that this matter is being

14  conducted via the Zoom videoconference.  There are no parties

15  or counsel in the courtroom for this proceeding.

16         With that, we'll go ahead and begin by taking

17  appearances.  I'll ask Mr. Lehners to please lead us off.

18         MR. LEHNERS:  Good morning, Your Honor.  This is

19  Michael Lehners appearing in Reno, Nevada by Zoom.  I consent

20  to this hearing.  I represent Chapter 7 Trustee Christopher

21  Burke.

22         THE COURT:  Thank you.

23         Ms. Tirre, you're also on the top row of my panel, so

24  I might as well have you go ahead and proceed.

25         MS. TIRRE:  Good morning, Your Honor.  This is Amy

 1  Tirre on behalf of Element Global, Inc. and its agent, Empire

 2  Capital Management, LLC.  I'm appearing from Po'ipū, Kauai.

 3  And believe my client, Mr. Steven Gagnon, he's letting me know

 4  that he is having trouble getting into the Zoom.  So I'm going

 5  to try to facilitate that with his link.  He says it shows up

 6  as a Teams meeting for some reason for him.  So I'm going to

 7  try to get him online.

 8           THE COURT:  All right.  Yeah.  And I think we just

 9  got a notice that something started in Teams.  So I think that

10  is him trying to get in through Teams.  When -- if -- do you

11  have the invitation?  Do you need it resent?

12           MS. TIRRE:  I do.

13           THE COURT:  Okay.

14           MS. TIRRE:  And I sent it to him again this morning.

15  So I'll try again to get him maybe to turn off Teams and, you

16  know, open Zoom.

17           THE COURT:  All right.

18           MS. TIRRE:  And I think it's -- honestly, Your Honor,

19  he would prefer dial-in, and I don't know if that's all right

20  with you this morning, if he could just do telephonic versus

21  video.

22           THE COURT:  Let's get through the appearances.  And

23  when I -- and you know, the other parties make their

24  appearances, if you'll advise if you consent to the telephonic

25  participation of Mr. Gagnon or not, and we'll take it from

1   there.

2            MS. TIRRE:  Thank you.

3            THE COURT:  Let's go on, Ms. Ostrow?

4            MS. OSTROW:  Good morning, Your Honor.  Ellen Ostrow

5   on behalf of Jex Technology.  Also on the line are Dave

6   McMullin, the CEO of Jex, and George Young, the General

7   Counsel.

8            THE COURT:  Thank you.

9            Mr. Adams?

10           MR. ADAMS:  Good morning, Your Honor.  Seth Adams on

11  behalf of Differential Engineering.

12           THE COURT:  Thank you.

13           Mr. Oines?

14           MR. OINES:  Good morning, Your Honor.  Ron Oines with

15  Rutan and Tucker on behalf of Geo-Logic Associates, Inc. and

16  Mr. Gary Lass is in the room with me as well, although he may

17  not be on the screen.

18           THE COURT:  All right.  And Mr. Bubala, you want to

19  enter your appearance as well?

20           MR. BUBALA:  Thank you, Your Honor.  Louis Bubala,

21  co-counsel with Mr. Oines for Geo-Logic Associates,

22  Incorporated.

23           THE COURT:  Thank you.  Does anyone wish to weigh in

24  on whether Mr. Gagnon can participate telephonically versus

25  video?

1          MR. LEHNERS:  No objection, Your Honor.

2          THE COURT:  All right.  Hearing none, then,

3   Ms. Tirre, I think that you can go ahead and advise Mr. Gagnon

4   go ahead and participate by telephone by calling in through the

5   Zoom number as well.

6          MS. TIRRE:  Thank you.  I will do so.  Thank you.

7          THE COURT:  Certainly.  All right.  While Ms. Tirre's

8   undertaking that task, we'll go ahead and just begin with the

9   particulars.

10          I have reviewed the declarations that have been

11   submitted in support of the good faith determination.  Hold on

12   for just a moment.  Apparently need to refresh my computer.

13   All right.  Here we go.  And then, I did not see any objections

14   that were filed.  Obviously, these were filed on the 12th and

15   13th of last week, Thursday and Friday -- or I guess Wednesday

16   and Thursday.  So the question I have, and I guess it's for

17   GLA, is where are we in the good faith determination based upon

18   the declarations?

19          MR. OINES:  We would, Your Honor, like to ask some

20   follow-up questions of the witnesses who submitted the

21   declarations.

22          THE COURT:  All right.  Does any other party wish to

23   weigh in on where we are in this process?

24          MR. LEHNERS:  Your Honor, I'd like to weigh in.  On

25   Tuesday, I circulated a proposed order to everybody.  And

1   Mr. Bubala got back to me.  Everybody else wants to see what

2   happens at this hearing.

3           But one of the things that came up is some semantics

4   in the asset purchase term sheet and language I put in my

5   order.  In particular, perhaps this could be clarified.  The

6   asset purchase agreement says payment is due within five

7   business days of the bankruptcy court entering a non-appealable

8   order approving the agreement.  And then, the Court, as

9   Mr. Burke pointed out to me later, spent some time discussing

10  what appealable means, the 14 days plus the 5 days equaling 19

11  days.

12          Mr. Burke and I put in the bankruptcy court entering

13  a final non-appealed, past-tense, order, and I don't know if

14  that is a better syntax for it, or if it should mirror the

15  asset purchase agreement.  I think the way we have it is for

16  clarity.

17          Mr. Bubala makes an excellent point.  He's following

18  the asset purchase term sheet.  I would just like to collect

19  input.  And no, Mr. Bubala, I'm not trying to put you on the

20  spot, I just want to make sure that this is cleared up.

21          THE COURT:  All right.  Do -- should we go ahead and

22  take this matter while we're waiting for Mr. Gagnon to get on

23  the line?

24          MR. GAGNON:  I'm on the line.

25          THE COURT:  All right.  Thank you, Mr. Gagnon.  All

1  right.

2          MR. GAGNON:  My apologies for the delay, Your Honor.

3          THE COURT:  Oh, no problem, not much of a delay at

4  all.

5          Let's go ahead then and take the witnesses and get

6  the witness -- the evidence done, and then we can deal with the

7  mechanics of language as such as we need.  And so --

8          MR. LEHNERS:  Thank you, Your Honor.  One other

9  preliminary matter.

10          THE COURT:  Sure.

11          MR. LEHNERS:  Would the Court be interested -- since

12  these are all declarations that everybody has read and the

13  questions are going to be answered sequentially, is the Court

14  at all, or are the parties interested, in invoking the

15  exclusionary rule while each witness is -- testifies, putting

16  everybody who will be testifying, but has not yet, in a

17  separate Zoom hearing room?  I just wanted to bring that up.

18          THE COURT:  I'll start in the parties.

19          MR. OINES:  Yes, Your Honor, yes, I think that's a

20  good idea.

21          THE COURT:  All right.

22          MS. OSTROW:  Your Honor, just one clarification on

23  that:  To the extent that there are questions that a witness

24  testified to something, we're not precluded from, on redirect,

25  if we need to ask our client about something that someone said

1  for the testimony.  We can have that kind of characterized out

2  back into the record or we read that into the record.

3          THE COURT:  I smile only because I think I'm having

4  trouble keeping up with what the -- nothing should be at the

5  prejudice of asking anyone, you know, any question that's

6  needed to establish this.  So I don't think it's an

7  exclusionary rule as to the substance, only exclusions from

8  listening until testimony is called.

9          MR. LEHNERS:  That's what I meant, Your Honor.

10          THE COURT:  Yeah.

11          MR. OINES:  Your Honor, this is Mr. Oines again.  If

12  it's a technological issue from the Court or from the parties,

13  we're okay with it.  We don't want to make it overly

14  complicated.  And so if it's difficult for the Court to have

15  parties excluded, I would withdraw my objection.

16          MR. LEHNERS:  Your Honor, I'm going to defer to

17  whatever is easier for the Court and the parties.  I just

18  thought I'd bring it up and see what everybody thought.

19          THE COURT:  Easy is a relative term these days.  We

20  can open a breakout room, or we could put them in a breakout

21  room if that is the parties' desire.  You tell me.  And you

22  know, we've had a request and a withdrawal, so I need a more

23  concrete suggestion.  Either you're invoking it or not at this

24  point.

25          MR. OINES:  We're not, Your Honor.

1          THE COURT:  Okay.  Then, Mr. Lehners, you were just

2   asking, not requesting is my understanding.

3          MR. LEHNERS:  I just wanted to bring it up and voice

4   my concerns on the record and I will defer to counsel.  I will

5   withdraw it, because I think it's important regarding the

6   technology itself.  But there will be multiple questions asked.

7   The answers are going to be what they are.  They're pretty set.

8   Well, with a good faith finding it's a limited question.  So I

9   think the concerns that the exclusionary rule protects is

10  outweighed by the necessity of this court making the factual

11  finding as to the good faith, which is linked to the

12  technology.  So on that basis, and so I'll withdraw.

13         THE COURT:  The Court agrees.  This is a very limited

14  discussion.  I do not anticipate getting into the substance of

15  the technological rights and underlying patents and such.  Does

16  any other party wish to weigh in on this question or make any

17  other comment?

18         All right, then.  Then, we're at the point that

19  Ms. Tirre, as counsel for the winning bidder, why don't you

20  call your witness to establish a good faith as requested by the

21  trustee and, I'm assuming, requested by your client.

22         MS. TIRRE:  Oh, yes, Your Honor.  I'll call Steve

23  Gagnon to the stand.

24         THE COURT:  Mr. Gagnon, you're being called to give

25  evidence to this matter.  I'm going to ask the deputy clerk to

1  swear you in to do so, please.

2          THE CLERK:  Please raise your right hand.

3      STEVEN GAGNON, ELEMENT GLOBAL INC.'S WITNESS, SWORN

4          THE COURT:  All right.  Mr. Gagnon, you've been sworn

5  to give testimony now.  I'll turn it over to Ms. Tirre, your

6  counsel, to lead the direct examination.  Ms. Tirre?

7          THE WITNESS:  Okay.

8                        DIRECT EXAMINATION

9  BY MS. TIRRE:

10 Q    Mr. Gagnon, would you please state your name and spell

11 your name for the record?

12 A    Steven Gagnon, that's S-T-E-V-E-N G-A-G-N-O-N.

13         THE COURT:  All right.  Ms. Tirre, do you want to

14 raise the concern?

15         MS. TIRRE:  I do.

16 BY MS. TIRRE:

17 Q    Mr. Gagnon, the microphone and the speaker that you're

18 using is not allowing us to hear your voice very clearly.

19 Could you please change what you're using in order to speak

20 into the microphone?

21 A    Can you hear me now?

22 Q    Yes.

23 A    My name is Steven Gagnon, S-T-E-V-E-N G-A-G-N-O-N.

24 Q    Thank you.  And what is your role with Element Global,

25 Inc.?

1    A    I am the co-CEO and chief operating officer and the

2    director of Element Global, Inc.

3    Q    Okay.

4              THE COURT:  Ms. Tirre, can I interrupt?  I mean, I

5    apologize.  I should have raised this beforehand.  The

6    tentative witnesses, including Mr. Gagnon, have submitted

7    declarations in support.  I am inclined to treat that as

8    alternative direct, subject to supplement.  So are you moving

9    the admission of the declaration of Mr. Gagnon as ECF 311?

10   Would you like to move that?

11             MS. TIRRE:  I will, Your Honor, because Mr. Gagnon --

12   yes, as counsel for Element Global, Inc., I'd like to move

13   Mr. Gagnon's declaration as ECF 311 into the record, and I'll

14   just establish that that is Mr. Gagnon's signature on the

15   declaration.

16   BY MS. TIRRE:

17   Q    Then, Mr. Gagnon, do you have a copy of your declaration

18   in front of you?

19   A    Yes, I do.

20   Q    Great.  And when you turn to the page with your signature,

21   will you verify for the Court that that is your signature?

22   A    Yes.  That's correct.  That is my signature.

23   Q    And that is your testimony in support of a good faith

24   finding today on behalf of Element Global, Inc. as the

25   successful bidder?

1   A    Yes, that is correct.

2   Q    Thank you.

3        MS. TIRRE:  I'll pass the witness, Your Honor.  Thank

4   you.

5        THE COURT:  All right.  Let me ask, is there any

6   objections to the admission of Mr. Gagnon's declaration as

7   direct testimony?

8        UNIDENTIFIED:  No.

9        UNIDENTIFIED:  None.

10       MR. LEHNERS:  No objection, Your Honor.

11       MR. OINES:  No objection.

12       THE COURT:  Hearing no objection, the Court admits

13  the declaration as Mr. Gagnon's direct testimony.  Ms. Tirre

14  has passed the witness, so the witness is available for cross-

15  examination.  Who would like to proceed next?

16       MR. LEHNERS:  I can go.

17       THE COURT:  All right, Mr. Lehners.

18                    CROSS-EXAMINATION

19  BY MR. LEHNERS:

20  Q    Mr. Gagnon, can you confirm that Element Global is a

21  publicly traded corporation?

22  A    That is correct.  It's a publicly traded corporation on

23  the OTC pink sheets.

24  Q    To the best of your knowledge, does anybody in Element

25  Global have any interest in Metal Recovery Solutions or Jex

 1  Technologies or Differential Engineering?

 2           MS. TIRRE:  Objection as to anybody.  It's unclear to

 3  me what you mean, Mr. Lehners.

 4           THE COURT:  And Mr. Lehners, I believe some of this

 5  has already been addressed in the declaration itself.  So if

 6  you've got something specific, probably best just to get to

 7  that.

 8           MR. LEHNERS:  No, I don't have anything specific.

 9  I'll rephrase.

10  BY MR. LEHNERS:

11  Q    Mr. Gagnon, other than what's in your declaration, are you

12  aware of any interests that your company may have in those

13  three companies?

14  A    No.

15  Q    Other than what's in your declaration, do you have any

16  knowledge about any relationship or business dealings with Geo-

17  Logic, Metal Recovery Solutions, Jex, Differential, or Dr. and

18  Mrs. Seal?

19  A    No.

20  Q    I believe you described -- how did you hear about the

21  assets that were being sold last week?

22  A    As in my declaration, I originally, we had -- we made two

23  investments into Jex over the years, so we knew about this

24  ongoing issue between the -- the situation.  And on the 24th of

25  February, I spoke to Mr. McMullin about potentially investing

1   additional capital in order to resolve this, plus other issues

2   of business going forward.  We chose not to make that

3   investment at that time due to the uncertainty of what was

4   taking place on the case.

5        Several weeks after that conversation, I was contacted at

6   our office from Mr. David Richards, who's a consultant of

7   Element Global Mining group.  And he explained to us that

8   there's a good potential here for us to come in and be a

9   bidder, and be a successful bidder if possible, which would

10  then put this issue to rest.  And that's why we -- that's how

11  we were found -- we were -- we were on -- found out about the

12  whole situation.

13  Q    Other than what's in your declaration, in the event that

14  you are confirmed as the highest bidder, meaning your company,

15  is there any agreement or arrangement that will come into being

16  with Geo-Logic, Metal Recovery Solutions, Jex Technology,

17  Differential Engineering, or Jette or Thom Seal as a result of

18  your being the highest bidder?

19  A    No.  The only thing we -- only look for is to -- to

20  maintain the lease situation where Jex's currently has to go

21  forward, nothing else.

22  Q    Okay.  And the value that you are paying is 2.5 million.

23  Is that correct?

24  A    Yes.

25  Q    All right.  In the event that you are confirmed as high

1   bidder, is anybody in your company going to receive any other

2   value, i.e. payment from a third party or an employment

3   agreement with any asset that your company purchased?

4   A    No.

5   Q    Are you aware of any facts that would cause you to believe

6   that Element took unfair advantage of other bidders either

7   through communication prior to the bidding or other

8   documentation?

9   A    No.

10  Q    Have you had a chance to read David McMullin's declaration

11  that's ECF 313?

12  A    Yes, I have.

13  Q    All right.  In there it says that -- well, I believe we've

14  already disclosed that Element does own minority interest in

15  Jex, less than .5 percent.  But my question is --

16  A    Yes --

17  Q    -- go ahead, please.

18  A    Yes, that's what we -- I came up with a different number,

19  but we're in the same ballpark.  I was based on the -- my --

20  mine was based on the overall valuation that we put on the

21  company.

22  Q    Okay.  One of the things he says is that if Element were

23  the successful bidder, there may be future business

24  opportunities, including an investment in Jex by Element.  Are

25  there any agreements that are firm regarding commitments for

1    future business opportunities between your company and Jex?

2    A    Not at the moment, just conversations of going forward in

3    additions to our current investment, and plus other businesses

4    that Element has that would utilize the technology that Jex is

5    doing.

6    Q    But nothing binding.

7    A    We don't have anything binding as of yet, no.

8    Q    Are you aware of any facts which could objectively

9    challenge if there had been fraud, collusion, or an intent to

10   take unfair advantage of other bidders in this process?

11   A    No.

12   Q    And you do understand that the assets are being sold as

13   is, where is, without a determination regarding the extent of

14   the Hydro-Jex technology?

15   A    Yes.

16   Q    And are you familiar with the trustee's claims that have

17   been brought in the adversary proceeding that he's filed?

18   A    To a limited capacity to be quite honest with you, because

19   we didn't do the diligence on that part.  That was done by

20   Mr. Richards.

21   Q    Okay.  With respect to any of the defendants, does Element

22   have any agreement with any party of that adversary to settle

23   the claims by virtue of Element being the highest bidder?

24   A    No.

25             MR. LEHNERS:  I have no further questions.

```
 1              THE COURT:  Thank you.  Mr. Oines?

 2              MR. OINES:  Thank you, Your Honor.

 3                        CROSS-EXAMINATION

 4   BY MR. OINES:

 5   Q    Mr. Gagnon, my name's Ron Oines.  I represent the creditor

 6   Geo-Logic Associates.  And I have just a couple of follow-up

 7   questions.  And one of the items I think you were addressing a

 8   moment ago, but I just wanted to get some clarity, in

 9   Paragraph 4 of your declaration, it indicates that Element owns

10   a minority shareholder interest in Jex Technologies, and it

11   says it's .001 percent.

12   A    Yes, sir.

13   Q    And that's your -- that interest was acquired for $90,000.

14   Is that what your declaration is indicating?

15   A    Yes, we made an investment of 40,000 on August 7th of

16   2020, and made an additional follow-up -- addition of 50,000 in

17   May 26th of 2021.  When we calculated this during our

18   declaration, we were understanding that the valuation currently

19   of Jex is approximately $90 million, so that's where we came up

20   with the .001 percent.

21   Q    Okay.  Well, because if I did the math, I came out to 9

22   billion, but maybe we're just talking about moving some --

23   moving the decimal point.  But it's your understanding that you

24   used a valuation of 90 million.  Is that correct?

25   A    That's correct, 90 million.
```

1    Q    Okay.  And in Paragraph 5, you indicated that Element has

2    agreed to invest an additional $3 million in Jex.  But I

3    understand from the declaration, that investment has not

4    actually been made.  Has there been an agreement as to how much

5    of the company Element will acquire for $3 million?

6    A    No, we didn't got -- we never got to that part.  Again, we

7    were in discussion.  When I said we agreed to that, that was

8    the board agreed to investing an additional 3 million into Jex

9    regarding this transaction.  But due to the uncertainty of what

10   was going on, we didn't get into any more discussions of what

11   the terms and conditions would be.

12       And then, as I said in my statement prior, Mr. Richards

13   came to us approximately two weeks later and presented this

14   opportunity to be a bidder in this process.  So that's why we

15   went down this road instead.  We calculated it's much better

16   protection for our potential invest forward.

17   Q    And then, for the $2.5 million that's been bid, I think it

18   is your understanding that that includes the trailer that you

19   testified to, correct?

20   A    Yeah, the two trailers, some ancillary equipment, and

21   it -- some other things, yes, correct.

22   Q    What are those other things to your understanding?

23   A    Some -- a pickup truck, I believe, some spare parts, a

24   computer, and other supplies.

25   Q    And are there any other assets that you believe you will

1   be acquiring for $2.5 million other than the trailers and then

2   these ancillary truck and equipment you just mentioned?

3   A    I believe there's intangible assets which -- which

4   includes stuff that's involved in here, but we haven't

5   completely gone through that.  But, you know, focusing on if

6   you look at the price, what know what the cost of trailer is

7   roughly, from what I understand, between 750 and $900,000 a

8   trailer.  So it gets to the point of where the value is in the

9   trailers and in the technology.

10  Q    It's your understanding that these trailers are worth 750

11  to 9,000 -- $900,000?

12  A    I was under the impression that it takes about $750,000 to

13  build a trailer.  That's my understanding.

14  Q    And it's my understanding in the lease agreement that Jex

15  could eventually buy the -- buy both trailers and all the

16  ancillary equipment you just mentioned for somewhere around

17  $750,000.  Is that your understanding?

18  A    No, I don't have the agreement in front of me.

19  Q    Well, if in fact that's true -- well, let me ask you this:

20  Has there been any agreement with Jex or anyone else about the

21  trailers or the lease other than just the -- is it -- it's my

22  understanding is that you have an agreement that you will allow

23  the lease to continue.  But has there been any agreement as to

24  whether Jex can buy the trailers or not?

25  A    We haven't discussed any of that.  All we -- all -- looked

1   at -- we are doing is taking it subject to the Jex lease going

2   forward.  There has been no discussion on any purchases for

3   this transaction.

4   Q    And when you say intangible assets, do you understand that

5   to be intellectual property related to the (indiscernible) of

6   the Hydro-Jex process?

7   A    That's how I understand it.  Yes, sir.

8   Q    And have you had any discussions with anyone at

9   Differential or Jex or any discussion with Thom Seal about

10  whether Element would be acquiring any intellectual property of

11  the debtor?

12            MS. TIRRE:  Objection.  Compound.  Okay, I just

13  find -- excuse me.  Objection.  Compound.  Jex, Differential,

14  and Seals are different parties.  So if you want to break down

15  your questions, please.

16            THE COURT:  Sustained.

17            MR. OINES:  Sure.

18  BY MR. OINES:

19  Q    Mr. Gagnon, have you had any discussions with anyone at

20  Jex about whether if Element purchases of the assets of the

21  debtor, it is acquiring any intellectual property?

22  A    Not to my knowledge of that discussion.  That might have

23  happened to Mr. Richards, but not with me direct.

24  Q    And you've never discussed it with Mr. Richards whether

25  Element would be acquiring any intellectual property of the

1   debtor?

2   A    I don't believe I've had that discussion with him.  This

3   is more of making sure that the assets were where they needed

4   to be so Jex could continue to move forward.  And that would

5   help us down the road with what we're doing in our mining

6   space, because we have very similar assets that they process.

7   Q    And just to close the loop, have you had any discussions

8   with Thom Seal about whether you -- Element would be acquiring

9   any IP from the debtor?

10  A    No.

11  Q    And have you had any conversations with Differential about

12  whether Element would be acquiring any IP from the debtor?

13  A    No.

14  Q    And is it correct that Empire Capital Management is also a

15  shareholder of Jex?

16  A    I believe they are.  They're a -- they're a shareholder of

17  Element Global.

18  Q    Well, is Empire -- does Empire own shares in Jex other

19  than what it might own through Element?

20  A    Yes.  They've -- I am sure they have invested on their own

21  and -- Empire Capital Management has.  Yes, correct.  Now, I

22  can't answer for Dave Richards what investment they've made in

23  Jex, but I do know there was investment in there separate to

24  what they've done in Element Global.

25  Q    And do you know the amount that Empire Capital Management,

1  LLC has invested in Jex?

2  A    No, I am not a part of Empire whatsoever other than

3  they're a consultant to Element Global.

4  Q    And have you -- is it your understanding that one of the

5  assets or some of the assets that Element would acquire would

6  be rights to litigation that's pending?

7  A    I am aware of that, but I've not really drilled down on

8  that.  That's not why we got into this transaction.  We got in

9  the transaction to make sure that the lease that Jex has is

10  intact moving forward.

11  Q    And have you discussed with anyone -- other than your

12  counsel, have you discussed with anyone what Element would do

13  with any of the litigation that it's acquiring if it is a

14  successful bidder?

15  A    No, we haven't had that discussion.

16  Q    All right.  Thank you, Mr. Gagnon.

17           MR. OINES:  That's all I have.

18           THE COURT:  Thank you.  Any other counsel wish to

19  cross-examine Mr. Gagnon?  All right.

20           Is there any, Ms. Tirre, redirect?

21           MS. TIRRE:  Your Honor, I don't have redirect.  If

22  the Court has questions, but I don't have any further follow-

23  up.

24           THE COURT:  No, I do not.  Thank you, Mr. Gagnon.  I

25  believe that concludes your testimony.

1              THE WITNESS:  Thank you, Your Honor.

2              THE COURT:  Thank you.  All right.  Then we switch

3    to --

4              MR. GAGNON:  I -- I -- excuse me, Your Honor.  I can

5    now leave?  You don't need me any longer, correct?

6              THE COURT:  I believe you can.  We'll let you know if

7    there's a reason that you're being recalled, but I don't

8    believe there will be.  Thank you.

9              MR. GAGNON:  Thank you.  Thank you, sir.

10             THE COURT:  All right.  Now, we'll move to testimony

11   for the Jex backup bid with Dr. Seal.  Again, I'll just ask, at

12   the onset, is there any objection to taking the declarations

13   and the amended declaration of Dr. Seal as the direct testimony

14   of these -- for these witnesses?

15             MR. LEHNERS:  No objection, Your Honor.

16             MR. OINES:  No objection, Your Honor.

17             THE COURT:  All right.  Hearing no objection, the

18   Court will take the declaration and the amended declaration of

19   Dr. Seal as evidence in support of their request for a good

20   faith determination.  Do the parties wish to cross-examine

21   either witness, either or both?

22             MR. OINES:  Yes, Your Honor.

23             MR. LEHNERS:  Yes, Your Honor.

24             THE COURT:  All right.  Mr. Oines, Mr. Lehners, which

25   order -- what order do we take the witnesses?

1              MR. LEHNERS:  Your Honor, I'm willing to examine

2    Mr. -- I believe it's McMullin.  Now, I just have a few quick

3    questions.

4              THE COURT:  All right.  Mr. McMullin, are you on the

5    line?  Sorry.  You are.  Can you hear us?

6              MR. MCMULLIN:  Sorry, I was on mute, Your Honor.

7              THE COURT:  All right.  And you're being called.

8    Ms. Ostrow, any objection to swearing in the witness?

9              MS. OSTROW:  No, Your Honor.

10             THE COURT:  All right.  Mr. McMullin, you're being

11   called as a witness in this matter.  I'm going to ask the

12   Deputy Clerk to administer the oath to allow you to give

13   testimony.

14             Madam Clerk, would you administer the oath?

15             THE CLERK:  Mr. McMullin, please raise your right

16   hand.

17             DAVID MCMULLIN, CREDITOR'S WITNESS, SWORN

18             THE COURT:  All right.  Thank you.  Mr. McMullin has

19   been sworn in.  Mr. Lehners, Mr. Oines, which one are you --

20   Ms. Ostrow, did you have anything to supplement of the

21   declaration?

22             MS. OSTROW:  No, Your Honor, just property and

23   declaration.  Thank you.

24             THE COURT:  All right.  The declaration is admitted.

25   Which counsel is going to proceed with the cross-examination

1    first?

2              MR. LEHNERS:  Your Honor, I can be brief.  Mr. Oines

3    may have more detailed information, but I'll defer to

4    Mr. Oines.

5              THE COURT:  We'll let you go ahead, Mr. Lehners.

6                         CROSS-EXAMINATION

7    BY MR. LEHNERS:

8    Q    Mr. McMullin, other than what's in your declaration, does

9    Jex have any interest in Metal Recovery Solutions, Element

10   Global, Element Empire Management, or Differential Engineering?

11   A    No, it does not.

12   Q    Thank you.  Other than what's in your affidavit, to the

13   best of your knowledge, does anybody in your company have any

14   relationship with, or business dealings with Metal Recovery

15   Solutions or Differential Engineering, Empire Global, Empire

16   Capital?

17   A    Other than in -- in the declaration, no.

18   Q    Okay.  Now have you read the declaration of Dr. Thomas

19   Seal?

20   A    I have.

21   Q    All right.  He refers to a technology commercialization

22   agreement.  I believe that's on Paragraph 17K.  Do you know

23   anything about that?

24   A    I do.  Jex entered into that agreement with -- with

25   Differential Engineering to further commercialize the

1   technology.

2   Q    All right.  Was this agreement ever finalized?

3   A    Yeah, the -- the -- the commercialization of GTA was

4   finalized.

5   Q    Okay.  So do you disagree with Dr. Seal's statement then

6   that it wasn't finalized?

7   A    I guess there was a component in the agreement that was

8   not finalized, which is there's a -- there's a reference to a

9   consulting arrangement for Dr. Seal and for his wife.  Those

10  two components were not finalized.  The -- the balance of the

11  agreement was completed.

12  Q    So it's a fair statement that the majority of it was

13  finalized?

14  A    Yes, sir.

15  Q    Okay.  Mr. McMullin, can you tell me the difference

16  between that agreement and the 2019 technical license agreement

17  regarding the Hydro-Jex technology?

18  A    The license agreement is sort of document name or title

19  speaks for itself.  Both of those agreements were -- were

20  agreed to.  One is a -- a document that is designed to -- to

21  sort of commercialize technology on a go-forward basis.  We

22  would go out and -- and -- and create our business opportunity

23  of Jex.  And the other one talks more about sort of a royalty

24  structure and -- and -- and some licensing arrangements that

25  would -- would give us access to the technology on an exclusive

 1  basis.

 2  Q    All right.  Now, I believe of the backup bid that you

 3  have, Dr. Seal is putting in $150,000 of his own money.

 4  A    Yes.

 5  Q    Did he tell you anything about why he did that?

 6  A    He didn't -- he didn't speak to me at all about why he did

 7  that.  We -- we had -- when we did the auction, we had an

 8  amount that we were able to go up to that I was -- I was

 9  approved by my board.  And when we -- when we were wrapping up,

10  there had been a discussion amongst counsel about potentially

11  seeing if there could be a joint bid.

12  Q    Okay.  Had any repayment terms of this been discussed at

13  the time that the bid was made?

14  A    No.

15  Q    In the event that Jex is successful as the backup bidder,

16  will Dr. Seal, any of his related companies, his wife, receive

17  favorable value -- receive anything favorable such as

18  employment, stock options, or any other consideration that is

19  not part of the agreement that was bid on?

20  A    No.  There's -- there's nothing agreed to.  No.

21  Q    Okay.  Are you aware of any facts that would cause you to

22  believe that you or Dr. Seal took unfair advantage of any other

23  bidders?

24  A    No, I'm not, sir.

25  Q    Are you aware of any facts where one could objectively

1   allege that there was fraud, collusion, or an attempt to

2   grossly take unfair advantage of other bidders?

3   A    No.

4   Q    Okay.  Okay.  Now who's Mark Shonnard?

5   A    Mark is my partner at Jex Technologies.

6   Q    What position does he hold?

7   A    He is the president and COO.

8   Q    But he's employed?

9   A    He is.

10  Q    All right.  Are you familiar with the adversary complaint

11  filed by the trustee that included those 11 claims?

12  A    I am.

13  Q    All right.  And are you aware of the fact that

14  Mr. Shonnard is a defendant in that proceeding for $14,000?

15  A    I am aware, yes.

16  Q    In the event that Jex acquires the backup bid, what do you

17  plan to do with that claim?

18  A    We have not -- we've not concluded what we would do with

19  that claim, but our offer was to move our business forward.

20  And so we would -- I think, we would act accordingly.

21  Q    All right.  At this time is there anything -- any

22  agreement with Mr. Shonnard that would give him any favorable

23  treatment should Jex be the successful backup bidder?

24  A    No.  No agreement.

25  Q    All right.  And I believe Mr. Gagnon already testified as

1  to this, but there may be future business opportunities between

2  Element and Jex, including an investment in Jex, but nothing's

3  been finalized to this point.

4  A    Nothing has been finalized.

5  Q    Okay.

6          MR. LEHNERS:  I don't have any further questions.

7  Thank you.

8          THE COURT:  Thank you.  Mr. Oines?

9          MR. OINES:  Thank you, Your Honor.

10                      CROSS-EXAMINATION

11 BY MR. OINES:

12 Q    Good morning, Mr. McMullin.  I'm Ron Oines.  I represent

13 the creditor Geo-Logic Associates.  I have just a couple more

14 questions.  In Paragraph 8 of your declaration, you talk about

15 providing business development consulting services to

16 Differential and MRS on a contract basis.  Is that you as an

17 individual or will you be doing that as part of Jex?

18 A    Me, as an individual.

19 Q    And that would be -- you were paid by -- well, let me ask

20 you:  Did Differential pay you for that consulting work?

21 A    The -- the basis for that agreement was a finder's fee

22 sort of scenario.  So the -- in my declaration if you review, I

23 had introduced them to clients in a few various states, and

24 none of those clients effectively panned out in terms of

25 gaining work for the use of the Hydro-Jex technology.  So I was

1  not paid.  There was some expenses that were paid to me.

2  Q    And that was paid by Differential or by MRS, Metal

3  Recovery Solutions?

4  A    I don't recall.

5  Q    And it is my understanding that under the technology

6  license agreement and the technology commercialization

7  agreement that I know you were just discussing with

8  Mr. Lehners, has Differential been paid any amounts under those

9  agreements?

10  A    Differential has been paid amounts under the -- under the

11  agreements.  I don't know, you know, an exact amount or

12  whatever.  But yes, they've been paid under the agreements,

13  yes.

14  Q    Can you estimate how much they've been paid under those

15  agreements?

16  A    Maybe -- I can't -- I can't estimate.  I -- I -- I don't

17  know what value an estimate would be.

18  Q    You think it's more than $100,000?

19  A    Yes.

20  Q    Do you think it's more than 200,000?

21  A    I do.

22  Q    Do you think it's more than 500,000?

23  A    I don't think (audio interference).

24  Q    Do you think it's more than 300,000?

25  A    I -- that -- it's an incremental amount that is paid based

1  on the licensing arrangement.  So I mean, there's

2  some -- there's some periods of time when there was no

3  payments.

4  Q    And to be clear, these are amounts that Jex has paid

5  Differential that are in addition to any amounts that Jex has

6  paid to lease the trailers, correct?

7  A    Maybe -- maybe ask that question differently or -- or I'm

8  not sure I understand.

9  Q    Well, Jex was a lessee under a lease for the two trailers

10  with MRS, correct?

11  A    We are a lessee for two trailers with MRS, and one trailer

12  with Differential.

13  Q    Okay.  And so the -- one of the assets if -- whoever is

14  the successful bidder here, one of the assets to be acquired is

15  the lease along with the two leased trailers and some ancillary

16  equipment.  Is that your understanding?

17  A    Yes.  The MRS -- the MRS trailers, correct.

18  Q    And so under that lease that we're talking about, Jex, to

19  my understanding, has paid somewhere around $250,000 as lease

20  payments.  Is that correct?

21  A    Yeah.  We paid that to the estate.

22  Q    And so just to get back to my question to close the loop,

23  the more than 200,000 that Jex has paid Differential pursuant

24  to the technology commercialization agreement and technology

25  license agreement, that's in addition to the roughly 250 that's

1   been paid on the lease, correct?

2   A    Yeah.    The -- the leases are standalone.    You know,

3   there's different -- there's -- there's the PCA, there's the

4   PLA, which are commercial and licensing arrangements with

5   Differential Engineering.    Then there is a subsequent lease

6   with Differential Engineering for one -- one trailer.    And then

7   there was a additional lease that was at -- with MRS for the

8   two trailers and the ancillary equipment you referred to.

9   Q    And other than the -- you know what, let me ask you this:

10  Other than making payments to Differential, has Jex ever made

11  payments to Thom or Jetta Seal?

12  A    I think other than what is in my declaration, which is a

13  very limited amount of expenses, no.

14  Q    In Paragraph 11 of your declaration, you indicated that

15  Dr. Seal was listed as a technology officer on Jex's website,

16  but the title is honorary only.    What does that mean, "honorary

17  only"?

18  A    Well, to me, that means that he's the inventor.    So he's a

19  highly thought of industry professional, and so we wanted to

20  honor his efforts when we acquired the technology.

21  Q    So does Dr. Seal help Jex market the technology?

22  A    I -- I don't -- I don't know that he helps us market the

23  technology other than his name is on the -- his name is on the

24  technology.    So I guess that would have some form of marketing

25  component.

1   Q    Does Dr. Seal ever communicate with mine operators or mine

2   owners to try and assist Jex in getting mining work?

3   A    I can't speak to what -- what he has done that I'm unaware

4   of, but he has not spoken to any of our clients.

5   Q    Do you know if Mr. Seal has spoken to any potential

6   clients, mining operators or mine owners, about the prospect of

7   Jex getting work?

8   A    I -- I -- I don't -- I don't remember a specific time that

9   Dr. Seal has -- has spoken to a client since we have -- I

10  can't -- I can't think of a specific time that Dr. Seal has

11  sort of walked a client over to Jex, if maybe that's a good way

12  to refer that.  Yeah, I can't think of a specific time.

13  Q    Well, like, but can you think of generally Dr. Seal

14  communicating with mine owners or mine operators on behalf of

15  Jex to try and help Jex get work?

16  A    Again, I -- I can't speak of a -- I can't think of a -- I

17  can't think of a time that that has happened, even generally.

18  Q    And have you had any discussions with Thom Seal or Jette

19  Seal or Mark Shonnard about what would happen to the adversary

20  claims if Jex and Dr. Seal jointly are the successful backup

21  bidder?

22  A    I -- I have not spoken to any of the three about what

23  the -- you know, what the next steps would be for us, for us

24  meaning Jex.

25  Q    I think a moment ago in response to Mr. Lehners' question,

 1  unless I misunderstood, he asked you specifically about

 2  Mr. Shonnard.  And I think you said something to the effect of

 3  you're planning to move forward with work, and so you will

 4  respond accordingly.  Do you have an understanding?  Even if

 5  there's not been any agreement, do you have an understanding

 6  with Mr. Shonnard or Dr. Seal or Jette Seal about what will

 7  happen with the adversary claims if Jex and Seal are the

 8  successful bidders?

 9  A     To be clear -- to be clear, with our, you know, with

10  what's included as my deposition and we -- we have not came to

11  any arrangements or any discussions with Mr. Shonnard or

12  Mr. Seal or -- or -- I'm sorry, Dr. Seal or his wife.  There

13  will -- I -- I guess what I was suggesting to Mr. Lehners,

14  there will be a time in the future where Jex would like to just

15  move forward and move away from all this.  And so we will then,

16  I guess, come together at some point and work out how that all

17  shakes out.

18  Q    Do you have an understanding with Dr. Seal about what

19  exactly he would be acquiring with the $150,000 portion of the

20  bid if you are the successful bidder?

21  A     That -- that happened really at the last moment and

22  there's no discussions around that.  I -- so there's absolutely

23  no discussions that have been -- been, I guess, happening --

24  happening or happening about that.

25  Q     And there's been some discussion and there's also

1   reference in your declaration to possible business

2   opportunities in the future between Jex and Element.  Are there

3   any specific agreements or understandings about what type of

4   opportunities would exist if either Element is the successful

5   bidder or Jex and Dr. Seal are the successful bidders?

6            MS. OSTROW:  Objection.  Compound.  You can break

7   those up.

8            THE COURT:  Go ahead and rephase.

9   BY MR. OINES:

10  Q    Have you or to your knowledge anyone else at Jex have any

11  understandings or agreements with Element about the future

12  relationship between Element and Jex if either Element or Jex

13  are the successful bidder?

14  A    Still not sure I understand -- I'm still not sure I -- I'm

15  still not sure I'm clear what you're asking.  So --

16  Q    Well, in the declaration for example, it says,

17  "Mr. Richards and I discussed that if Element was the

18  successful bidder, Element would likely take the assets subject

19  to the lease, and that there may be future business

20  opportunities, including an investment in Jex by Element."  And

21  so I'm just asking if have there been any specific discussions

22  about any specific business opportunities between Jex and

23  Element?

24  A    There -- there have been discussions in the past

25  with -- with Element about making an equity investment into Jex

1   going all the way back to 2020.  They have -- they've

2   been -- they've been looking to make that investment into Jex

3   and could not -- they could not get past the issues of

4   that -- this particular case has presented.  Therefore, only

5   discussions that we have had have been about them making an

6   equity investment into Jex.  There has not been any discussions

7   with Element about sort of a relationship that would develop as

8   the basis of their purchase.

9   Q   All right.  Thank you, Mr. McMullin.

10           MR. OINES:  That's all I have.

11           THE COURT:  Thank you.  Any other counsel wish to ask

12  any questions on cross-examination of Mr. McMullin?

13           Hearing none, Ms. Ostrow, do you have any redirect?

14           MS. OSTROW:  I don't think so.  Thank you, Your

15  Honor.

16           THE COURT:  Thank you.  All right.  Thank you,

17  Mr. McMullin.  That concludes your testimony as well.

18           THE WITNESS:  Thank you, Your Honor.  Sorry about my

19  dog.

20           THE COURT:  It's no problem.

21      (Witness excused)

22           All right.  Then that leaves us the examination of

23  Dr. Seal.  Mr. Lehners are you still wanting to cross-examine

24  Dr. Seal?

25           MR. LEHNERS: Yes, Your Honor, briefly.

```
 1              THE COURT:  All right.  Ms. Fletcher, there you are,
 2    sorry.  Let's go ahead and ask -- I'll just clarify again,
 3    there's no -- I understand there's no objection to the
 4    admission of the amended declaration of Dr. Seal as direct
 5    testimony.  Is that correct?
 6              MR. LEHNERS:  No objection, Your Honor.
 7              THE COURT:  All right.  Thank you.  In hearing none,
 8    then the amended declaration is accepted as direct testimony.
 9    We'll go ahead and ask -- Dr. Seal, thank you for appearing on
10    the video.  Going to ask the in-court clerk to swear you in to
11    provide cross-examination then on your declaration.
12              Madam Clerk, if you would, administer the oath.
13              THE CLERK:  Mr. Seal, please raise your right hand.
14                  THOM SEAL, INTERESTED PARTY, SWORN
15              THE COURT:  Could you hear the clerk, Dr. Seal?  A
16    little faint.
17              MR. SEAL:  Not -- not really, but in courts, I
18    presume it's the same as we --
19              THE COURT:  Well, it's important that you actually
20    hear it though.  So, Madam Clerk, I'll ask you just to speak
21    up, please.
22              THE CLERK:  Yes, sir.
23                  THOMAS SEAL, INTERESTED PARTY, SWORN
24              THE COURT:  All right.  And thank you, sir.  You have
25    been sworn to give testimony in this matter.
```

```
 1              Ms. Fletcher, do you have any additional supplement

 2    to the declaration as the direct testimony of Dr. Seal.

 3              MS. FLETCHER:  No, Your Honor, we don't.

 4              THE COURT:  All right.  Mr. Lehners, why don't we go

 5    ahead and follow the previous convention and have you ask any

 6    questions if you have any for cross-examination of Dr. Seal.

 7              MR. LEHNERS:  Just briefly the standard ones.

 8                        CROSS-EXAMINATION

 9    BY MR. LEHNERS:

10    Q    Good morning, Dr. Seal.  How you today?

11    A    Pretty good.

12    Q    Thank you.  Under -- if Jex were the backup bidder on

13    this, does Jex owe you any money?

14    A    Personally, no.

15    Q    What?

16    A    Personally, no.

17    Q    Does it owe any of your companies, like Differential

18    Engineering?

19    A    Not to my knowledge.

20    Q    Okay.  Does Element owe you any money?

21    A    Not to my knowledge.

22    Q    Does Element owe your wife or any other company you have

23    an interest in any money?

24    A    No, sir.

25    Q    Okay.  You were present at the auction, correct?
```

1  A     Yes.

2  Q     Did you have any agreement with Geo-Logics or Differential

3  Engineering or Empire or Empire Global regarding bidding on

4  these assets that is dependent upon who is the successful

5  bidder?

6  A     No.

7  Q     Other than the value of the assets that were purchased by

8  Element, or possibly purchased by Jex if it is the backup

9  bidder, do you have anyone in any company that is going to

10 receive value, such as payment from a third party, an

11 employment agreement, or any other asset that was not sold

12 under the purchase agreement?

13 A     Not to my knowledge.

14 Q     Are you aware of any facts that would cause you to believe

15 that either Jex Technologies or Element took unfair advantage

16 of any other bidders?

17 A     Not to my knowledge.

18 Q     Are you aware of any facts that would indicate that there

19 was fraud, collusion, or an attempt to take unfair advantage of

20 any other bidders?

21 A     Not to my knowledge.

22 Q     Now, Dr. Seal, you testified or your declarations say you

23 provide information to Jex regarding the technical aspects of

24 the Hydro-Jex technology.  Is that correct?

25 A     Yes.

1    Q    In the event that Jex is the successful backup bidder, is

2    your compensation for those services going to become more

3    favorable?

4    A    Not to my knowledge.

5    Q    Same question regarding Element:  Will it become more

6    favorable if Element is the successful bidder?

7    A    Not to my knowledge.

8    Q    Okay.  Now, I have read your amended declaration.

9    Paragraph 22 says, "There is no agreement to what assets I

10   would receive in exchange for the $150,000 portion of the

11   backup bid."  Do you remember that paragraph?

12   A    I do remember it.  I'm looking at it, and it's correct.

13   Q    And you heard Mr. McMullin testify that there is no

14   specific agreement or any deal in place to repay you the

15   150,000 that you're willing to put up if Jex is the successful

16   backup bidder.  Is that correct?

17   A    (Indiscernible).

18   Q    And you stand by that.  That's true according to the best

19   of your knowledge.

20   A    Correct.

21   Q    Now, let's look at the flip side.  Is there any detriment

22   to you, your family, any company you have an interest in if Jex

23   is not the backup bidder?  In other words, if Element is the

24   successful bidder, are you aware of any possible detriment you

25   will suffer if Element instead of Jex is the backup bidder?

1  A    Not to my knowledge.

2  Q    And that will include any potential deals or treatment

3  under the adversary complaint and claims against you and your

4  family that the trustee has filed.

5  A    Not to my knowledge.

6          MR. LEHNERS:  I have no further questions.

7          THE COURT:  Thank you.  Mr. Oines?

8          MR. OINES:  Thank you.

9                      CROSS-EXAMINATION

10 BY MR. OINES:

11 Q    Dr. Seal, it's my understanding based on Mr. McMullin's

12 testimony a moment ago that at least to the best of his

13 recollection Jex has paid Differential over $200,000 pursuant

14 to the technology license agreement and technology

15 commercialization agreement.  Is that your understanding?  I'm

16 sorry.  Is that a yes?  We didn't hear you.  I think you're --

17         MR. OINES:  I'm not hearing him.  Is anyone else

18 hearing him?

19         MS. FLETCHER:  No.

20         THE COURT:  Did he have his own -- Dr. Seal, did you

21 hear the question?

22         THE WITNESS:  Yes.

23         MS. FLETCHER:  Oh, there he is.

24         THE COURT:  All right.  We didn't hear your response

25 to the question then.

1            THE WITNESS:  I answered yes.  It appears everything

2    is good on my end as far as the Zoom.  I apologize.  I'm

3    unaware of why.  Can you hear me okay now, sir?

4            THE COURT:  We can.  I'm just going to reset the

5    matter for the record so it doesn't get too confusing.

6    Mr. Oines, why don't you restart the question again from the

7    top and see if we can a better transmission.

8            MR. OINES:  Sure, thank you.

9    BY MR. OINES:

10   Q    Dr. Seal, my understanding there is a technology licensing

11   agreement and a technology commercialization agreement between

12   Differential and Jex.  And according to Mr. McMullin's

13   testimony a moment ago, it was his best estimate that Jex has

14   paid Differential over $200,000 pursuant to those agreements.

15   Is that consistent with your understanding?

16   A    Yes.  Could you hear that (indiscernible)?

17   Q    Yes.  Thank you.  Can you be any more specific?  Do you

18   know actually how much Jex had paid Differential under those

19   two agreements?

20   A    No, I don't recall.

21   Q    Okay.  And in your declaration, you had mentioned a

22   separate consulting agreement that apparently was contemplated,

23   but never actually finalized.  Is that correct?

24   A    Yes, that is correct.

25   Q    Has there been any discussion with Jex about whether that

1  consulting agreement would be finalized if Jex or if Element

2  were to be the successful bidder here?

3  A    Not to my knowledge.

4  Q    And do you -- I understand you're the chief technology

5  officer of Jex, correct?

6  A    Honorary, yes.

7  Q    Okay.  And what does that mean to you, honorary?

8  A    Well, my name is associated with the technology (audio

9  interference) publication on the technology.  And it's a

10 trademark on the technology.  And I'm the inventor of several

11 patents on the technology.

12 Q    Okay.  And do you ever -- or have you ever attempted to

13 help Jex market the Hydro-Jex technology by speaking with

14 prospective mine owners or operators?

15 A    I have answered questions regarding the technology.

16 Q    Questions from the mine owner or operator?

17 A    Mine owner, operator, various different engineers that I

18 contact in my professional career.

19 Q    And do you ever -- with those mine owners or operators,

20 have you discussed Differential's patents?

21 A    Yes.

22 Q    And what have you said about Differential's patents to the

23 mine owners and operators?

24 A    (Indiscernible) --

25        MR. ADAMS:  Your Honor, objection.

1          THE COURT:  Objection, Mr. Adams?

2          MR. ADAMS:  Your Honor, Differential is not a

3  co-bidder, and so to the extent that we're getting into a

4  discussion regarding Differential's patents with third parties,

5  I'm not sure it bares any relevance on the proceeding today.

6          THE COURT:  Mr. Oines, response?

7          MR. OINES:  Sure.  Well, first of all, Differential

8  definitely is Dr. Seal.  He's the only employee of the company

9  and is the owner and operator of the company.  But also, I

10 believe we're entitled to explore Dr. Seal's and Differential's

11 relationship with Jex because the -- you know, the purpose of

12 this other than just trying to understand the relationship and

13 what exactly Dr. Seal does as an honorary chief technology

14 officer.

15         THE COURT:  Let's sustain the objection.  I think

16 we've gotten that point.  He's indicated it's honorary.  He

17 answers questions about the technology to the extent that you

18 wish to understand that.  But as of further, you can be more

19 direct about that.  But this isn't a deposition.  So I mean,

20 we're here on a very limited question on good faith.  The Court

21 will sustain the objection.

22         MR. OINES:  Okay.  Thank you, Your Honor.

23 BY MR. OINES:

24 Q    Can I just ask:  Dr. Seal, other than your role of chief

25 technology officer, do you have any other duties and

 1  responsibilities as an individual with Jex?

 2  A    Not to my knowledge.

 3  Q    And have you been promised any additional roles in the

 4  event that Jex or Element are the successful bidders here?

 5  A    Not to my knowledge.

 6  Q    And have you had any discussion with anyone about -- other

 7  than your attorneys -- any discussion with anyone about what

 8  would happen with the adversary proceeding that's pending or

 9  any other litigation involving MRS in the event that Jex or

10  Element are the successful bidders here?

11  A    No.

12  Q    All right.  That's all I have.  Thank you.

13          THE COURT:  Thank you.  Any other counsel wish to

14  make any cross-examination of Dr. Seal?

15          All right, hearing none, any redirect, Ms. Fletcher?

16          MS. FLETCHER:  No, Your Honor.

17          THE COURT:  All right.  Thank you, Dr. Seal.  That

18  concludes your testimony.

19      (Witness excused)

20          THE COURT:  All right.  Are there any other witnesses

21  that any party wishes to bring forward for examination on the

22  question of good faith of either purchaser or the backup

23  purchaser?

24          All right.  In hearing no further evidence, the

25  evidence is closed.  Let's get to the main question then.  Is

```
 1   there an objection to the finding of good faith?

 2            MR. OINES:  Your Honor, could we have five minutes to

 3   confer?

 4            THE COURT:  Sure we could do it.  Let's take a five-

 5   minutes recess.  We'll go off record.  Please let the deputy

 6   clerk know when you're ready to go back on record.  Thank you.

 7            MR. OINES:  Thank you.

 8       (Recess taken at 12:10 p.m.)

 9       (Proceedings resumed at 12:19 p.m.)

10            THE CLERK:  Good afternoon.  This is Illuminada

11   speaking from the courtroom.  We are back on record.

12            THE COURT:  Thank you very much.  We're back in on

13   record in the Metal Recovery main case and the Burke v. Metal

14   Recovery adversary.

15            All right.  We've concluded the evidence on the issue

16   of good faith under 363(m).

17            Mr. Oines, where do we stand as to any objections?

18            MR. OINES:  Your Honor, if Mr. Burke and Mr. Lehners

19   are satisfied and if Your Honor is satisfied, then Geo-Logic

20   does not have an objection.

21            THE COURT:  Thank you.  Mr. Lehners?

22            MR. LEHNERS:  Your Honor, I have reviewed the case

23   law on this, and in order to have a good faith finding, there

24   has to be a good faith purchaser value consideration.  The

25   auction gives us value.  And what they're looking for is lack
```

1   of good faith that shows, like, fraud, collusion between the

2   purchaser and other bidders, or any attempt to gross -- take

3   grossly unfair advantage of the others.  That's how I've drawn

4   my questions.  I've gotten answers under oath as to all of

5   those.  There's no indication of that.  I believe that prima

6   facie showing for 363(m) of good faith has been made.  The

7   record -- the case I'm relying on is In re Suchy, S-U-C-H-Y,

8   750 F.2d 900 (9th Cir. 1985).

9           THE COURT:  All right.  Does any other party counsel

10  wish to weigh in on the ultimate question of good faith for

11  either the winning bid or the backup bid?

12          All right.  Hearing no objection, Mr. Oines, then, I

13  am taking you up on your statement to follow up, that since the

14  trustee is not objecting to any determination of good faith,

15  that there is no objection from GLA.

16          MR. OINES:  Correct.

17          THE COURT:  All right.  Then, based upon there's no

18  objection, the Court has listened to the witness statements as

19  previously reviewed prior to commencement of the hearing, the

20  declarations that had formed the direct testimony of the

21  witnesses.  While I understand the concern, indeed, that was

22  part of the reason why the Court was unwilling to just simply

23  accept or make a determination of good faith at the conclusion

24  of the auction.  There has been sufficient evidence

25  demonstrating that the inherent competitive nature of the

1    auction in light of the participation of the three bidders and

2    in multiple rounds of bidding established a fairly robust

3    auction process competitive that did not present any evidence

4    of collusion or tampering of the bidding and the auction

5    process itself.

6          The testimony that has been induced for the support

7    that while there are relationships between the ultimate bidder

8    and the backup bidder, including Dr. Seal, those relationships

9    do not rise to the point of casting any hesitancy, lull, or

10   doubt on the good faith basis of the bidding that took place.

11   And as Mr. Lehners has indicated, the requirements are a

12   purchaser, we have the purchaser; the value, we certainly have

13   value.  The question is good faith.

14         There being no opposition of good faith and the

15   declarations and testimony submitted indicating that it was a

16   fair auction, bidding was robust and not hampered by any fraud

17   or collusion, the Court will grant the 363 good faith

18   determinations to both the purchaser and the backup purchaser.

19   I will ask that that be included within the order approving the

20   sale.

21         Now, after the Court's ruling on that matter -- and

22   so let's then start where we kind of began with your concerns

23   about the actual language in the order approving sale, and

24   specifically you're referencing the five days after the order

25   becomes non-appealable and whether if it had to be that

 1  language or a final non-appealable order.

 2          MR. LEHNERS:  Well, Your Honor, the problem we found

 3  ourselves wrestling with is mentioned before.  I did draw up a

 4  draft order and circulate it.  But everybody pretty much wanted

 5  to wait until after this hearing, which is fine.  But at least

 6  they have an idea of where my thoughts are going.

 7          The order -- the offer says final non-appealable

 8  order.  The way I see it, a non-appealable order would be like

 9  a non-final order.  You can't appeal it.  The order's been

10  entered, but you can't appeal it.  Here we have something of a

11  different color.  You have an order that is entered.  You have

12  an order that is final as to all parties.  You have an order

13  that is appealable.  It's just that there is a deadline on when

14  to appeal it.

15          So payment would be due after the appeal period

16  expires, assuming there are no appeals, which would be 14 days,

17  plus the 5 days to pay.  That's how we got it to 19 days.

18          So what Mr. Burke suggested, and I agreed, is we put

19  in there that Empire Capital Management shall pay the purchase

20  price within five business days of the bankruptcy court

21  entering a final -- I'm sorry -- within five business days

22  of -- I think I have it -- and I'm trying to go through the

23  redlines, but the intent is the time period starts after the

24  Court enters a final order that has not been appealed, five

25  days after that.  So that would be the time period to start

1    running on Day 15 and end on Day 19.

2         THE COURT:  All right.  And that language has been

3    objected to?

4         MR. LEHNERS:  Well, it hasn't been objected to.

5    Mr. Bubala did basically put a redline in so it matches the

6    asset agreement term sheet, because that's what the term was.

7    Mr. Bubala said they put the term in that was there.  But it

8    kind of causes a bit of a disconnect between a non-appealable

9    order versus an order that can no longer be appealed.  It's

10   two -- it's apples and oranges, sir.

11        THE COURT:  I understand that.  The parties can

12   figure out their own language and we'll talk about that.  But

13   the clear intent, and what the Court will enforce is that is a

14   final order, if that term is used within the appellate

15   construct, that has become non-appealable.

16        MR. LEHNERS:  Become (indiscernible).

17        THE COURT:  And to be clear, the common definition

18   "that has become non-appealable" is the expiration of the

19   14-day period under the Rule 8000 series.  And so there's

20   always wiggle, there's always creative arguments.  But that is

21   the concept.  The 19 days is clearly an indication of that

22   concept, and that is what the Court is going to enforce,

23   however that is ultimately written up as the meaning of the

24   parties.  I don't know if that helps, Mr. Lehners, or not.

25        MR. LEHNERS:  No, it does.  It does.  Look, every

1    change Mr. Bubala made, I appreciated it.

2         THE COURT:  Sure.

3         MR. LEHNERS:  I'm going to make the changes.  I'm

4    grateful to him for making the changes.  It was just that I saw

5    kind of a disconnect, and there is a very good point that he

6    made, and that's why I wanted to bring it to the Court.

7         THE COURT:  Sure.  And I agree that the language can

8    get -- you can trip over your own feet with the language

9    regarded non-appealable final order for this.  But it's why

10   it's helpful that we went over the 19 days.  That clarifies

11   whatever meaning the parties have in my mind so --

12        MS. TIRRE:  Your Honor, may I be heard on this

13   question?  This is Amy Tirre.

14        THE COURT:  Go ahead.

15        MS. TIRRE: Your Honor, I just want to clarify for the

16   record, I believe Mr. Lehners stated Empire Capital Management,

17   LLC.  But that's inaccurate, because they stated in the notice

18   of appearance and I believe at the hearing itself, my client,

19   the principal, is Element Global, Inc., and that's the party

20   that will be purchasing the asset.  That should be identified

21   as the buyer in the sale order.

22        And I have not yet weighed in on the sale order.  I

23   was waiting for today's hearing, and I will be providing my

24   comments to Mr. Lehners.  But I just wanted to make the record

25   clear as to who the purchaser is.

```
 1              And with respect to this 19-day question, based upon
 2   the exchange at the hearing on the 5th of April, I have stated
 3   to my client, Element Global, Inc., that it would have 19 days
 4   from the date of the entry of the sale order to make that
 5   $2.5 million payment to the trustee.  And I'm informed that I
 6   will be getting the funds to my client trust account, and then
 7   I would be able to, you know, wire them to the trustee, you
 8   know, on the day -- you know, the appropriate date.
 9              THE COURT:  Yeah.
10              MR. LEHNERS:  And Ms. Tirre, that's Empire -- or
11   Element Global, Inc., not Empire Capital Management, true?
12              MS. TIRRE:  That's correct.  Element Global, Inc. is
13   the principal and the buyer.  Empire Capital Management, LLC,
14   was only the agent through which I originally, you know, was
15   working.  But obviously Element became the successful bidder.
16   It's the principal.
17              THE COURT:  I appreciate you clarifying that.
18   Because that was -- I had noted that as a question.  My
19   understanding is that Element Global, Inc. was the entity
20   approved as the final successful purchaser.
21              MS. TIRRE:  Thank you.
22              THE COURT:  All right.
23              MR. LEHNERS:  Element Global, Inc.  They are the
24   buyer.  Okay.  I fixed that.
25              THE COURT:  All right.  Mr. Lehners, did you have any
```

1  other concerns that you wanted to raise regarding the mechanics

2  of the order approving the sale?

3           MR. LEHNERS:  Well, Judge, like I said, I sent that

4  out last Tuesday.  I'm going to ask Mr. Bubala to send me a

5  clean version of his redline, and then I can add that one part,

6  and just send it out to everybody else so they can comment, and

7  we should get an order uploaded for you as fast as we can.

8           THE COURT:  Yeah.  Yeah, and fortunately, I'm not

9  heading anywhere for a while, so I will be here and looking for

10  the proposed order.

11          MR. LEHNERS:  Thank you, Your Honor.

12          MS. TIRRE:  Thank you.

13          THE COURT:  Anything else any other party wishes to

14  bring up in either the main case or the adversary related to

15  the sale and the determination of good faith under 363(m)?

16          All right.  Then, thank you very much.  I appreciate

17  the efforts.  I'm glad we were able to get this concluded.

18  I'll look forward to receiving the proposed order.  But that

19  will conclude the hearing for today and we'll be adjourned.

20          MR. LEHNERS:  Thank you, Your Honor.

21          MS. TIRRE:  Thank you.

22          MS. OSTROW:  Thank you, Your Honor.

23          MS. FLETCHER:  Thank you, Your Honor.

24          MR. OINES:  Thank you, Your Honor.

25       (Proceedings concluded at 12:31 p.m.)

1                          **C E R T I F I C A T I O N**

2

3            I, Alicia Jarrett, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8

9

10 _____

11 ALICIA JARRETT, AAERT NO. 428     DATE: May 18, 2023

12 ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25